# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATURAL RESOURCES DEFENSE COUNCIL,
INC.
40 West 20th Street, 11th Floor
New York, New York 10011;

*Plaintiff,*

v.

DOUG BURGUM, Secretary of the Interior, in his
official capacities as CHAIR and MEMBER of the
ENDANGERED SPECIES COMMITTEE
1849 C Street NW
Washington, D.C. 20240;

BROOKE ROLLINS, Secretary of Agriculture, in
her official capacity as a MEMBER of the
ENDANGERED SPECIES COMMITTEE
1400 Independence Ave SW
Washington, D.C. 20250;

DANIEL DRISCOLL, Secretary of the Army, in
his official capacity as a MEMBER of the
ENDANGERED SPECIES COMMITTEE
101 Army Pentagon
Washington, D.C. 20310;

PIERRE YARED, Acting Chair of the Council of
Economic Advisors, in his official capacity as a
MEMBER of the ENDANGERED SPECIES
COMMITTEE
1600 Pennsylvania Ave NW
Washington, D.C. 20500;

LEE ZELDIN, Administrator of the
Environmental Protection Agency, in his official
capacity as a MEMBER of the ENDANGERED
SPECIES COMMITTEE
1200 Pennsylvania Ave NW
Washington, D.C. 20460;

NEIL JACOBS, Administrator of the National

**Case No. 1:26-cv-1116**

Oceanic and Atmospheric Administration, in his
official capacity as a MEMBER of the
ENDANGERED SPECIES COMMITTEE
1401 Constitution Ave NW
Washington, D.C. 20230;

PETE HEGSETH, in his official capacity as
SECRETARY OF DEFENSE
1000 Defense Pentagon
Washington, D.C. 20301;

                                   *Defendants.*

## COMPLAINT FOR VACATUR AND DECLARATORY RELIEF

1.      Plaintiff Natural Resources Defense Council (Plaintiff) challenges the Secretary of Defense[1] Pete Hegseth's finding that overriding statutory protections for endangered species in the Gulf of Mexico is necessary for national security reasons. Plaintiff further challenges the March 31, 2026 exemption from Section 7(a)(2) of the Endangered Species Act (ESA), granted by Secretary of the Interior Doug Burgum, Secretary of Agriculture Brooke Rollins, Secretary of the Army Daniel Driscoll, Acting Chairman of the Council of Economic Advisors Pierre Yared, Environmental Protection Agency (EPA) Administrator Lee Zeldin, and Administrator of National Oceanic and Atmospheric Administration (NOAA) Neil Jacobs, all of whom collectively purported to exercise the authority of the Endangered Species Committee (Committee). Secretary Hegseth's necessity determination—the ostensible predicate for the Committee's exemption under Section 7(j) of the ESA—is, *inter alia,* unsupported by reasoned decision-making and in excess of his statutory authority, in violation of the Administrative Procedure Act (APA). Yet based on that determination, and in violation of the APA, the Committee granted a sweeping exemption, equally unmoored from its authority under the ESA.

---

[1] *See* Exec. Order No. 14,347, 90 Fed. Reg. 43,893 (Sept 5, 2025) ("The Secretary of Defense is authorized the use of this additional secondary title—the Secretary of War[.]").

2.      The Gulf of America (also known as the Gulf of Mexico) and the Gulf Coast are among the most productive and biodiverse ecosystems in the United States, providing a home to thousands of species, including marine mammals like manatees and the endemic Rice's whales, commercially important fish, globally unique sea turtles, and myriad seabirds and shorebirds. Oil and gas operations have already inflicted grave harm on Gulf ecosystems. Seismic surveying, vessel traffic, air and water pollution, and oil spills threaten these species and degrade their habitats.

3.      Six members of the Committee convened on March 31, 2026, at the Department of Interior in Washington, D.C.; they considered Secretary Hegseth's national security determination as the basis for granting a broad exemption from the ESA for oil and gas activities in the Gulf.

4.      During the March 31, 2026, meeting, which lasted only seventeen minutes, Secretary Hegseth announced his determination that the ESA, its regulations, and litigation arising thereunder constitute "a substantial threat to national security," and thus justify an exemption to secure domestic energy production. Members of the Committee swiftly acceded, voting to grant the exemption on such grounds.

5.      Secretary Hegseth's determination that the exemption was necessary for national security, which informed the Committee's exemption under subsection 7(j) of the ESA, is arbitrary and capricious and contrary to law in violation of the APA. It is devoid of evidentiary justification and lacks any rational connection between the facts and the ultimate determination that national security necessitates overthrowing critical ESA protections in the Gulf of Mexico.

6.      Defendants' failure to comply with federal law and the resulting harm to the marine environment in the Gulf of Mexico harms the interests of Plaintiff and its members.

Plaintiff asks this Court to declare that Defendants' exemption violates the APA, and to vacate the exemption.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this claim arises under federal law, as Plaintiff brings claims under the Administrative Procedure Act (APA), 5 U.S.C. §§ 704, 706.

8.      This Court has authority to issue declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

9.      This Court has authority to vacate the exemption pursuant to the APA, 5 U.S.C. § 706.

10.      Venue is proper in this district because this action is brought against officers of the United States acting in their official capacity and under color of legal authority; and a substantial part of the events giving rise to the claim occurred in the District of Columbia as members of the Committee convened and granted the exemption in the District of Columbia.[2]

## PARTIES

### *The Plaintiff*

11.      Plaintiff Natural Resources Defense Council (NRDC) is a nationwide not-for-profit, tax-exempt membership organization incorporated under New York law. NRDC's mission is to safeguard the earth—its people, its plants and animals, and the natural systems on which all life depends. NRDC has hundreds of thousands of members nationwide, including over 37,000 members in the Gulf. NRDC is working to solve the most pressing environmental issues we face today, including environmental injustice, air pollution, and climate change. NRDC's advocacy to

---

[2] *See* 28 U.S.C. § 1391(e)(1).

protect ocean and coastal ecosystems and wildlife, including the Gulf of Mexico and its marine life, from the harms of oil production dates back decades. NRDC members have economic, recreational, aesthetic, and other interests in areas and animals threatened by the exemption.

12. NRDC brings this action on behalf of its members, who regularly use, enjoy, and benefit from the marine and coastal environments of the Gulf of Mexico and plan to continue doing so in the future.

13. NRDC's members regularly enjoy and benefit from the presence of healthy marine and avian life within those environments for recreational, aesthetic, commercial, scientific, and environmental purposes, including whale-watching, bird-watching, scientific study, boat-touring, underwater diving, fishing, photography, sculpture, and beachgoing.

14. For example, one NRDC member, Stephen Gittings, was the inaugural superintendent of Flower Garden Banks National Marine Sanctuary in the northwestern Gulf; he has spent his career working in conservation science. He engages regularly in Gulf research and exploration, including research on endangered coral species, and he enjoys experiencing its diversity of ocean wildlife. Another NRDC member, Dale Hensley, actively participates in sea turtle monitoring and rescue along the Gulf coast and dives in offshore waters, where she observes some of the Gulf's most magnificent species.

15. The exemption threatens Plaintiff's members' interests by removing crucial protections for the Gulf's threatened and endangered species and inviting the degradation of its marine, coastal, and estuarine ecosystems. Plaintiff's members' injuries will be redressed by the relief requested, as that relief would undo the causes of those injuries. Plaintiff has no other adequate remedy at law.

*The Defendants*

16.     Defendant Doug Burgum is sued in his official capacity as Chair and Member of the Committee, which Defendant Burgum serves as via his position as Secretary of the Interior and pursuant to 16 U.S.C. §§ 1536(e)(3)(E), (5)(B).

17.     Defendant Brooke Rollins is sued in her official capacity as Member of the Committee, on which she serves via her position as Secretary of Agriculture and pursuant to 16 U.S.C. § 1536(e)(3)(A).

18.     Defendant Daniel Driscoll is sued in his official capacity as Member of the Committee, on which he serves via his position as Secretary of the Army and pursuant to 16 U.S.C. § 1536(e)(3)(B).

19.     Defendant Pierre Yared is sued in his official capacity as Member of the Committee, on which he serves via his position as Acting Chair of the Council of Economic Advisers and pursuant to 16 U.S.C. § 1536(e)(3)(C).

20.     Defendant Lee Zeldin is sued in his official capacity as Member of the Committee, on which he serves via his position as Administrator of the Environmental Protection Agency and pursuant to 16 U.S.C. § 1536(e)(3)(D).

21.     Defendant Neil Jacobs is sued in his official capacity as Member of the Committee, on which he serves via his position as Administrator of the National Oceanic and Atmospheric Administration and pursuant to 16 U.S.C. § 1536(e)(3)(F).

22.     Defendant Pete Hegseth is sued in his official capacity as Secretary of Defense. Section 7 of the ESA, 16 U.S.C. § 1536, requires the Committee to "grant an exemption for any

agency action if the Secretary of Defense finds that such exemption is necessary for reasons of national security."[3]

## LEGAL BACKGROUND

23.    The APA confers a right of judicial review on any person who is adversely affected by agency action.[4]

24.    Under the APA, a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"[5]

*Section 7 Consultation*

25.    Congress enacted the ESA because human activities had caused many species to go extinct, while others "have been so depleted in numbers that they are in danger of or threatened with extinction."[6] These species are "of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people."[7]

26.    Section 7 of the ESA generally prohibits federal agencies from authorizing, funding, or carrying out any action "likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species[.]"[8] To "jeopardize" is to engage in an action that could reduce appreciably the likelihood of survival or recovery.[9]

27.    Section 7 of the ESA establishes a consultation process with the U.S. Fish and

---

[3] *Id.* § 1536(j).
[4] 5 U.S.C. § 702.
[5] *Id.* § 706(2)(A).
[6] 16 U.S.C. § 1531(a)(2).
[7] *Id.* § 1531(a)(2), (3).
[8] *Id.* § 1536(a)(2).
[9] *See* 50 C.F.R. § 402.02

Wildlife Service (FWS) and/or the National Marine Fisheries Service (NMFS) (collectively, the Services), to ensure agency actions avoid jeopardizing endangered or threatened species or adversely affecting their habitat.

28.    This consultation requirement—the "heart" of the ESA[10]—provides a crucial check against reckless development.

29.    Where a proposed action is likely to adversely affect listed species or their habitat, triggering formal consultation,[11] the Secretary of the Interior prepares a biological opinion to determine whether the action is likely to destroy or adversely modify critical habitat.[12]

30.    Where the Secretary finds that the proposed action violates section 7(a)—that is, jeopardizes a listed species or adversely affects their habitat—they must "suggest those reasonable and prudent alternatives which [they] believe[] would not violate subsection (a)(2) and can be taken by the Federal agency or applicant in implementing the agency action."[13]

31.    If the relevant Service concludes that the proposed action will not violate section 7(a)(2), including through implementation of reasonable and prudent alternatives, but may result in a "take" of the species—that is, may harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect the species[14]—the agency must produce an incidental take statement (ITS) that specifies the impact of the action and identifies "reasonable and prudent measures" that will minimize the impact of that take, among other requirements.[15]

32.    Where a proposed action is likely to violate section 7(a)(2), the agency has two

---

[10] *See Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir. 2011).
[11] 50 C.F.R. § 402.14(a), (b).
[12] 16 U.S.C. § 1536(b)(3)(A)–(B).
[13] *Id.* § 1536(b)(3)(A).
[14] *Id.* § 1532(19).
[15] 50 C.F.R. § 402.14(i)(1).

main options: it must implement any reasonable and prudent alternatives or terminate the action altogether.[16]

*The "God Squad"*

33.    But Congress also recognized that there may be rare cases where a third option is warranted: an exemption. In 1978, Congress amended the ESA to authorize a committee of government officials—the Endangered Species Committee—to issue an exemption from the substantive requirements of Section 7(a)(2) following a series of adjudicatory hearings bound by rigorous procedural rules.

34.    Because the Committee effectively has the power to consign an endangered species to extinction,[17] the Committee is commonly known as the "God Squad."[18] "It was created to address extremely rare situations in which proposed federal action conflicts with the protection of an endangered or threatened species and no workable alternatives appear to exist."[19]

35.    Statutorily, the Committee's authority can only commence when an agency, state, or permit or license applicant submits an application to the relevant Service for an exemption within 90 days following completion of consultation in which the Service determines "that the agency action would violate [section 7(a)(2)]."[20]

36.    The Secretary must then promptly notify the Governors of any affected states and publish the application in the Federal Register.[21]

37.    The Secretary next determines whether the application meets certain threshold

---

[16] *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 265 (2021) (citing 16 U.S.C. §§ 1536(b)(4), 1538(a)).
[17] H.R. REP. No. 95-1625, at 13 (1978), as reprinted in 1978 U.S.C.C.A.N. 9453, 9482 (1978).
[18] *Portland Audubon Soc. v. Endangered Species Comm.*, 984 F.2d 1534, 1536 (9th Cir. 1993).
[19] Exhibit A.
[20] 16 U.S.C. § 1536(g)(1)–(2)(A).
[21] *Id.* § 1536(g)(2)(B).

requirements, including that the federal agency and the exemption applicant have made a "good faith" and "reasonable and responsible effort to develop and fairly consider modifications or reasonable and prudent alternatives to the proposed agency action which would not violate [section 7(a)(2)]."[22] A denial of the application at this stage represents final agency action for APA purposes.[23]

38.    Should the Secretary determine that these preliminary criteria are met, they "shall, in consultation with the Members of the Committee, hold a hearing on the application for exemption in accordance with" the adjudicatory provisions of the APA: 5 U.S.C. §§ 554–556.[24]

39.    The Secretary must then submit to the Committee a report discussing the factors relevant to the Committee's consideration, including the availability of reasonable and prudent alternatives and reasonable mitigation measures.[25]

40.    All of the meetings and records during this process—from receiving the application to transmitting the report—must be open to the public.[26] The Secretary's consideration of the application during this process must also be consistent with the adjudicatory provisions of the APA at 5 U.S.C. §§ 554–556.[27]

41.    Following this report, the Committee "make[s] a final determination whether or not to grant an exemption within 30 days after receiving the report of the [Service] pursuant to [section 7(g)(5)]." The Committee must hold a formal adjudication and consider (1) the report by the Service, (2) the record of the hearing held by the Service, and (3) other testimony or evidence

---

[22] Id. § 1536(g)(3).
[23] Id.
[24] Id. § 1536(g)(4).
[25] Id. § 1536(g)(5).
[26] Id. § 1536(g)(8).
[27] Id. § 1536(g)(6).

that it receives.[28] In order to grant the requested exemption, the Committee must make several factual findings, including that there are not reasonable and prudent alternatives to the proposed action and that the benefits of the proposed action outweigh alternative courses of action consistent with conserving the species or critical habitat.[29] The Committee must also "establish[] . . . reasonable mitigation and enhancement measures."[30]

42.    Section 7 of the ESA also authorizes three individuals—the Secretary of State, the Secretary of Defense, and the President—to make determinations that force the Committee's hand, requiring it to either grant or deny an exemption application.[31]

43.    Relevant to this case, under subsection (j), the Committee must grant an exemption for a proposed agency action "if the Secretary of Defense finds that such exemption is necessary for reasons of national security."[32] Subsection (j) has never before been invoked.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Rich Ecosystem of the Gulf*

44.    The Gulf is an ecologically rich region that supports some of the most biodiverse ecosystems in the United States. It is home to thousands of marine species, many of which are endangered or threatened. These species include five of the world's seven sea turtle species; the endangered Rice's whale and sperm whale; the Florida manatee (a subspecies of the endangered West Indian manatee); and the endangered Gulf sturgeon. Hundreds of shore and coastal bird species reside in or migrate through the Gulf of Mexico, including the endangered Black-capped Petrel and whooping crane.

---

[28] *Id.* § 1536(h)(1)(A).
[29] *Id.* § 1536(h)(1)(A)(i)–(iv).
[30] *Id.* § 1536(h)(1)(B).
[31] *Id.* § 1536(i)–(j), (p).
[32] *Id.* § 1536(j).

45.     The Gulf is the exclusive home of the critically endangered Rice's whale, of which fewer than 100 individuals remain on Earth.[33] A unique species in the same family as the great blue and fin whales, Rice's whales live year-round in a strip of habitat along the Gulf's continental shelf break. NMFS estimated that the Deepwater Horizon oil spill caused a 22% decline in the whale's population.[34] Now, the loss of even a single breeding female could drive the species into extinction.[35]

46.     Sperm whales are endangered throughout their range, including in the Gulf of Mexico. NMFS analyses found that the Deepwater Horizon oil spill likely exposed an estimated 16% of the Gulf's sperm whale population to oil and killed 6%, and it took at least 11 years for the population to recover to pre-Deepwater Horizon levels.[36]

47.     The Gulf coast and the Gulf itself also host five of the world's seven species of sea turtles; all are listed as threatened or endangered. Sea turtles are vulnerable to industry vessel strikes and marine debris, as well as to oil spills, both at their coastal nesting sites and at sea. Sea turtles were devastated by the 2010 Deepwater Horizon Oil Spill,[37] and their future remains uncertain.[38]

48.     The Gulf coast further provides critical habitat and nesting sites for several

---

[33] Melissa S. Soldevilla, Amanda J. Debich, Lance P. Garrison, John A. Hildebrand & Sean M. Wiggins, *Rice's Whale in the Northwestern Gulf of Mexico: Call Variation and Occurrence Beyond the Known Core Habitat*, 48 Endangered Species Rsch. 155, 155 (2022).

[34] NOAA Fisheries, *Rice's Whale: In the Spotlight*, https://www.fisheries.noaa.gov/species/rices-whale/spotlight (last visited April 1, 2026).

[35] NOAA Fisheries, *Endangered Species Act: Rice's Whale Critical Habitat Report* 4 (July 2023), https://www.fisheries.noaa.gov/s3/2023-07/Critical-Habitat-Report-508-Final.pdf.

[36] NMFS, Biological and Conference Opinion 260, 262, 512–13 (May 20, 2025).

[37] Deepwater Horizon Natural Resource Damage Assessment Trustees, *Deepwater Horizon Oil Spill: Final Programmatic Damage Assessment and Restoration Plan and Final Programmatic Environmental Impact Statement*, 4-517 to 4-518 (2016).

[38] *See id.* at 4-577.

endangered and threatened species of birds, such as the endangered whooping crane, a migratory species reliant on coastal wetlands, bays, freshwater and estuarine habitats.[39] Their numbers have dwindled from 10,000 in precolonial times, to only around 451 individuals presently.[40] An oil spill could be catastrophic for their population: the FWS has found that "the only self-sustaining wild population remains vulnerable to destruction through a hurricane event or contaminant spill, due to oil and gas activity and transportation of chemical and petroleum products in critical habitat areas and through other areas utilized by wintering whooping cranes."[41]

49.    The Black-capped Petrel is endangered throughout its range, including in the Gulf of Mexico. The FWS has found that oil spills, artificial lighting from oil and gas infrastructure, collisions with oil and gas vessels, and entanglement and collision with oil and gas equipment could all have harmful and deadly effects on Black-capped Petrels in the Gulf.[42] Moreover, as most petrels that forage in the Gulf OCS region are adults, "any increase in losses from threats on the foraging grounds would disproportionally affect the adult segment of the population."[43] "[T]ime for recovery for the adult age class is inherently longer" for Black-capped Petrels, so such losses would have substantial implications at the species level.[44]

*Environmental Harms from Oil and Gas Development*

50.    Existing oil and gas exploration, development, and production is widespread across the Gulf of Mexico Outer Continental Shelf (OCS) region. As of November 2025, there were over 2,000 active oil and gas leases across more than 11 million acres in the Gulf.

---

[39] FWS, Biological Opinion, 4, 90 (April 20, 2018).
[40] *Id.* at 89–90.
[41] *Id.* at 93.
[42] FWS, *Species Assessment Report for the Black-capped Petrel (Pterodroma hasitata)*, 28–31 (May 2023), https://iris.fws.gov/APPS/ServCat/DownloadFile/242904.
[43] *Id.* at 29.
[44] *Id.* at 29–30.

51.    Nearly every step of the oil and gas production process, including leasing, exploration, development, and production, causes widespread harm to the Gulf's species and habitats. Seismic airgun surveys to locate oil and gas deposits produce damaging levels of noise; wells, pipelines, and other structures destroy seafloor habitats; transportation vessels strike animals; and oil spills pollute massive swaths of the ocean surface. Oil and gas activities also cause air pollution, exacerbate climate change, impair commercial and recreational fishing, damage archaeological resources, and generally degrade the environment.

52.    The harms from oil and gas activities can be catastrophic. On April 20, 2010, the Deepwater Horizon oil rig exploded and sank, killing eleven people and creating the worst environmental disaster in the history of the Gulf.[45]

53.    The Deepwater Horizon spill was also the largest oil spill in United States history. The spill lasted 87 days, during which time the seabed well remained uncapped and allowed 134 million gallons of oil, as well as unknown amounts of natural gas, to flow into the Gulf.[46] The resulting oil slick spread across over 43,000 square miles of ocean surface—approximately the size of Virginia—and contaminated over 1,300 miles of shoreline.[47] To help break down the oil, responders released nearly 2 million gallons of toxic dispersants into Gulf waters.[48]

54.    The spill killed or seriously harmed billions, if not trillions, of animals. Over 100,000 of those damaged or killed belonged to threatened or endangered species. The environmental damage to the Gulf continues to this day and will persist for years to come.

---

[45] *See generally In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 21 F. Supp. 3d 657 (E.D. La. 2014).

[46] Deepwater Horizon Natural Resource Damage Assessment Trustees, *Deepwater Horizon Oil Spill: Final Programmatic Damage Assessment and Restoration Plan and Final Programmatic Environmental Impact Statement*, 1-2 to 1-3 (2016).

[47] *Id.* at 1-14

[48] *Id.* at 2-2.

55.    Since the Deepwater Horizon disaster, oil spills continue to happen regularly. In 2023, the Main Pass Oil Gathering pipeline degraded and released 26,000 barrels of oil into Gulf waters.[49] Meanwhile, the Taylor Energy well platform spill has been leaking since Hurricane Ivan damaged it in 2004. It has released over 3 million barrels so far and continues leaking to this day.[50]

56.    Recent years have seen oil and gas companies moving their operations into deeper waters and high-heat and high-pressure geologic formations. Drilling in these areas is even more likely to result in well blowouts and catastrophic spills.

*The Services Have Imposed Modest ESA Restrictions on Oil and Gas Activity in the Gulf*

57.    In light of the grave threats that oil and gas development pose to the threatened and endangered species of the Gulf, the Services have imposed modest restrictions on federally authorized oil and gas activities.

58.    In 2018, FWS issued an incidental take statement, or ITS, accompanying its biological opinion (BiOp) for the Gulf federal oil and gas program's effects on ESA-listed species. The ITS did not estimate that the proposed action would incidentally take any listed species under its jurisdiction. FWS therefore issued a set of discretionary "Conservation Recommendations" to BOEM and BSEE.[51]

59.    In 2024, BOEM and BSEE asked to reinitiate consultation with FWS and submitted new information that had arisen since 2025, including the listing of a seabird, the Black-capped petrel; proposed critical habitat designations for the Rufa red knot and green sea

---

[49] National Transportation Safety Board, *Third Coast Infrastructure LLC Crude Oil Release*, https://www.ntsb.gov/investigations/Pages/PLD24FR001.aspx (accessed April 1, 2026).
[50] Brad Plumer, *Louisiana Company to Pay $43 Million for Longest-Running Oil Spill in U.S. History*, N.Y. TIMES (Dec. 22, 2021), https://www.nytimes.com/2021/12/22/climate/taylor-energy-oil-spill-gulf.html.
[51] FWS, Biological Opinion 121–23 (Apr. 20, 2018).

turtle; and updated information on climate change, sea-level rise, artificial lighting, and oil spill risk.[52] FWS ultimately determined that no further ESA consultation was warranted.[53]

60.     NMFS, for its part, issued its most recent BiOp in May 2025. The 2025 BiOp was prepared after a federal court found fundamental errors in NMFS's analysis and ordered the agency to go back to the drawing board.[54] NMFS' 2025 BiOp found the federal oil and gas program in the Gulf "likely to jeopardize the continued existence of the Rice's whale."[55] NMFS further determined that "the proposed action is not likely to jeopardize the continued existence of sperm whale, Northwest Atlantic loggerhead sea turtle, Kemp's ridley sea turtle, North Atlantic DPS green sea turtle, leatherback sea turtle, hawksbill sea turtle, or Gulf sturgeon."[56] NMFS concluded "that the proposed action is not likely to destroy or adversely modify loggerhead or Gulf sturgeon designated critical habitat, or proposed critical habitat for green sea turtle North Atlantic DPS or Rice's whale."[57]

61.     Because the proposed federal oil and gas program was likely to jeopardize the continued existence of the Rice's whale, NMFS proposed a reasonable and prudent alternative that would allow the project to proceed.[58] Namely, NMFS determined that only vessel traffic was likely to jeopardize the continued existence of the Rice's whale, so it focused its reasonable and prudent alternative on reducing the risk of vessel strikes.[59]

62.     Among other things, the reasonable and prudent alternative required BOEM and

---

[52] FWS, Letter from Brigette D. Firmin to Dr. Agatha-Marie Kaller and Tommy Broussard, Reinitiation of Endangered Species Act Consultation (March 28, 2025), 1–5.
[53] *Id.* at 10.
[54] NMFS, Biological and Conference Opinion 573 (May 20, 2025).
[55] *Id.*
[56] *Id.* at 574.
[57] *Id.*
[58] *Id.*
[59] *Id.* at 574–75.

BSEE to use technology, including a real-time reporting platform, and protocol, for ships to take appropriate action in response to Rice's whale sightings.[60] BOEM and BSEE would also establish an expert working group on developing and implementing Rice's whale vessel strike avoidance technology, complete an advanced assessment of Rice's whale vessel strike risks, develop a Rice's whale vessel strike avoidance technology plan, secure peer review for the assessment and plan, implement the plan, and monitor Rice's whales to ensure no likelihood of jeopardy during the implementation of the RPA.[61]

63.    Plaintiff, along with other organizations, challenged the 2025 BiOp in the U.S. District Court for the District of Maryland.[62] That case is pending; the Sierra Club plaintiffs have asked the Court for post-merits proceedings to seek "[t]ailored . . . protections through injunctive relief" to protect imperiled species while NMFS works to correct the 2025 BiOp.[63]

*The United States' Oil and Gas Production Outpaces Consumption*

64.    In 2025, the United States produced more oil and gas than any country in the world and more than it has produced at any time in its history.[64]

65.    Domestic oil and gas production has outpaced consumption since at least 2020, when the United States became a net oil exporter.[65]

66.    The national rate of gasoline consumption has fallen since 2018 and is projected

---

[60] *Id.* at 577.

[61] *Id.* at 577–80.

[62] *See* Am. Compl., *Sierra Club v. NMFS*, No. 8:25-cv-1627 (May 20, 2025).

[63] *See* Pl.'s Opp'n & Reply at 52, *Sierra Club v. NMFS*, No. 8:25-cv-1627 (Feb. 27, 2026).

[64] Press Release, Dep't of Interior, Interior Highlights Record U.S. Energy Production Under President Trump's American Energy Dominance Agenda (Apr. 1, 2026), https://perma.cc/NV84-QKCG.

[65] Louis Jacobson, *Fact Check: Does the US produce more oil than it consumes?*, WRAL NEWS (Mar. 23, 2026), https://perma.cc/XG7T-RBWT.

to continue to decline in the future.[66]

67.    Indeed, the Administration appears to appreciate these realities. On March 13, 2026, the same day Secretary Hegseth sent the Committee Chair his finding under section 7(j),[67] Secretary Hegseth addressed concerns of rising global energy prices, claiming, "We have been dealing with it; don't need to worry about it."[68]

68.    Ten days later, the Committee Chair, Secretary Burgum, announced oil production in Venezuela is on the rise. During a White House Cabinet meeting, Secretary Burgum reported that Venezuela's "oil production is climbing towards 50 percent increase just in the three months we've been here. That flows to American refineries on the Gulf Coast, lowering the price of gas in America[.]"[69] Secretary Burgum also suggested that Venezuelans may build a "statue of President Trump" as "liberator" of the country, and President Trump later asked, "When are they gonna do the statue? To hell with the other thing."[70]

69.    On March 31, 2026, a couple hours before the Committee granted the exemption, President Trump posted on his Truth Social account: "All of those countries that can't get jet fuel because of the Strait of Hormuz . . . I have a suggestion for you: Number 1, buy from the U.S.,

---

[66] See U.S. Energy Information Administration, *How much gasoline does the United States consume?* (Mar. 29, 2024) https://perma.cc/43QD-WYYH; Lucas Davis, *Is U.S. Gasoline Consumption Declining?,* ENERGY INSTITUTE AT HAAS (May 12, 2025), https://perma.cc/8N23-A4R8.

[67] *See* Letter from Secretary of Defense Pete Hegseth to Secretary of Interior Doug Burgum, (Mar. 13, 2026) ("Secretary Letter") (attached as Exhibit E).

[68] *See* Colin Meyn, *Pentagon Plays Down Strait of Hormuz Quagmire: Don't Need to Worry About It,* THE HILL (Mar. 13, 2026), https://thehill.com/policy/defense/5782620-strait-hormuz-shipping-crisis/.

[69] Forbes Breaking News, *Doug Burgum to Trump: 'I Literally Think They're Going to Put a Statute To' Trump in Venezuela,* YOUTUBE (Mar. 26, 2026), https://www.youtube.com/watch?v=aSIoqn1k-SM&t=173s.

[70] *Id.*

18

*we have plenty*, and Number 2, build up some delayed courage, go to the Strait, and just TAKE IT . . . President DJT."[71]

70.    Meanwhile, renewable energy sources are helping to meet U.S. energy generation needs and are the fastest-growing sources of electricity.[72] Wind and solar energy provide cost-effective sources of electricity capable of out-competing fossil fuel power generation.[73]

71.    Renewable energy in the United States promises vast amounts of power. In 2025, the entire United States electricity sector produced 4,260 billion kilowatt-hours of energy.[74] The National Renewable Energy Lab has estimated that the United States could potentially add nearly 4,250 GW of generation capacity via offshore wind power and a further 7,700 GW from onshore renewables—nearly tripling the nation's current generation capacity.[75]

72.    Despite this enormous potential, the Trump administration has taken unprecedented steps to smother American renewable energy. These actions have persisted even after commencement of the American "excursion" into Iran and into the present, despite the Administration's purported energy-based national security concerns.

---

[71] Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 31, 2026, 7:11 AM), https://perma.cc/B4H7-T3E9 (emphasis added).

[72] Climate Central, *A Decade of Growth for U.S. Solar and Wind* (Mar. 12, 2025), https://www.climatecentral.org/climate-matters/solar-and-wind-2025 (compiling U.S. Energy Information Administration data).

[73] *See* Lazard, *Levelized Cost of Energy* 8 (June 2025), https://www.lazard.com/media/5tlbhyla/lazards-lcoeplus-june-2025-_vf.pdf.

[74] U.S. Energy Information Administration, *Solar power generation drives electricity generation growth over the next two years* (Jan. 16, 2026), https://www.eia.gov/todayinenergy/detail.php?id=67005.

[75] *See* National Renewable Energy Lab, *Offshore Wind Energy Technical Potential for the Contiguous United States* 16 (August 15, 2025), https://docs.nlr.gov/docs/fy22osti/83650.pdf; DOE, New Interagency Study Finds Further Expansion of Renewable Energy Production on Federal Lands Could Power Millions More American Homes by 2035 (January 14, 2025), https://www.energy.gov/articles/new-interagency-study-finds-further-expansion-renewable-energy-production-federal-lands.

73.    The Trump Administration began suppressing domestic renewable energy production immediately upon taking office. On January 20, 2025, the very first day of his second term, President Trump issued a memorandum withdrawing all areas on the Outer Continental Shelf from offshore wind leasing and ordering a review of the government's leasing and permitting practices for wind projects.[76] That same day, he rescinded multiple prior executive orders supporting domestic renewable energy production, including EO 14008 (Tackling the Climate Crisis at Home and Abroad), EO 14057 (Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability), and EO 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022).[77]

74.    Federal agencies have proceeded to hamper domestic renewable energy development in a variety of ways, including by attempting to revoke or buy back leases and imposing lengthy permitting and review processes on wind and solar projects.[78] The Administration has also undercut programs which would have reduced reliance on foreign oil by lowering domestic fossil fuel demands, for instance, targeting the federal electric vehicle mandate, electric vehicle charging station program, and renewable energy tax credits.[79]

---

[76] Presidential Memorandum, Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects, 90 Fed. Reg. 8,363 (January 20, 2025).

[77] Exec. Order No. 14,154, 90 Fed. Reg. 8,353, 8,354–55 (Jan. 20, 2025).

[78] *See, e.g.*, Dep't of Interior Order No. 3,418 (Feb. 3, 2025), https://www.doi.gov/document-library/secretary-order/so-3418-unleashing-american-energy; Dep't of Interior, *Departmental Review Procedures for Decisions, Actions, Consultations, and Other Undertakings Related to Wind and Solar Energy Facilities* (July 15, 2025), https://www.doi.gov/media/document/departmental-review-procedures-decisions-actions-consultations-and-other#; Dep't of Interior Order No. 3,438, Managing Federal Energy Resources and Protecting the Environment (Aug. 1, 2025), https://perma.cc/XQ5V-JZAR; Press Release, Dep't of Interior, Interior Department Moves to Cancel Reckless Biden-era Approval of Lava Ridge Wind Project (Aug. 6, 2025), https://perma.cc/3K9C-66U2.

[79] *See* Exec. Order No. 14,154, 90 Fed. Reg. 8,353 (Jan. 20, 2025); Exec. Order. No. 14,135, 90 Fed. Reg. 30,821 (July 7, 2025).

75.    The baseless and vague national security concerns the Administration now invokes to justify its exemption are similar to those it has cited in efforts to suppress domestic renewable energy. For instance, the Department of the Interior on December 22, 2025, announced an immediate pause of "the leases for all large-scale offshore wind projects under construction in the United States due to national security risks identified by the Department of [Defense] in recently completed classified reports."[80]

76.    The Administration's use of the same empty rationale to both attack renewable energy and support oil and gas underscores that its "national security" explanation is little more than a pretext to advance its political agenda.

77.    Moreover, these attacks on domestic renewable energy have continued even as the Iran war impacts global oil markets. As of March 30, 2026, at least 30 onshore wind farm projects, totaling 7.5 GW of generation capacity, were stalled due to Pentagon review delays.[81]

78.    The Administration's continued suppression of domestic renewable energy projects with enormous energy generating potential, including after the commencement of hostilities with Iran and the resulting impacts on global oil markets, further undermines its assertion that Gulf oil production is essential for national security reasons. If true, those national security concerns would necessitate an urgent expansion of *all* domestic energy production, including the renewable energy that the Administration continues to suffocate.

---

[80] Press Release, Dep't of Interior, The Trump Administration Protects U.S. National Security by Pausing Offshore Wind Leases (Dec. 22, 2025), https://perma.cc/9PYG-HETN.
[81] Amy Harder, *Exclusive: Wind projects pile up as Pentagon reviews stall*, Axios (Mar. 30, 2026), https://perma.cc/7W7J-YZY5.

79.    Moreover, increased renewable energy production would reduce civilian demand for domestic fossil fuels. If national security required the military's increased access to domestic fossil fuels, the Administration would promote, not suppress, American renewable energy.

*The March 31, 2026, Exemption*

80.    On information and belief, on January 26, 2026, the Department of the Interior sent a communication to the Department of Defense concerning the pending ESA litigation and seeking a national security exemption.[82]

81.    On March 13, 2026, Secretary Hegseth notified Secretary Burgum that, in light of "ongoing . . . ESA litigation that threatens to halt oil and gas production in the Gulf of [Mexico]," he found it "necessary for reasons of national security to exempt [these activities] from the ESA's requirements[.]"[83]

82.    Three days later, on March 16, 2026, Secretary Burgum, as Chair of the Endangered Species Committee, published a notice in the Federal Register announcing his intention to convene the Committee on March 31, 2026.[84]

83.    On March 18, 2026, Plaintiff sent Secretary Burgum a letter explaining why the Committee had no lawful basis to convene.

84.    On March 30, 2026, Plaintiff sent a second letter to Secretary Burgum explaining why the Committee could not legally grant an exemption. Plaintiff included an indexed production of documents relevant to the Committee's decision making.

85.    On March 31, 2026, six members of the Committee—Secretaries Burgum, Rollins, Driscoll, Acting Chairman Yared, and Administrators Zeldin and Jacobs—joined by

---

[82] Exhibit E, Secretary Letter (Mar. 13, 2026).
[83] *Id.*
[84] 91 Fed. Reg. 12,672.

Secretary Hegseth, gathered at the Department of the Interior in Washington, D.C. No "individual from [any] affected State" was present.[85]  At approximately 9:49 a.m., the Committee Chair, Secretary Burgum, called the meeting to order and invited Secretary Hegseth to share the national security finding distributed beforehand to the Committee members.[86]

86.     Secretary Hegseth opined that, as a matter of "urgent national security," a steady, affordable supply of domestic energy is required, but ongoing district court litigation to enforce the ESA created uncertainty for industry's development in the Gulf. In his view, the "recent hostile action by the Iranian terror regime" highlighted that domestic energy development is essential; without it, he asserted, the military is weakened to the benefit of the country's adversaries. Secretary Hegseth proclaimed, "we cannot allow our own rules to weaken our standing and strengthen those who wish to harm us." He requested the Committee grant the exemption based on his national security determination.

87.     Each Committee member delivered brief remarks assenting to Secretary Hegseth's request. Secretary Rollins characterized energy security as national security and expressed appreciation for President Trump prioritizing energy dominance. Administrators Zeldin and Jacobs and Acting Director Yared reiterated the Committee has no discretion upon receipt of Secretary Hegseth's findings, with which they each agreed anyway. Administrator Zeldin further opined that ongoing ESA litigation threatens energy independence, and that it is critical for national security to remove such impediments.

88.     During the meeting, no reference was made to the Committee's consideration of any report from Secretary Burgum, or of the availability of "reasonable and prudent alternatives"

---

[85] *See* 16 U.S.C. § 1536(e)(3).
[86] Dep't of Interior, Endangered Species Act Meeting, YOUTUBE (Mar. 31, 2026) https://www.youtube.com/live/iC3xyp4GxRE?si=GtkuiAVS5yFmTBua&t=2085.

to a proposed agency action, or of "nature and extent of the benefits" of the proposed agency action versus "alternative courses of action consistent with conserving" impacted species or their habitat, or of the competing public interests, or of any "reasonable mitigation and enhancement measures[,]" among other things.[87]

89.    At the conclusion of the meeting, Secretary Burgum requested a voice vote of the Committee members present; each voted affirmatively to grant the exemption and thanked Secretary Hegseth for his leadership. The meeting then concluded at approximately 10:06 a.m.

90.    The assembled Committee made no pretense of attempting to hew to any of the procedural requirements outlined in section 7(h) of the ESA. The Committee did not conduct a formal adjudicative hearing. The entirety of the Committee members' commentary revolved around Secretary Hegseth's statement.

91.    Later on March 31, 2026, several documents were posted on the Interior Department's website at https://perma.cc/MGV6-UGNF (attached hereto as Exhibits B through E). This was the first time any of these four documents had been publicly disclosed.

92.    The first document is titled "Endangered Species Committee Order" (attached hereto as Exhibit B). The order, signed by the six participating Committee members on March 31, 2026, "grants an exemption for Gulf of America Oil and Gas Activities" and provides that "[t]his decision and order are effective immediately."

93.    The second document is titled "Gulf of America Energy Security" (attached hereto as Exhibit C). The document appears to be a six-page memorandum from the Department of Energy to Secretary Hegseth, dated March 10, 2026.

94.    The third document is titled "Market impact analysis of the disruption to federal

---

[87] *See* 16 U.S.C. § 1536(g)(5).

offshore Gulf of America crude oil and natural gas production" (attached hereto as Exhibit D). The document appears to be an undated six-page memorandum from the U.S. Energy Information Administration to Secretary Hegseth.

95.    The fourth document is titled "Correspondence from Secretary of [Defense] - Act Exemption" (attached hereto as Exhibit E). The document appears to be a two-page letter and thirteen-page memorandum attachment from Secretary Hegseth to Secretary Burgum, dated March 13, 2026, setting forth Secretary Hegseth's national security determination.

96.    Defendants have not made public any other supporting documents or correspondence. Nor have they responded to NRDC's or others' public comments.

## CLAIM FOR RELIEF

### COUNT ONE:
### Arbitrary, Capricious, and Unlawful Agency Action (5 U.S.C. § 706(2)(A), (C))

97.    Plaintiff incorporates by reference Paragraphs 1–96.

98.    Agency action is arbitrary and capricious if the agency fails to give adequate reasons for its decisions, fails to examine the relevant data, or offers no rational connection between the facts found and the choice made. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

99.    Secretary Hegseth's national security determination, and the Committee's implementation thereof, are arbitrary and capricious, not in accordance with law, and in excess of statutory authority.

100.    Notwithstanding the glaring deficiencies in his finding, the Committee unreservedly relied on them under subsection 7(j) of the ESA upon granting the exemption.

101.    For all these reasons, the Committee's exemption is arbitrary and capricious, and contrary to law.

102.    There is no adequate alternative to APA review.

**RELIEF REQUESTED**

WHEREFORE Plaintiff requests that the Court:

A.    Declare that Secretary Hegseth's national security determination and the Committee's implementation thereof (collectively, "the exemption") is arbitrary and capricious and contrary to law;

B.    Hold unlawful and vacate the exemption;

C.    Grant such other relief that the Court deems just and proper.

Dated: April 1, 2026                           Respectfully submitted,


/s/ Sitara Witanachchi
Sitara Witanachchi (D.C. Bar No. 1023007)
Jared Solomon (D.C. Bar No. 90033165)
Erik Van de Stouwe (New York Bar No. 5692512), *pro hac vice motion forthcoming*
Natural Resources Defense Council, Inc.
1152 15th St. NW, Suite 300
Washington, D.C. 20005
switanachchi@nrdc.org
jsolomon@nrdc.org
evandestouwe@nrdc.org
Tel: (202) 289-6868

Kate Desormeau (D.D.C. Bar No. CA00024)
Natural Resources Defense Council, Inc.
111 Sutter St., 21st Floor
San Francisco, CA 94104
kdesormeau@nrdc.org
Tel: (415) 875-6100

*Attorneys for Plaintiff Natural Resources Defense Council*

26