**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATURAL RESOURCES DEFENSE COUNCIL,
INC.
40 West 20th Street, 11th Floor
New York, New York 10011;

                    *Plaintiff*,

                 v.

DOUG BURGUM, Secretary of the Interior, in his
official capacities as CHAIR and MEMBER of the
ENDANGERED SPECIES COMMITTEE
1849 C Street NW
Washington, D.C. 20240;

BROOKE ROLLINS, Secretary of Agriculture, in
her official capacity as a MEMBER of the
ENDANGERED SPECIES COMMITTEE
1400 Independence Ave SW
Washington, D.C. 20250;

DANIEL DRISCOLL, Secretary of the Army, in
his official capacity as a MEMBER of the
ENDANGERED SPECIES COMMITTEE
101 Army Pentagon
Washington, D.C. 20310;

PIERRE YARED, Acting Chair of the Council
of Economic Advisors, in his official capacity
as a MEMBER of the
ENDANGERED SPECIES COMMITTEE
1600 Pennsylvania Ave NW
Washington, D.C. 20500;

LEE ZELDIN, Administrator of the
Environmental Protection Agency, in his official
capacity as a MEMBER
of the ENDANGERED SPECIES COMMITTEE
1200 Pennsylvania Ave NW

**Case No. 1:26-cv-01116 (RC)**

Washington, D.C. 20460;

NEIL JACOBS, Administrator of the National
Oceanic and Atmospheric Administration, in his
official capacity as a MEMBER of the
ENDANGERED SPECIES COMMITTEE
1401 Constitution Ave NW
Washington, D.C. 20230; and

PETE HEGSETH, in his official capacity as
SECRETARY OF DEFENSE
1000 Defense Pentagon
Washington, D.C. 20301;

*Defendants*.

**FIRST AMENDED COMPLAINT FOR VACATUR AND DECLARATORY RELIEF**

1.      Plaintiff Natural Resources Defense Council, Inc. (Plaintiff) challenges the

Secretary of Defense[1] Pete Hegseth's finding that overriding statutory protections for

endangered species in the Gulf of America (also known as the Gulf of Mexico) is necessary for

national security reasons. Plaintiff further challenges the March 31, 2026, exemption from

Section 7(a)(2) of the Endangered Species Act (ESA), granted by Secretary of the Interior Doug

Burgum, Secretary of Agriculture Brooke Rollins, Secretary of the Army Daniel Driscoll, Acting

Chairman of the Council of Economic Advisors Pierre Yared, Environmental Protection Agency

(EPA) Administrator Lee Zeldin, and Administrator of the National Oceanic and Atmospheric

Administration (NOAA) Neil Jacobs, all of whom collectively purported to exercise the

authority of the Endangered Species Committee (Committee). Secretary Hegseth's national

security determination—the ostensible predicate for the Committee's exemption under Section

---

[1] *See* Exec. Order No. 14,347, 90 Fed. Reg. 43,893 (Sept 5, 2025) ("The Secretary of Defense is
authorized the use of this additional secondary title—the Secretary of War[.]").

2

7(j) of the ESA—is, *inter alia,* unsupported by reasoned decision-making and in excess of his statutory authority, in violation of the Administrative Procedure Act (APA). Yet based on that determination, and in violation of the APA, the Committee granted a sweeping exemption, equally unmoored from its authority under the ESA.

2.      The Gulf of Mexico and the Gulf Coast are among the most productive and biodiverse ecosystems in the United States, providing a home to thousands of species, including marine mammals like manatees and the endemic Rice's whales, commercially important fish, globally unique sea turtles, and myriad seabirds and shorebirds. Oil and gas operations have already inflicted grave harm on Gulf ecosystems. Seismic surveying, vessel traffic, air and water pollution, and oil spills threaten these species and degrade their habitats.

3.      Six members of the Committee convened on March 31, 2026, at the Department of the Interior in Washington, D.C. They cited Secretary Hegseth's national security determination as the basis for granting a broad exemption from the ESA for oil and gas activities in the Gulf.

4.      During the March 31, 2026, meeting, which lasted only seventeen minutes, Secretary Hegseth announced his determination that the ESA, its regulations, and litigation arising thereunder constitute "a substantial threat to national security," and thus justify an exemption to secure domestic energy production. Members of the Committee swiftly acceded, voting to grant the exemption on such grounds.

5.      Secretary Hegseth's determination that the exemption was necessary for national security, which informed the Committee's exemption under subsection 7(j) of the ESA, is arbitrary and capricious and contrary to law in violation of the APA. It is devoid of evidentiary

3

justification and lacks any rational connection between the facts and the ultimate determination that national security necessitates overthrowing critical ESA protections in the Gulf of Mexico.

6.    Defendants' failure to comply with federal law and the resulting harm to the marine environment in the Gulf of Mexico harms the interests of Plaintiff and its members. Plaintiff asks this Court to declare that Defendants' exemption violates the APA, and to vacate the Exemption.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this claim arises under federal law, as Plaintiff brings claims under the Administrative Procedure Act (APA), 5 U.S.C. §§ 704, 706.

8.    If the Committee had conducted a formal adjudication under ESA section 7(g) and rendered a decision on the record pursuant to ESA section 7(h),[2] that decision would be subject to judicial review under ESA section 7(n),[3] in the court of appeals. Here, however, Defendants acted under ESA section 7(j),[4] and granted an exemption based on Secretary Hegseth's national security determination, without complying with the requirements of sections 7(g) and 7(h).[5] Because Defendants' action was not a "decision of the Endangered Species Committee under []section [7](h),"[6] it is not subject to the judicial review provisions of section 7(n), and review in this Court under the APA is proper.

---

[2] 16 U.S.C. §§ 1536(g)-(h).
[3] *Id.* at § 1536(n).
[4] 16 U.S.C. § 1536(j)
[5] *Id.*
[6] 16 U.S.C. § 1536(n).

9. This Court has authority to issue declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

10. This Court has authority to vacate the Exemption pursuant to the APA, 5 U.S.C. § 706.

11. Venue is proper in this district because this action is brought against officers of the United States acting in their official capacity and under color of legal authority; and a substantial part of the events giving rise to the claim occurred in the District of Columbia as Defendants convened and voted to grant the exemption in the District of Columbia.[7]

**PARTIES**

*The Plaintiff*

12. Plaintiff Natural Resources Defense Council (NRDC) is a nationwide not-for-profit, tax-exempt membership organization incorporated under New York law. NRDC's mission is to safeguard the earth—its people, its plants and animals, and the natural systems on which all life depends. NRDC has hundreds of thousands of members nationwide, including over 37,000 members in the Gulf region. NRDC is working to solve the most pressing environmental issues we face today, including environmental injustice, air pollution, and climate change. NRDC's advocacy to protect ocean and coastal ecosystems and wildlife, including the Gulf of Mexico and its marine life, from the harms of oil production dates back decades. NRDC members have economic, recreational, aesthetic, and other interests in areas and animals threatened by the exemption.

---

[7] *See* 28 U.S.C. § 1391(e)(1).

13.    NRDC brings this action on behalf of its members, who regularly use, enjoy, and benefit from the marine and coastal environments of the Gulf of Mexico and plan to continue doing so in the future.

14.    NRDC's members regularly enjoy and benefit from the presence of healthy marine and avian life within those environments for recreational, aesthetic, commercial, scientific, and environmental purposes, including whale-watching, bird-watching, scientific study, boat-touring, underwater diving, fishing, photography, sculpture, and beachgoing.

15.    For example, one NRDC member, Stephen Gittings, was the inaugural superintendent of Flower Garden Banks National Marine Sanctuary in the northwestern Gulf. He has spent his career working in conservation science. He engages regularly in Gulf research and exploration, including research on endangered coral species, and he enjoys experiencing its diversity of ocean wildlife. Another NRDC member, Dale Hensley, actively participates in sea turtle monitoring and rescue along the Gulf coast and dives in offshore waters, where she observes some of the Gulf's most magnificent species.

16.    The Exemption threatens Plaintiff's members' interests by removing crucial protections for the Gulf's threatened and endangered species and inviting the degradation of its marine, coastal, and estuarine ecosystems. Plaintiff's members' injuries will be redressed by the relief requested, as that relief would undo the causes of those injuries. Plaintiff has no other adequate remedy at law.

*The Defendants*

17.    Defendant Doug Burgum is sued in his official capacity as Chair and Member of the Committee, on which Defendant Burgum serves via his position as Secretary of the Interior and pursuant to 16 U.S.C. §§ 1536(e)(3)(E), (5)(B).

6

18.     Defendant Brooke Rollins is sued in her official capacity as Member of the Committee, on which she serves via her position as Secretary of Agriculture and pursuant to 16 U.S.C. § 1536(e)(3)(A).

19.     Defendant Daniel Driscoll is sued in his official capacity as Member of the Committee, on which he serves via his position as Secretary of the Army and pursuant to 16 U.S.C. § 1536(e)(3)(B).

20.     Defendant Pierre Yared is sued in his official capacity as Member of the Committee, on which he serves via his position as Acting Chair of the Council of Economic Advisers and pursuant to 16 U.S.C. § 1536(e)(3)(C).

21.     Defendant Lee Zeldin is sued in his official capacity as Member of the Committee, on which he serves via his position as Administrator of the Environmental Protection Agency and pursuant to 16 U.S.C. § 1536(e)(3)(D).

22.     Defendant Neil Jacobs is sued in his official capacity as Member of the Committee, on which he serves via his position as Administrator of the National Oceanic and Atmospheric Administration and pursuant to 16 U.S.C. § 1536(e)(3)(F).

23.     Defendant Pete Hegseth is sued in his official capacity as Secretary of Defense. Section 7 of the ESA, 16 U.S.C. § 1536, requires the Committee to "grant an exemption for any agency action if the Secretary of Defense finds that such exemption is necessary for reasons of national security."[8]

---

[8] 16 U.S.C. § 1536(j).

7

**LEGAL BACKGROUND**

*The Administrative Procedure Act (APA)*

24.    The APA confers a right of judicial review on any person who is adversely affected by agency action.[9]

25.    Under the APA, a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"[10] A reviewing court shall also "hold unlawful and set aside" any agency action promulgated "without observance of procedure required by law."[11]

*The National Environmental Policy Act*

26.    Congress enacted the National Environmental Policy Act (NEPA) "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation."[12] "NEPA requires the federal government to identify and assess in advance the likely environmental impact of its proposed actions, including its authorization or permitting of private actions."[13] NEPA therefore "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant

---

[9] 5 U.S.C. § 702.
[10] *Id.* § 706(2)(A).
[11] *Id.* § 706(2)(D).
[12] 42 U.S.C. § 4321.
[13] *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 36 (D.C. Cir. 2015).

information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."[14]

27.    Under NEPA, all agencies must prepare a "detailed statement" evaluating all "major federal actions significantly affecting the quality of the human environment."[15] This statement, known as an Environmental Impact Statement (EIS), must analyze "reasonably foreseeable environmental effects" of the proposed action, "any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented,"[16] and a "reasonable range of alternatives" that are technically and economically feasible, including a no action alternative.[17]

*The Endangered Species Act (ESA) and Section 7 Consultation*

28.    Congress enacted the ESA because human activities had caused many species to go extinct, while others "have been so depleted in numbers that they are in danger of or threatened with extinction."[18] These species are "of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people."[19]

29.    Section 7 of the ESA generally prohibits federal agencies from authorizing, funding, or carrying out any action "likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of

---

[14] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).
[15] 42 U.S.C. § 4332(2)(C).
[20] *Id.*
[17] *Id.*
[18] 16 U.S.C. § 1531(a)(2).
[19] *Id.* § 1531(a)(2), (3).

habitat of such species[.]"[20] To "jeopardize" is to engage in an action that could reduce appreciably the likelihood of survival or recovery.[21]

30.     Section 7 of the ESA establishes a consultation process with the U.S. Fish and Wildlife Service (FWS) and/or the National Marine Fisheries Service (NMFS) (collectively, the Services), to ensure agency actions avoid jeopardizing endangered or threatened species or adversely affecting their habitat.

31.     This consultation requirement—the "heart" of the ESA[22]—provides a crucial check against reckless development.

32.     Where a proposed action is likely to adversely affect listed species or their habitat, triggering formal consultation,[23] the relevant Service prepares a biological opinion to determine, *inter alia*, whether the action is likely to destroy or adversely modify critical habitat.[24]

33.     Where the Service finds that the proposed action violates section 7(a)—that is, jeopardizes a listed species or adversely affects its habitat—it must "suggest those reasonable and prudent alternatives which [it] believes would not violate subsection (a)(2) and can be taken by the Federal agency or applicant in implementing the agency action."[25]

34.     If the relevant Service concludes that the proposed action will not violate section 7(a)(2), including through implementation of reasonable and prudent alternatives, but may result in a "take" of the species—that is, may harass, harm, pursue, hunt, shoot, wound, kill,

---

[20] *Id.* § 1536(a)(2).
[21] *See* 50 C.F.R. § 402.02
[22] *See Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir. 2011).
[23] 50 C.F.R. § 402.14(a), (b).
[24] 16 U.S.C. § 1536(b)(3)(A)–(B); 50 C.F.R. § 402.14(h)(iv).
[25] 16 U.S.C. § 1536(b)(3)(A).

trap, capture, or collect the species[26]—the agency must produce an incidental take statement (ITS) that specifies the impact of the action and identifies "reasonable and prudent measures" that will minimize the impact of that take, among other requirements.[27]

35.    Where a proposed action would otherwise violate section 7(a)(2), the agency must typically implement any reasonable and prudent alternatives identified by the relevant Service to carry out the action.[28]

### The "God Squad"

36.    Congress also recognized that there may be rare cases where no reasonable and prudent alternatives are available. For those cases, Congress provided an option for the agency to carry out a proposed action despite otherwise violating section 7(a)(2): an exemption. In 1978, Congress amended the ESA to authorize a committee of government officials—the Endangered Species Committee—to issue an exemption from the substantive requirements of Section 7(a)(2) following a series of adjudicatory hearings bound by rigorous procedural rules.[29]

37.    Because the Committee effectively has the power to consign an endangered species to extinction,[30] the Committee is commonly known as the "God Squad."[31] "It was created to address extremely rare situations in which proposed federal action conflicts with the protection of an endangered or threatened species and no workable alternatives appear to exist."[32]

---

[26] *Id.* § 1532(19).
[27] 50 C.F.R. § 402.14(i)(1).
[28] *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 265 (2021) (citing 16 U.S.C. §§ 1536(b)(4), 1538(a)).
[29] *See* 16 U.S.C. § 1536(e), (g)-(p).
[30] H.R. Rep. No. 95-1625, at 13 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 9453, 9482 (1978).
[31] *Portland Audubon Soc. v. Endangered Species Comm.*, 984 F.2d 1534, 1536 (9th Cir. 1993).
[32] U.S. Dep't of the Interior, Endangered Species Committee, http://www.doi.gov/endangered-species-committee (last visited May 22, 2026) (screenshot attached as Exhibit A).

38.     The Committee can exercise its exemption authority only after an agency, state, or permit or license applicant submits an application to the relevant Service for an exemption within 90 days following completion of consultation in which the Service determines "that the agency action would violate [section 7(a)(2)]."[33]

39.     The Secretary must then promptly notify the Governors of any affected states and publish the application in the Federal Register.[34]

40.     The Secretary next determines whether the application meets certain threshold requirements, including that the federal agency and the exemption applicant have made a "good faith" and "reasonable and responsible effort to develop and fairly consider modifications or reasonable and prudent alternatives to the proposed agency action which would not violate [section 7(a)(2)]."[35] A denial of the application at this stage represents final agency action for APA purposes.[36]

41.     Should the Secretary determine that these preliminary criteria are met, he "shall, in consultation with the Members of the Committee, hold a hearing on the application for exemption in accordance with" the adjudicatory provisions of the APA: 5 U.S.C. §§ 554–556.[37] The Secretary "shall designate an Administrative Law Judge to conduct the hearing[,]"[38] for which "[m]otions and objections may be filed . . . , rebuttal evidence may be submitted, and

---

[33] 16 U.S.C. § 1536(g)(1)–(2)(A).
[34] *Id.* § 1536(g)(2)(B).
[35] *Id.* § 1536(g)(3).
[36] *Id.*
[37] *Id.* § 1536(g)(4).
[38] 50 C.F.R. § 452.05(a)(2).

cross-examination may be conducted, as required for a full and true disclosure of the facts, by parties, witnesses under subpoena, and their respective counsel."[39]

42.    The Secretary must then submit to the Committee a report discussing the factors relevant to the Committee's consideration, including the availability of reasonable and prudent alternatives and reasonable mitigation measures.[40]

43.    Following this report, the Committee "make[s] a final determination whether or not to grant an exemption within 30 days after receiving the report of the Secretary pursuant to [section 7(g)(5)]." The Committee must hold a formal adjudication and consider (1) the report by the Secretary, (2) the record of the hearing held by the Secretary, and (3) other testimony or evidence that it receives.[41] In order to grant the requested exemption, the Committee must make several factual findings, including that there are not reasonable and prudent alternatives to the proposed action and that the benefits of the proposed action outweigh alternative courses of action consistent with conserving the species or critical habitat.[42] The Committee must also "establish[] . . . reasonable mitigation and enhancement measures."[43]

44.    All the meetings and records during this process—from receiving the application to transmitting the report—must be open to the public.[44] The consideration of the application and the conduct of any hearing must also be consistent with the adjudicatory provisions of the APA at 5 U.S.C. §§ 554–556.[45]

---

[39] *Id.* § 452.05(d)(2).
[40] 16 U.S.C. § 1536(g)(5).
[41] *Id.* § 1536(h)(1)(A).
[42] *Id.* § 1536(h)(1)(A)(i)–(iv).
[43] *Id.* § 1536(h)(1)(B).
[44] *Id.* § 1536(g)(8).
[45] *Id.* § 1536(g)(6).

45.     The Committee's exemption decision "shall not be a major Federal action for purposes of the National Environmental Policy Act of 1969" so long as "an environmental impact statement which discusses the impacts upon endangered species or threatened species or their critical habitats" has already been prepared.[46]

46.     Section 7 of the ESA also authorizes three individuals—the Secretary of State, the Secretary of Defense, and the President—to make determinations that force the Committee's hand, requiring it to either grant or deny an exemption application.[47]

47.     Relevant to this case, under subsection (j), the Committee must grant an exemption for a proposed agency action "if the Secretary of Defense finds that such exemption is necessary for reasons of national security."[48]

48.     Prior to March 2026, the Endangered Species Committee convened only three times.[49]

49.     The Endangered Species Committee granted just two exemptions prior to March 2026—the first in 1979 for the Missouri Basin Power Project's construction of the Grayrocks Dam and Reservoir, and the second in 1992 for a series of timber sales by the Bureau of Land Management (BLM) in Oregon.

50.     In 1979, the Committee conditioned its exemption for the Grayrocks Dam and Reservoir on the implementation of mitigation and enhancement measures, including, among

---

[46] *Id.* § 1536(k).
[47] *Id.* § 1536(i)–(j), (p).
[48] *Id.* § 1536(j).
[49] Pervaze A. Sheikh, Cong. Rsch. Serv., R40787, *Endangered Species Act (ESA): The Exemption Process* 1 (2017) ("In more than four decades since the ESA was enacted, there have been only six instances in which an exemption was sought, and only two in which it was granted.").

other things, a requirement that the Missouri Basin Power Project create a trust fund devoted to protecting the critical habitat of the impacted species, the whooping crane.[50]

51.    In 1992, the Committee's exemption stemmed from BLM's application for an exemption for 44 timber sales impacting the critical habitat of the endangered northern spotted owl.[51] The Committee of seven included a representative from Oregon consistent with 16 U.S.C. § 1536(e)(3)(G). "The Committee applied the exemption criteria" from section 7(h), "one by one in such a manner that failure to meet any one criterion eliminated the sale from further consideration for exemption."[52] The Committee eliminated 31 proposed sales with reasonable and prudent alternatives or devoid of regional significance, for example.[53] Following an evidentiary hearing before an Administrative Law Judge from January 8 to 30, 1992, and public hearings in February 1992,[54] the Committee ultimately granted the exemption for the remaining 13 sales while requiring BLM to implement and fund certain mitigation measures.[55]

52.    Before March 2026, no Secretary of Defense had ever made a finding under Section 7(j).

---

[50] Press Release, Dep't of Interior, *Endangered Species Committee Completes Report on Grayrocks and Tellico* (1979), https://www.fws.gov/sites/default/files/documents/historic-news-releases/1979/19790208.PDF.

[51] Notice of Exemption Application, 56 Fed. Reg. 48548-01 (1991).

[52] Decision, 57 Fed. Reg. 23405-02 (1992).

[53] *Id.*

[54] *Id.*

[55] *See* Victor M. Sher, Public Land & Resources Law Review, *Travels with Strix: The Spotted Owl's Journey through the Federal Courts*, 14 Pub. Land L. Rev. 41 (1993).

## FACTUAL AND PROCEDURAL BACKGROUND

*The Rich Ecosystem of the Gulf*

53.    The Gulf is an ecologically rich region that supports some of the most biodiverse ecosystems in the United States. It is home to thousands of marine species, many of which are endangered or threatened. These species include five of the world's seven sea turtle species; the endangered Rice's whale and sperm whale; the Florida manatee (a subspecies of the endangered West Indian manatee); and the endangered Gulf sturgeon. Hundreds of shore and coastal bird species reside in or migrate through the Gulf of Mexico, including the endangered Black-capped Petrel and the endangered whooping crane.

54.    The Gulf is the exclusive home of the critically endangered Rice's whale, of which fewer than 100 individuals remain on Earth.[56] A unique species in the same family as the great blue and fin whales, Rice's whales live year-round in a strip of habitat along the Gulf's continental shelf break. NMFS estimated that the Deepwater Horizon oil spill caused a 22% decline in the whale's population.[57] Now, the loss of even a single breeding female could drive the species into extinction.[58]

55.    Sperm whales are endangered throughout their range, including in the Gulf of Mexico. NMFS analyses found that the Deepwater Horizon oil spill likely exposed an estimated

---

[56] Melissa S. Soldevilla, Amanda J. Debich, Lance P. Garrison, John A. Hildebrand & Sean M. Wiggins, *Rice's Whale in the Northwestern Gulf of Mexico: Call Variation and Occurrence Beyond the Known Core Habitat*, 48 Endangered Species Rsch. 155, 155 (2022).

[57] NOAA Fisheries, *Rice's Whale: In the Spotlight*, https://www.fisheries.noaa.gov/species/rices-whale/spotlight (last visited May 22, 2026).

[58] NOAA Fisheries, *Endangered Species Act: Rice's Whale Critical Habitat Report* 4 (July 2023), https://www.fisheries.noaa.gov/s3/2023-07/Critical-Habitat-Report-508-Final.pdf.

16% of the Gulf's sperm whale population to oil and killed 6%.[59] It took at least 11 years for the population to recover to pre-Deepwater Horizon levels.

56.     The Gulf and its coast also host five of the world's seven species of sea turtles; all are listed as threatened or endangered. Sea turtles are vulnerable to industry vessel strikes and marine debris, as well as to oil spills, both at their coastal nesting sites and at sea. Sea turtles were devastated by the 2010 Deepwater Horizon Oil Spill,[60] and their future remains uncertain.[61]

57.     The Gulf coast further provides critical habitat and nesting sites for several endangered and threatened species of birds, such as the endangered whooping crane, a migratory species reliant on coastal wetlands, bays, freshwater and estuarine habitats.[62] Their numbers have dwindled from 10,000 in precolonial times, to only around 451 individuals presently.[63] An oil spill could be catastrophic for their population: the FWS has found that "the only self-sustaining wild population remains vulnerable to destruction through a hurricane event or contaminant spill, due to oil and gas activity and transportation of chemical and petroleum products in critical habitat areas and through other areas utilized by wintering whooping cranes."[64]

58.     The Black-capped Petrel is endangered throughout its range, including in the Gulf of Mexico. The FWS has found that oil spills, artificial lighting from oil and gas infrastructure, collisions with oil and gas vessels, and entanglement and collision with oil and gas equipment

---

[59] NMFS, Biological and Conference Opinion 260, 262, 512–13 (May 20, 2025).
[60] Deepwater Horizon Natural Resource Damage Assessment Trustees, *Deepwater Horizon Oil Spill: Final Programmatic Damage Assessment and Restoration Plan and Final Programmatic Environmental Impact Statement*, 4-517 to 4-518 (2016).
[61] *See id.* at 4-577.
[62]  FWS, Biological Opinion, 4, 90 (April 20, 2018).
[63] *Id.* at 89–90.
[64] *Id.* at 93.

could all have harmful and deadly effects on Black-capped Petrels in the Gulf.[65] Moreover, as most petrels that forage in the Gulf region are adults, "any increase in losses from threats on the foraging grounds would disproportionally affect the adult segment of the population."[66] "[T]ime for recovery for the adult age class is inherently longer" for Black-capped Petrels, so such losses would have substantial implications at the species level.[67]

*Environmental Harms from Oil and Gas Development*

59.     Existing oil and gas exploration, development, and production is widespread across the Gulf of Mexico Outer Continental Shelf (OCS) region. As of November 2025, there were over 2,000 active oil and gas leases across more than 11 million acres in the Gulf.

60.     Nearly every step of the oil and gas production process, including leasing, exploration, development, and production, causes widespread harm to the Gulf's species and habitats. Seismic airgun surveys to locate oil and gas deposits produce damaging levels of noise; wells, pipelines, and other structures destroy seafloor habitats; transportation vessels strike animals; and oil spills pollute massive swaths of the ocean surface. Oil and gas activities also cause air pollution, exacerbate climate change, impair commercial and recreational fishing, damage archaeological resources, and generally degrade the environment.

61.     The damage from oil and gas activities can be catastrophic. On April 20, 2010, the Deepwater Horizon oil rig exploded and sank, killing eleven people and creating the worst environmental disaster in the history of the Gulf.[68]

---

[65] FWS, *Species Assessment Report for the Black-capped Petrel (Pterodroma hasitata)*, 28–31 (May 2023), https://iris.fws.gov/APPS/ServCat/DownloadFile/242904.
[66] *Id.* at 29.
[67] *Id.* at 29–30.
[68] *See generally In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 21 F. Supp. 3d 657 (E.D. La. 2014).

62.     The Deepwater Horizon spill was also the largest oil spill in United States history. The spill lasted 87 days, during which time the seabed well remained uncapped and allowed 134 million gallons of oil, as well as unknown amounts of natural gas, to flow into the Gulf.[69] The resulting oil slick spread across over 43,000 square miles of ocean surface—approximately the size of Virginia—and contaminated over 1,300 miles of shoreline.[70] To help break down the oil, responders released nearly 2 million gallons of toxic dispersants into Gulf waters.[71]

63.     The spill killed or seriously harmed billions, if not trillions, of animals. Over 100,000 of those injured or killed belonged to threatened or endangered species. The environmental damage to the Gulf from this spill continues to this day and will persist for years to come.

64.     Since the Deepwater Horizon disaster, oil spills continue to happen regularly. In 2023, the Main Pass Oil Gathering pipeline degraded and released 26,000 barrels of oil into Gulf waters.[72] Meanwhile, the Taylor Energy well platform spill has been leaking since Hurricane Ivan damaged it in 2004. It has released over 3 million barrels so far and continues leaking to this day.[73]

---

[69] Deepwater Horizon Natural Resource Damage Assessment Trustees, *Deepwater Horizon Oil Spill: Final Programmatic Damage Assessment and Restoration Plan and Final Programmatic Environmental Impact Statement*, 1-2 to 1-3 (2016).
[70] *Id.* at 1-14.
[71] *Id.* at 2-2.
[72] National Transportation Safety Board, *Third Coast Infrastructure LLC Crude Oil Release*, https://perma.cc/5SH4-CLYS (last visited May 21, 2026).
[73] Brad Plumer, *Louisiana Company to Pay $43 Million for Longest-Running Oil Spill in U.S. History*, N.Y. Times (Dec. 22, 2021), https://www.nytimes.com/2021/12/22/climate/taylor-energy-oil-spill-gulf.html [https://perma.cc/896T-UZFT].

65. Recent years have seen oil and gas companies moving their operations into deeper waters and high-heat and high-pressure geologic formations. Drilling in these areas is even more likely to result in well blowouts and catastrophic spills.

*The Services Have Imposed Modest ESA Restrictions on Oil and Gas Activity in the Gulf*

66. In light of the grave threats that oil and gas development pose to the threatened and endangered species of the Gulf, the Services have imposed modest restrictions on federally authorized oil and gas activities.

67. In 2018, FWS issued an incidental take statement, or ITS, accompanying its biological opinion (BiOp) for the Gulf federal oil and gas program's effects on ESA-listed species. The ITS did not estimate that the proposed action would incidentally take any listed species under FWS's jurisdiction. FWS therefore issued a set of discretionary "Conservation Recommendations" to the Bureau of Ocean Energy Management (BOEM) and the Bureau of Safety and Environmental Enforcements (BSEE).[74]

68. In 2024, BOEM and BSEE asked to reinitiate consultation with FWS and submitted new information that had arisen since 2025, including the listing of a seabird, the Black-capped Petrel; proposed critical habitat designations for the Rufa red knot (a bird) and the green sea turtle; and updated information on climate change, sea-level rise, artificial lighting, and oil spill risk.[75] FWS ultimately determined that no further ESA consultation was warranted.[76]

69. NMFS, for its part, issued its most recent BiOp in May 2025. The 2025 BiOp was prepared after a federal court found fundamental errors in NMFS's analysis and ordered the

---

[74] FWS, Biological Opinion 121–23 (Apr. 20, 2018).
[75] FWS, Letter from Brigette D. Firmin to Dr. Agatha-Marie Kaller and Tommy Broussard, Reinitiation of Endangered Species Act Consultation (March 28, 2025), 1–5.
[76] *Id.* at 10.

agency to go back to the drawing board.[77] NMFS's 2025 BiOp found the federal oil and gas program in the Gulf "likely to jeopardize the continued existence of the Rice's whale."[78] NMFS further determined that "the proposed action is not likely to jeopardize the continued existence of sperm whale, Northwest Atlantic loggerhead sea turtle, Kemp's ridley sea turtle, North Atlantic DPS green sea turtle, leatherback sea turtle, hawksbill sea turtle, or Gulf sturgeon."[79] NMFS concluded "that the proposed action is not likely to destroy or adversely modify loggerhead or Gulf sturgeon designated critical habitat, or proposed critical habitat for green sea turtle North Atlantic DPS or Rice's whale."[80]

70.    Because the proposed federal oil and gas program was likely to jeopardize the continued existence of the Rice's whale, NMFS proposed a reasonable and prudent alternative that would allow the project to proceed.[81] Namely, NMFS determined that only vessel traffic was likely to jeopardize the continued existence of the Rice's whale, so it focused its reasonable and prudent alternative on reducing the risk of vessel strikes.[82]

71.    Among other things, the reasonable and prudent alternative required BOEM and BSEE to use technology, including a real-time reporting platform, and protocol for ships to take appropriate action in response to Rice's whale sightings.[83] BOEM and BSEE would also establish an expert working group on developing and implementing Rice's whale vessel strike avoidance technology, complete an advanced assessment of Rice's whale vessel strike risks,

---

[77] NMFS, Biological and Conference Opinion 573 (May 20, 2025).
[78] Id.
[79] Id. at 574.
[80] Id.
[81] Id.
[82] Id. at 574–75.
[83] Id. at 577.

develop a Rice's whale vessel strike avoidance technology plan, secure peer review for the assessment and plan, implement the plan, and monitor Rice's whales to ensure no likelihood of jeopardy during the implementation of the reasonable and prudent alternatives.[84]

72.     Neither the 2018 and 2025 FWS BiOps nor the 2025 NMFS BiOp found *both:* (1) that the federal oil and gas program in the Gulf would jeopardize listed species or adversely modify their critical habitat; *and* (2) no reasonable and prudent alternatives exist to prevent jeopardy.[85]

73.     On May 20, 2025, Plaintiff, along with other organizations, challenged the 2025 NMFS BiOp in the U.S. District Court for the District of Maryland.[86] That case is pending.

74.     On May 20, 2025, the State of Louisiana, American Petroleum Institute, and Chevron USA, Inc. filed their own challenge to the 2025 NMFS BiOp in the U.S. District Court for the Western District of Louisiana.[87] On January 23, 2026, that court granted plaintiffs' motion for summary judgment and initially ordered that the BiOp be remanded, without vacatur, to NMFS for revision consistent with the court's ruling.[88]

*BOEM Prepared a Programmatic Environmental Impact Statement*

75.     In August 2025, BOEM prepared a Programmatic Environmental Impact Statement (2025 PEIS) that "analyzes the impacts of a representative Gulf of America (GOA)

---

[84] *Id.* at 577–81.

[85] *See generally* FWS, Biological Opinion (Apr. 20, 2018); FWS, Biological Opinion (Mar. 28, 2025); NMFS, Biological and Conference Opinion (May 20, 2025).

[86] *See* Am. Compl., *Sierra Club v. NMFS*, No. 8:25-cv-1627 (D. Md. May 20, 2025), ECF No. 32.

[87] Compl., *Louisiana v. NMFS*, No. 2:25-cv-00691-JDC-TPL (W.D. La. May 20, 2025), ECF No. 1.

[88] Orders, *id.*, ECF Nos. 53 and 59.

Outer Continental Shelf (OCS) oil and gas lease, and the associated potential site and activity specific actions."[89]

76.     The 2025 PEIS considered the anticipated impacts for "a single representative GOA oil and gas lease sale[.]"[90] Specifically, it was "expected to be used to inform the decision for the first GOM oil and gas lease sale proposed in the 2024-2029 National OCS Oil and Gas Leasing Program."[91]

77.     The 2025 PEIS did not analyze all oil and gas activities in the Gulf of America.

78.     The 2025 PEIS did not analyze the environmental effects of a blanket ESA exemption for "all oil and gas exploration, development, and production activities associated with the [BOEM] and the [BSEE] Outer Continental Shelf Oil and Gas Program," nor did it perform any other environmental analysis.[92]

*The United States' Oil and Gas Production Outpaces Consumption*

79.     In 2025, despite the ESA's requirements and pending litigation challenging the 2025 BiOp, the United States produced more oil and gas than it has produced at any time in its history.[93] Indeed, in 2024, the Energy Information Administration found that the United States produced more crude oil than any nation at any time for the previous six consecutive years.[94]

---

[89] BOEM, Programmatic Environmental Impact Statement, Regional Director's Note, 3 (August 2025), https://perma.cc/GD2P-BFXL.
[90] *See e.g., id.*, Executive Summary x.
[94] 89 Fed. Reg. 101044, 101045 (Dec. 13, 2024).
[92] 90 Fed. Reg. 16966, 16966 (2026).
[93] Press Release, Dep't of the Interior, *Interior Highlights Record U.S. Energy Production Under President Trump's American Energy Dominance Agenda* (Apr. 1, 2026), https://perma.cc/NV84-QKCG.
[94] U.S. Energy Info. Admin., *United States Produces More Crude Oil Than Any Country, Ever* (Mar. 11, 2024), https://www.eia.gov/todayinenergy/detail.php?id=61545.

U.S. crude production broke this record again the following year in 2024.[95] And in 2025, U.S. crude oil production increased by 3%, or 350,000 barrels per day, setting a new annual production level.[96] Of that increase, 111,000 barrels per day were attributable to increased production in the Gulf.[97]

80.    Domestic oil and gas production has outpaced consumption since at least 2020, when the United States became a net oil exporter.[98]

81.    The national rate of gasoline consumption has fallen since 2018 and is projected to continue to decline in the future.[99]

82.    Indeed, the Administration appears to appreciate these realities. On February 23, 2026, the Committee Chair, Secretary Burgum, announced on X that the Department of the Interior "is boosting offshore oil output in the Gulf of America – increasing production by 100,000 barrels per day!"[100]

---

[95] U.S. Energy Info. Admin., *In 2024, the United States Produced More Energy Than Ever Before* (June 9, 2025), https://www.eia.gov/todayinenergy/detail.php?id=65445

[96] U.S. Energy Info. Admin., *U.S. Crude Oil Production Rose in 2025, Setting New Record* (Mar. 31, 2026), https://www.eia.gov/todayinenergy/detail.php?id=67404.

[97] *Id*.

[98] Louis Jacobson, *Fact Check: Does the US produce more oil than it consumes?*, WRAL News (Mar. 23, 2026), https://perma.cc/XG7T-RBWT.

[99] See U.S. Energy Information Administration, *How much gasoline does the United States consume?* (Mar. 29, 2024) https://perma.cc/43QD-WYYH; Lucas Davis, *Is U.S. Gasoline Consumption Declining?,* Energy Institute At HAAS (May 12, 2025), https://perma.cc/8N23-A4R8.

[100] Secretary Doug Burgum (@SecretaryBurgum), X (Feb. 23, 2026, at 3:51 PM EST), https://perma.cc/HL9M-SMEU.



83.    On March 13, 2026, the same day Secretary Hegseth sent the Committee Chair his finding under section 7(j),[101] Secretary Hegseth addressed reporters' questions about global energy prices, claiming, "We have been dealing with it; don't need to worry about it."[102]

84.    Thirteen days later, President Trump emphasized the United States has ample oil, while Secretary Burgum announced oil production in Venezuela is on the rise. During a White House Cabinet meeting on March 26, 2026—just days before the Committee convened—President Trump, with Secretary Hegseth sitting beside him, responded to reporters' questions about the war in Iran, asserting: "The amazing thing is we don't need the Hormuz Strait. We don't need it. We don't need it at all. We don't—we have so much oil. Our country is not affected by this. We have more—we have twice the amount of oil as Saudi Arabia or Russia, and soon it'll be three times the amount."[103] Secretary Burgum followed: "[B]ack on Venezuela, . . .

---

[101] *See* Letter from Secretary of Defense Pete Hegseth to Secretary of Interior Doug Burgum, (Mar. 13, 2026) ("Secretary Letter") (attached as Exhibit E).

[102] *See* Colin Meyn, *Pentagon Plays Down Strait of Hormuz Quagmire: Don't Need to Worry About It, The Hill* (Mar. 13, 2026), https://perma.cc/8G6S-H2Q5.

[103] The White House, *President Trump Participates in a Cabinet Meeting, Mar. 26, 2026*, at 1:25:00 (YouTube, Mar. 26, 2026), https://www.youtube.com/watch?v=Sse9HAmQtD0.

I literally think they're going to put up a statue of President Trump" as a "liberator" of the country.[104] "Oil production is climbing towards 50 percent increase just in the three months we've been [t]here," Secretary Burgum continued, and "[t]hat . . . flows to American refineries on the Gulf coast, lowering the price of gas in America. So it's a—" President Trump interrupted him: "Forget that. When are they gonna do the statue? To hell with the other [thing]"—i.e., the price of gas in America.[105]

85.    On March 31, 2026, a couple hours before the Committee granted the exemption, President Trump posted on his Truth Social account: "All of those countries that can't get jet fuel because of the Strait of Hormuz . . . I have a suggestion for you: Number 1, buy from the U.S., *we have plenty*, and Number 2, build up some delayed courage, go to the Strait, and just TAKE IT . . . President DJT."[106]



---

[104] *Id.* at 1:26:08.
[105] *Id.* at 1:27:12.
[106] Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 31, 2026, at 7:11 AM EDT), https://perma.cc/B4H7-T3E9 (emphasis added).

86.    On April 1, 2026, the Department of the Interior issued a press release "announc[ing] that U.S. energy production reached record levels in 2025, with offshore oil production totaling over 714 million barrels, the highest annual output on record."[107] The press release further touted: "[r]ecent offshore developments and new projects entering production have driven record output levels, particularly in deepwater areas in the Gulf of America. The 2025 total surpasses all previously annual production levels, reinforcing the United States' position as a global energy leader."[108]

87.    On April 2, 2026, Secretary Burgum posted on X, "Drill, Baby, Drill! America leads the world in oil and natural gas production thanks to @POTUS' American Energy Dominance Agenda [reposting a chart titled 'USA NOW PRODUCES MORE OIL THAN SAUDI ARABIA AND RUSSIA *COMBINED*!'"][109]

---

[107] U.S. Dep't of Interior, *Interior Highlights Record U.S. Energy Production Under President Trump's American Energy Dominance Agenda* (Apr. 1, 2026), https://perma.cc/P8WJ-8QVL.
[108] *Id.*
[109] Secretary Doug Burgum (@SecretaryBurgum), X (Apr. 2, 2026, at 10:29 AM EDT), https://perma.cc/A2S9-Y7CP (reposted from Rapid Response 47, @RapidResponse47).



*The Department of Defense Infrastructure to Ensure Fuel Supply*

88.    The Department of Defense's logistics capabilities run through a dedicated unified combatant command, Transportation Command ("TRANSCOM").

89.    TRANSCOM is responsible for ensuring that the military has reliable access to fuel.

90.     "TRANSCOM conducts globally integrated mobility operations, leads the broader Joint Deployment and Distribution Enterprise, and provides enabling capabilities in order to project and sustain the Joint Force in support of national objectives."[110]

91.     TRANSCOM is led by a four-star military officer, General Randal Reed, who has led TRANSCOM since 2024.[111]

92.     There is no indication that Secretary Hegseth or his staff consulted with TRANSCOM or General Reed about Secretary Hegseth's national security determination.

93.     The Defense Logistics Agency ("DLA") also assumes a role in supplying the military with fuel.[112]

94.     The DLA manages global defense supply chain for the five military services; 11 combatant commands; federal, state and local partners; and allied nations.

95.     There is no indication that the DLA provided Secretary Hegseth or his staff any information suggesting that the military's fuel supply was at risk.

96.     The DLA reports to the Office of the Deputy Under Secretary of Defense for Acquisition & Sustainment. There is no indication that the Office of the Deputy Under Secretary of Defense for Acquisition & Sustainment provided Secretary Hegseth or his staff any information suggesting that the military's fuel supply was at risk.

---

[110] U.S. Transp. Command, https://www.business.ustranscom.mil/ (last visited May 21, 2026).
[111] U.S. Transp. Command, https://www.ustranscom.mil/pages/nfdppozbkw8dbms632yvvndq (last visited May 21, 2026).
[112] Ebony Gay, *Joint Petroleum Course at Fort Lee Unites Military Branches in Fuel Logistics,* Def. Logistics Agency (May 18, 2026), https://www.dla.mil/About-DLA/News/News-Article-View/Article/4495081/joint-petroleum-course-at-fort-lee-unites-military-branches-in-fuel-logistics/.

97.    The military's logistical work is supported by related military logistics commands, such as the maritime-based Military Sealift Command (MSC).[113]

98.    These commands have broad authority, responsibility, and resources to coordinate logistics and fuel supply for the military.

99.    There is no indication that Secretary Hegseth or his staff consulted with any of these military logistics commands about Secretary Hegseth's national security determination.

100.    Despite the Department of Defense's institutional capacity to monitor and maintain a resilient fuel supply for the military, there is no indication that Secretary Hegseth based his determination on any information provided by the offices charged with this responsibility.

101.    Rather, Secretary Hegseth and his staff relied principally on the national security advice of personnel outside of his agency, including those of the Departments of Energy and the Interior.[114]

102.    Solicitor of the Interior William Doffermyre advised the Department of Defense on the rationale for Secretary Hegseth's section 7(j) determination.[115]

103.    Upon information and belief, Solicitor Doffermyre is an attorney who has never served in or worked for the military. He lacks training and expertise in military supply chains and military fuel needs.[116]

---

[113] Mil. Sealift Command, Mission, https://www.msc.usff.navy.mil/About-Us/Mission/ (last visited May 21, 2026).
[114] Exhibit E.
[115] Doffermyre Email (attached as Exhibit F).
[116] U.S. Dep't of Interior, Office of the Solicitor, https://www.doi.gov/solicitor/sol-bio (last visited May 21, 2026).

104.    To formally request support from other agencies, the Department of Defense or the relevant Under Secretaries, including the Under Secretary of Defense for Acquisition and Sustainment, will enter into a support agreement using the procedures described in DOD Instruction 4000.19. There is no indication that the Under Secretary of Defense for Acquisition and Sustainment, or any other official of the Department of Defense, entered into such an agreement with respect to the preparation of Secretary Hegseth's national security determination.

105.    Meanwhile, the Trump administration has taken unprecedented steps to smother American renewable energy production.

106.    The Trump Administration began suppressing domestic renewable energy production immediately upon taking office. On January 20, 2025, the very first day of his second term, President Trump issued a memorandum withdrawing all areas on the Outer Continental Shelf from offshore wind leasing and ordering both the cessation in issuance of new permits and a review of the government's leasing and permitting practices for wind projects.[117] That same day, he rescinded multiple prior executive orders supporting domestic renewable energy production, including Executive Order 14008 (Tackling the Climate Crisis at Home and Abroad), Executive Order 14057 (Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability), and Executive Order 14082 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022).[118]

107.    Federal agencies have proceeded to hamper domestic renewable energy development in a variety of ways, including by attempting to revoke or buy back leases and

---

[117] Presidential Memorandum, Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects, 90 Fed. Reg. 8,363 (Jan. 20, 2025).
[118] Exec. Order No. 14,154, 90 Fed. Reg. 8,353, 8,354–55 (Jan. 20, 2025).

imposing lengthy permitting and review processes on wind and solar projects.[119] The Administration has also undercut programs which would have reduced reliance on foreign oil by lowering domestic fossil fuel demands, for instance, by targeting the federal electric vehicle charging station investments and renewable energy tax credits.[120]

108.    The baseless and vague national security concerns the Administration now invokes to justify its exemption and supercharge oil and gas development are, paradoxically, similar to those it has invoked to *suppress* domestic renewable energy. For instance, the Department of the Interior on December 22, 2025, announced an immediate pause of "the leases for all large-scale offshore wind projects under construction in the United States due to national security risks identified by the Department of [Defense] in recently completed classified reports."[121]

109.    The Administration's use of the same empty rationale to both attack renewable energy and support oil and gas underscores that its "national security" explanation is little more than a pretext to advance its political agenda and to confer favors on the oil and gas industry while eliminating domestic renewables.

---

[119] *See, e.g.*, Dep't of Interior Order No. 3,418 (Feb. 3, 2025), https://www.doi.gov/document-library/secretary-order/so-3418-unleashing-american-energy; Dep't of Interior, *Departmental Review Procedures for Decisions, Actions, Consultations, and Other Undertakings Related to Wind and Solar Energy Facilities* (July 15, 2025), https://www.doi.gov/media/document/departmental-review-procedures-decisions-actions-consultations-and-other#; Dep't of the Interior Order No. 3,438, Managing Federal Energy Resources and Protecting the Environment (Aug. 1, 2025), https://perma.cc/XQ5V-JZAR; Press Release, Dep't of the Interior, Interior Department Moves to Cancel Reckless Biden-era Approval of Lava Ridge Wind Project (Aug. 6, 2025), https://perma.cc/3K9C-66U2.
[120] *See* Exec. Order No. 14,154, 90 Fed. Reg. 8,353 (Jan. 20, 2025); Exec. Order. No. 14,135, 90 Fed. Reg. 30,821 (July 7, 2025).
[121] Press Release, Dep't of the Interior, The Trump Administration Protects U.S. National Security by Pausing Offshore Wind Leases (Dec. 22, 2025), https://perma.cc/9PYG-HETN.

110.    Moreover, these attacks on domestic renewable energy have continued even as the Iran war impacts global oil markets. As of May 4, 2026, over 150 onshore wind farm projects, totaling about 30 GW of generation capacity, were stalled due to Pentagon review delays.[122]

111.    The Administration's continued suppression of domestic renewable energy projects, including after the commencement of hostilities with Iran, further undermines its assertion that there is an urgent national security threat to Gulf oil production. If true, those national security concerns would necessitate an urgent expansion of *all* domestic energy production, including the renewable energy that the Administration continues to suffocate.

112.    Moreover, increased renewable energy production would reduce civilian demand for domestic fossil fuels. If national security urgently required the military's increased access to domestic fossil fuels, the Administration would promote, not suppress, American renewable energy.

*The March 31, 2026, Exemption*

113.    On January 26, 2026, the Solicitor of the Department of the Interior, William Doffermyre, emailed the General Counsel for the Department of Defense concerning the outcome of ESA litigation in the Western District of Louisiana. That court, on January 23, 2026, had granted plaintiffs' motion for summary judgment and ordered briefing on the remedy.[123] While noting that offshore oil and gas activities would not be immediately impacted by the court's ruling, Mr. Doffermyre expressed concern that the other court presiding over pending

---

[122] Brad Plumer, *More Than 150 Wind Projects Stall as Pentagon Delays Reviews*, N.Y. TIMES (May 4, 2026), https://www.nytimes.com/2026/05/04/climate/wind-power-delays-trump-pentagon.html.

[123] Order, *Louisiana v. NMFS*, No. 2:25-cv-00691-JDC-TPL, ECF No. 53.

ESA litigation detailed *supra*—that is, the U.S. District Court for the District of Maryland—*could* produce a different outcome.[124]

114.    On March 13, 2026, Secretary Hegseth wrote to Secretary Burgum and the other Committee members that "ongoing . . . ESA litigation that threatens to halt oil and gas production in the Gulf of America" and "creates uncertainty and instability that is beginning to chill oil and gas development in the Gulf[,]" and that he found it "necessary for reasons of national security to exempt [these activities] from the ESA's requirements[.]"[125] Nowhere did Secretary Hegseth's finding identify an irreconcilable conflict between ESA protections and any proposed action pertaining to oil and gas development in the Gulf. Nor was his finding rooted in evidence of faltering oil and gas production in the Gulf; indeed, the Administration has repeatedly asserted to the contrary.

115.    Three days later, on March 16, 2026, Secretary Burgum, as Chair of the Endangered Species Committee, published a notice in the Federal Register announcing his intention to convene the Committee on March 31, 2026.[126]

116.    The statutory prerequisites to the March 16 notice publication did not occur. The Services engaged in interagency consultation under Section 7(a)(2) but did not conclude both that a proposed agency action would likely "jeopardize" the continued existence of listed species or critical habitat, *and* that no "reasonable and prudent alternatives" to the proposed action exist

---

[124] Exhibit F.
[125] "Correspondence from Secretary of [Defense] - Act Exemption" at 1, attached as Exhibit E.
[126] 91 Fed. Reg. 12,672 (Mar. 16, 2026).

to avoid jeopardy.[127] Nor did the Committee receive an "application" for an exemption following the Services' conclusion that the agency action would violate subsection (a)(2)."[128]

117.    Because there was no exemption application, the Secretary did not make the initial determinations as to whether the agencies carried out their consultation responsibilities "in good faith and made a reasonable and responsible effort to develop and fairly consider modifications or reasonable and prudent alternatives to the proposed agency action which would not violate subsection (a)(2)."[129] Nor did the Secretary "submit to the Committee a report discussing" four statutory criteria for an exemption, including "the availability of reasonable and prudent alternatives," and "appropriate reasonable mitigation and enhancement measures."[130]

118.    On March 18, 2026, Plaintiff sent Secretary Burgum a letter explaining why the Committee had no lawful basis to convene.

119.    On March 30, 2026, Plaintiff sent a second letter to Secretary Burgum explaining why the Committee could not legally grant an exemption. Plaintiff included an indexed production of documents relevant to the Committee's decision making.

120.    On March 31, 2026, six members of the Committee—Secretaries Burgum, Rollins, and Driscoll, Acting Chairman Yared, and Administrators Zeldin and Jacobs—joined by Secretary Hegseth, gathered at the Department of the Interior in Washington, D.C. No "individual from [any] affected State" was present.[131] Nor did the President appoint a seventh member as contemplated by the regulations.[132] At approximately 9:49 a.m., the Committee

---

[127] *See* 16 U.S.C. § 1536(b)(3)(A).
[128] 16 U.S.C. § 1536(g)(1).
[129] Id. § 1536(g)(3)(A)(i).
[130] *Id.* § 1536(g)(5).
[131] *See* 16 U.S.C. § 1536(e)(3).
[132] *See* 50 C.F.R. § 451.03(b)(2).

Chair, Secretary Burgum, called the meeting to order and invited Secretary Hegseth to share the national security finding distributed beforehand to the Committee members.[133]

121.    Secretary Hegseth opined that, as a matter of "urgent national security," a steady, affordable supply of domestic energy is required but "under threat" by "ongoing Endangered Species Act litigation" that "threaten[s] to halt oil and gas activity in the Gulf of America."[134] Secretary Hegseth proclaimed, "we cannot allow our own rules to weaken our standing and strengthen those who wish to harm us."[135] He requested the Committee grant the exemption based on his national security determination.[136]

122.    Each Committee member delivered brief remarks assenting to Secretary Hegseth's request. Secretary Rollins characterized energy security as national security and expressed appreciation for President Trump prioritizing energy dominance. Administrators Zeldin and Jacobs and Acting Director Yared reiterated the Committee has no discretion upon receipt of Secretary Hegseth's findings, with which they each agreed anyway. Administrator Zeldin further opined that ongoing ESA litigation threatens energy independence, and that it is critical for national security to remove such impediments.

123.    During the meeting, no reference was made to the Committee's consideration of any report from Secretary Burgum, or of the availability of "reasonable and prudent alternatives" to a proposed agency action, or of "nature and extent of the benefits" of the proposed agency action versus "alternative courses of action consistent with conserving" impacted species or their

---

[133] Dep't of the Interior, Endangered Species Act Meeting, Youtube (Mar. 31, 2026) https://www.youtube.com/live/iC3xyp4GxRE?si=GtkuiAVS5yFmTBua&t=2085.
[134] Transcript of March 31, 2026, Committee Hearing (attached as Exhibit G) at 4:16-17, 19-21.
[125] *Id.* at 7:4-6.
[136] *Id.* at 7:7-11.

habitat, or of the competing public interests, or of any "reasonable mitigation and enhancement measures[,]" among other things.[137]

124.    At the conclusion of the meeting, Secretary Burgum requested a voice vote of the Committee members present; each voted affirmatively to grant the exemption. The meeting then concluded at approximately 10:06 a.m.

125.    The assembled Committee members made no pretense of attempting to hew to any of the procedural requirements outlined in section 7(h) of the ESA. The Committee members did not conduct a formal adjudicative hearing, hear testimony, or make findings on a record. The entirety of the Committee members' commentary revolved around Secretary Hegseth's statement.

126.    Later on March 31, 2026, several documents were posted on the Interior Department's website at https://www.doi.gov/endangered-species-committee (*see* https://perma.cc/MGV6-UGNF), attached hereto as Exhibits B through E. This was the first time any of these four documents had been publicly disclosed.

127.    The first document is titled "Endangered Species Committee Order" (attached hereto as Exhibit B, and available at https://perma.cc/FVU8-KHDX). This Exemption, signed by the six participating Committee members on March 31, 2026, "grants an exemption for Gulf of America Oil and Gas Activities" and provides that "[t]his decision and order are effective immediately."

128.    The second document is titled "Gulf of America Energy Security" (attached hereto as Exhibit C, and available at https://perma.cc/AX9R-HWW4). The document appears to

---

[137] *See* 16 U.S.C. § 1536(g)(5).

be a six-page memorandum from the Department of Energy to Secretary Hegseth, dated March 10, 2026.

129.    The third document is titled "Market impact analysis of the disruption to federal offshore Gulf of America crude oil and natural gas production" (attached hereto as Exhibit D, and available at https://perma.cc/AB63-VJMU). The document appears to be an undated six-page memorandum from the U.S. Energy Information Administration to Secretary Hegseth.

130.    The fourth document is titled "Correspondence from Secretary of [Defense] - Act Exemption" (attached hereto as Exhibit E, and available at https://perma.cc/693D-CXAA). The document appears to be a two-page letter and thirteen-page memorandum attachment from Secretary Hegseth to Secretary Burgum, dated March 13, 2026, setting forth Secretary Hegseth's national security determination.

131.    Defendants did not make public any other supporting documents or correspondence. Nor have they responded to NRDC's or others' public comments.

132.    The Committee did not undertake any NEPA analysis.

133.    No agency has prepared an environmental impact statement discussing the impacts of the Exemption upon endangered species, threatened species, or critical habitats. Nor has any agency prepared an environmental impact statement analyzing those impacts with respect to the Committee's Exemption itself.

*The Exemption is Generally Applicable and Prospective*

134.    The Exemption purports to "cover[] all oil and gas exploration, development, and production activities associated with the Bureau of Ocean Energy Management's (BOEM) and the Bureau of Safety and Environmental Enforcement's (BSEE) Outer Continental Shelf Oil and

Gas Program[,]"[138] defined in Secretary Hegseth's letter as "the full suite of agency actions that BOEM and BSEE identified when initiating and pursuing ESA consultation with NMFS, which NMFS then reviewed in its 2025 biological opinion and FWS reviewed in the 2018 and 2025 consultation decisions."[139] It is not limited to any defined range of actors or specific actions beyond those broad categorizations.

135.    NMFS's 2025 Biological Opinion (BiOp) "analyzes the effects of all on-going and future oil and gas activities related to leases awarded through 2029 on ESA-listed species and designated and proposed critical habitat in the entire Gulf of America," including "actions associated with all past leases operating in the Gulf of America at the time [the] opinion [was] issued, regardless of when the lease was awarded, and actions associated with new leases awarded in the Gulf of America in the first ten years following issuance of the 2020 biological opinion for oil and gas program activities (through approximately 2029)."[140]

136.    As "[e]ach lease is projected to have a 40-year lifespan," the 2025 NMFS BiOp "covers approximately 45 years of operations (i.e., five years of program implementation following the 2020 biological opinion [plus 40 years of operations on resulting leases])."[141]

137.    Similarly, FWS's 2018 BiOp covers, for a ten-year period starting from the date of signature: "(1) [a]ll oil and gas leases issued as a result of sales held during the ten-year period, including associated exploration, development, production, and decommissioning activities authorized by BOEM or BSEE under those leases; (2) [t]hose associated exploration, development, production, and decommissioning activities authorized by BOEM or BSEE during

---

[138] Exhibit B at 1.
[139] Exhibit E at 11.
[140] NMFS 2025 Biological Opinion at 2, 9.
[141] *Id.* at 2.

this 10-year period under all other oil and gas leases, regardless of the date of issuance of the lease; and (3) those geological and geophysical permits issued by BOEM during the ten-year period."[142]

138.    "Because a lease life is typically up to 40 years," the 2018 FWS BiOp "may include lease activities for a 50-year time span (i.e., 40 years out from leases issued at year 10)."[143] The 2018 FWS BiOp was signed on April 20, 2018.[144]

139.    Because the Exemption defines itself based on the actions reviewed in the 2025 NMFS BiOp and 2018 FWS BiOp, and because the 2025 NMFS BiOp contemplates "approximately 45 years of operations"[145] and the 2018 FWS BiOp contemplates "lease activities for a 50 year time span,"[146] the Exemption is sweeping and prospective in scope, and unrelated to any particular lease sale or project.

**CLAIMS FOR RELIEF**

**COUNT ONE**

**Violation of the APA:**

**Arbitrary, Capricious, and Unlawful Agency Action (5 U.S.C. § 706(2)(A), (C), (D))**

***(Defendant Hegseth)***

140.    Plaintiff incorporates by reference Paragraphs 1–139.

141.    Agency action is arbitrary and capricious if the agency fails to give adequate reasons for its decisions, fails to examine the relevant data, or offers no rational connection

---

[142] FWS 2018 Biological Opinion at 2.
[143] *Id.* at 9.
[144] *Id.* at 2.
[145] NMFS 2025 Biological Opinion at 2.
[136] FWS 2018 Biological Opinion at 9.

between the facts found and the choice made. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

142.    Secretary Hegseth's national security determination is arbitrary and capricious, not in accordance with law, in excess of statutory authority, and without observance of procedure required by law.

143.    There is no adequate alternative to APA review.

## COUNT TWO

### Violation of the APA:

### Arbitrary, Capricious, and Unlawful Agency Action (5 U.S.C. § 706(2)(A), (C), (D))

### *(Defendants Burgum, Rollins, Driscoll, Yared, Zeldin, and Jacobs)*

144.    Plaintiff incorporates by reference Paragraphs 1-139.

145.    The Committee members' implementation of Secretary Hegseth's national security determination is arbitrary and capricious, not in accordance with law, in excess of statutory authority, and without observance of procedure required by law.

146.    There is no adequate alternative to APA review.

## COUNT THREE

### Violation of NEPA and the APA:

### Failure to conduct NEPA analysis

### *(Defendants Burgum, Rollins, Driscoll, Yared, Zeldin, and Jacobs)*

147.    Plaintiff incorporates by reference Paragraphs 1-139.

148.    The Exemption is a major Federal action that significantly affects the quality of the human environment. 42 U.S.C. § 4332(C).

41

149.    Defendants did not conduct a NEPA analysis prior to issuing the Exemption. Nor did Defendants identify any "previously prepared" environmental impact statement discussing the Exemption's impacts on listed species and their critical habitats. 16 U.S.C. § 1536(k).

150.    Defendants acted in an arbitrary and capricious manner by issuing the Exemption without preparing an environmental impact statement, in violation of NEPA.

151.    For these reasons, Defendants' Exemption is "arbitrary, capricious, . . . or otherwise not in accordance with law," in violation of the APA, 5 U.S.C. § 706(2)(A).

152.    There is no adequate alternative to APA review.

**RELIEF REQUESTED**

WHEREFORE Plaintiff requests that the Court:

A.    Declare that Secretary Hegseth's national security determination is arbitrary and capricious, not in accordance with law, and in excess of statutory authority;

B.    Declare that Committee members' implementation of Secretary Hegseth's national security determination in voting to grant the Exemption is arbitrary and capricious, not in accordance with law, and in excess of statutory authority;

C.    Hold unlawful and vacate the Exemption; and

D.    Grant such other relief that the Court deems just and proper.

Dated: May 26, 2026               Respectfully submitted,

                                  /s/ Sitara Witanachchi

                                  Sitara Witanachchi (D.C. Bar No. 1023007)
                                  Jared Solomon (D.C. Bar No. 90033165)
                                  Erik Van de Stouwe (New York Bar No. 5692512)
                                      *admitted pro hac vice*
                                  Natural Resources Defense Council, Inc.
                                  1152 15th St. NW, Suite 300
                                  Washington, D.C. 20005
                                  switanachchi@nrdc.org

jsolomon@nrdc.org
evandestouwe@nrdc.org
Tel: (202) 289-6868

Katherine Desormeau (D.D.C. Bar No. CA00024)
Natural Resources Defense Council, Inc.
111 Sutter St., 21st Floor
San Francisco, CA 94104
kdesormeau@nrdc.org
Tel: (415) 875-6100

*Attorneys for Plaintiff Natural Resources Defense
Council*