**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> DOUG BURGUM, et al., <br><br> *Defendants*. | **Case No. 1:26-cv-01116 (RC)** |

**PLAINTIFF NRDC'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... iv

INTRODUCTION ................................................................................................................ 1

BACKGROUND .................................................................................................................. 3

I.    Legal Background ...................................................................................................... 3

      A.    The Endangered Species Act ........................................................................... 3

      B.    The Administrative Procedure Act ................................................................... 5

II.   Factual Background .................................................................................................... 6

III.  Procedural Background ............................................................................................... 8

STANDARD OF REVIEW ................................................................................................. 10

ARGUMENT ...................................................................................................................... 10

I.    Defendants cannot challenge NRDC's statutory cause of action on
      a motion to dismiss for lack of jurisdiction ..............................................................11

II.   No plausible reading of the ESA supports direct review of the
      Exemption in the Courts of Appeals ........................................................................ 14

      A.    This Court has jurisdiction because the Exemption
            exceeded the Committee's statutory authority .............................................. 14

      B.    The Committee's disregard for subsections (g) and (h)
            highlights the impropriety of original appellate review ................................ 19

      C.    Even if section 7(j) authorized the Exemption, the
            Committee improperly invoked section 7(h) .................................................. 23

            i.    Only exemptions under subsection (h) are subject to
                  direct review in the Courts of Appeal ................................................. 24

            ii.   Defendants have not demonstrated that exemptions
                  granted pursuant to the Secretary of War's direction
                  under subsection (j) necessarily travel the
                  subsection (h) route .............................................................................. 27

            iii.  This Exemption was not issued under subsection (h) ............................ 30

iv.    The Committee cannot evade district court jurisdiction by labeling its Exemption a "section 7(h)" exemption ........................................................ 31

D.    NRDC's claims are properly before this Court ...................................................... 32

i.    Because NRDC's claims fall outside of the scope of section 7(n), they are properly brought under the APA ..................................................................... 32

ii.    Defendant's policy arguments cannot rewrite the statute ................................................................ 34

iii.    Defendants' claim-splitting argument fails ............................................... 37

CONCLUSION ................................................................................................................ 39

**TABLE OF AUTHORITIES**

**Cases**

*Am. Oversight v. U.S. Dep't of Veterans Affs.*,
  498 F. Supp. 3d 145 (D.D.C. 2020) ............................................................................. 13

*\*Am. Petroleum Inst. v. SEC*,
  714 F.3d 1329 (D.C. Cir. 2013) ........................................................... 28, 32, 33, 37

*Am. Soybean Ass'n v. Regan*,
  77 F.4th 873 (D.C. Cir. 2023) ...................................................................................... 37

*Arch Coal, Inc. v. Acosta*,
  888 F.3d 493 (D.C. Cir. 2018) ..................................................................................... 33

*Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*,
  430 U.S. 442 (1977) ...................................................................................................... 20

*Axon Enter., Inc. v. FTC*,
  598 U.S. 175 (2023) ...................................................................................................... 20

*Azar v. Allina Health Servs.*,
  587 U.S. 566 (2019) ...................................................................................................... 31

*Baxter v. Islamic Republic of Iran*,
  No. 1:11-CV-2133-RCL, 2025 WL 689217 (D.D.C. Mar. 4, 2025) ................................. 39

*\*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................................................. 5, 33

*Block v. Cmty. Nutrition Inst.*,
  467 U.S. 340 (1984) ...................................................................................................... 34

*Bombardier, Inc. v. U.S. Dep't of Lab.*,
  145 F. Supp. 3d 21 (D.D.C. 2015) ................................................................................. 20

*Bowen v. Mich. Acad. of Fam. Physicians*,
  476 U.S. 667 (1986) ................................................................................................. 33, 34

*Citizens for Const. Integrity v. Census Bureau*,
  115 F.4th 618 (D.C. Cir. 2024),
  *cert. denied*, 145 S. Ct. 2818 (2025) ..................................................................... 12, 13

*City of Chicago v. Env't Def. Fund*,
  511 U.S. 328 (1994) ...................................................................................................... 28

*City of Rancho Palos Verdes v. Abrams,*
    544 U.S. 113 (2005)........................................................................................ 34, 36

*City of Rochester v. Bond,*
    603 F.2d 927 (D.C. Cir. 1979)............................................................................. 22

*CSL Plasma Inc. v. U.S. Customs & Border Prot.,*
    33 F.4th 584 (D.C. Cir. 2022) ........................................................................ 12, 13

*Curtis v. Leother,*
    415 U.S. 189 (1974).......................................................................................... 20

*Eagle-Picher Indus., Inc. v. EPA,*
    759 F.2d 905 (D.C. Cir. 1985)....................................................................... 34, 36

*EC Term of Years Tr. v. United States,*
    550 U.S. 429 (2007)...................................................................................... 34, 36

*Elgin v. Dep't of Treasury,*
    567 U.S. 1 (2012)............................................................................................. 37

*EPA v. Calumet Shreveport Ref., L.L.C.,*
    605 U.S. 627 (2025)...................................................................................... 31, 32

*Epic Sys. Corp. v. Lewis,*
    584 U.S. 497 (2018)......................................................................................... 18

*Esteras v. United States,*
    606 U.S. 185 (2025)......................................................................................... 25

*Fed. Election Comm'n v. Cruz,*
    596 U.S. 289 (2022)......................................................................................... 14

*Fischer v. United States,*
    603 U.S. 480 (2024)......................................................................................... 29

*Fla. Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985)......................................................................................... 25

*Fla. Power & Light,*
    470 U.S. 729 (1985)......................................................................................... 35

*Greenbaum v. Islamic Republic of Iran,*
    67 F.4th 428 (D.C. Cir. 2023) ........................................................................... 18

*Herbert v. Nat'l Acad. of Scis.,*
    974 F.2d 192 (D.C. Cir. 1992)........................................................................... 12

v

*Hettinga v. United States*,
    677 F.3d 471 (D.C. Cir. 2012)................................................................... 10, 13, 31

*Hikvision USA, Inc. v. FCC*,
    97 F.4th 938 (D.C. Cir. 2024) ............................................................................ 14

*Hinck v. United States*,
    550 U.S. 501 (2007).................................................................................... 34, 36

*Humane Soc'y of the U.S. v. Vilsack*,
    797 F.3d 4 (D.C. Cir. 2017).................................................................... 10, 13, 31

*ITServe All., Inc. v. U.S. Dep't of Homeland Sec.*,
    71 F.4th 1028 (D.C. Cir. 2023) ........................................................................ 19

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
    341 U.S. 123 (1951)........................................................................................ 26

*Jordan v. Am. Eagle Fire Ins. Co.*,
    169 F.2d 281 (D.C. Cir. 1948).......................................................................... 21

*Kowal v. MCI Commc'ns Corp.*,
    16 F.3d 1271 (D.C. Cir. 1994).......................................................................... 10

*Land v. Dollar*,
    330 U.S. 731 (1947)........................................................................................ 13

*Lemus ex rel O.C.L. v. D.C. Int'l Charter Sch.*,
    No. 20-cv-3839 (RCL), 2022 WL 407151 (D.D.C. Feb. 10, 2022)................................. 12

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)................................................................................... 12, 13

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024)........................................................................................ 14

*Loyola Univ. Med. Ctr. v. Becerra*,
    728 F. Supp. 3d 128 (D.D.C. 2024) .................................................................. 34

*Mach Mining, LLC v. EEOC*,
    575 U.S. 480 (2015)........................................................................................ 34

*Make the Rd. N.Y. v. Wolf*,
    962 F.3d 612 (D.C. Cir. 2020).......................................................................... 24

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012)........................................................................................ 37

*McBride v. Merrell Dow & Pharm., Inc.*,
  800 F.2d 1208 (D.C. Cir. 1986)................................................................... 34

*Mercy Hosp., Inc. v. Azar*,
  891 F.3d 1062 (D.C. Cir. 2018).................................................................. 29

*Murphy Expl. & Prod. Co. v. U.S. Dep't of the Interior*,
  252 F.3d 473 (D.C. Cir. 2001),
  *modified on denial of petition for reh'g*, 270 F.3d 957 (D.C. Cir. 2001) ........................... 31

*\*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
  583 U.S. 109 (2018)................................................................ 35, 36, 37

*NetCoalition v. S.E.C.*,
  715 F.3d 342 (D.C. Cir. 2013)..................................................................... 32

*NRDC v. U.S. Nuclear Regul. Comm'n*,
  606 F.2d 1261 (D.C. Cir. 1979).................................................................. 21

*Ohio Bell Tel. Co. v. Pub. Utilities Comm'n of Ohio*,
  301 U.S. 292 (1937)............................................................................ 21, 22

*Oklahoma v. EPA*,
  605 U.S. 609 (2025).................................................................................. 32

*\*Portland Audubon Soc'y v. Endangered Species Comm.*,
  984 F.2d 1534 (9th Cir. 1993) ............................................................ 4, 20, 23, 36

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
  489 F.3d 1279 (D.C. Cir. 2007).................................................................. 23, 32

*Russello v. United States*,
  464 U.S. 16 (1983)................................................................................... 30

*Sea-Land Serv., Inc. v. Fed. Mar. Comm'n*,
  402 F.2d 631 (D.C. Cir. 1968)..................................................................... 31

*Sierra Club v. Jackson*,
  813 F. Supp. 2d 149 (D.D.C. 2011) ............................................................ 37

*Sierra Club v. Thomas*,
  828 F.2d 783 (D.C. Cir. 1987)
  *partly abrogated by statute as recognized by*
  *Mexichem Specialty Resins, Inc. v. EPA*,
  787 F.3d 544 (D.C. Cir. 2015)..................................................................... 23

*Steele v. United States*,
  144 F.4th 316 (D.C. Cir. 2025) .................................................................. 37

vii

*Telecomms. Rsch. & Action Ctr. v. FCC*,
    750 F.2d 70 (D.C. Cir. 1984) ................................................................................. 33

*Tennessee Valley Auth. v. Hill*,
    437 U.S. 153 (1978) .............................................................................................. 17

*Trump v. Slaughter*,
    609 U.S. ---, 2026 WL 1855612 (U.S. June 29, 2026) ....................................... 29

*United States v. Apodaca*,
    251 F. Supp. 3d 1 (D.D.C. 2017) ......................................................................... 34

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) .............................................................................................. 18

*W. Virginia v. EPA*,
    597 U.S. 697 (2022) .............................................................................................. 18

*Wash. Metro Area Transit Auth. v. Ragonese*,
    617 F.2d 828 (D.C. Cir. 1980) ............................................................................. 39

*WildEarth Guardians v. Salazar*,
    670 F. Supp. 2d 1 (D.D.C. 2009) ......................................................................... 22

*Zemeka v. Holder*,
    963 F. Supp. 2d 22 (D.D.C. 2013) ....................................................................... 13

**Statutes**

5 U.S.C. § 554 ................................................................................................................ 4, 15

5 U.S.C. § 555 ................................................................................................................ 4, 15

5 U.S.C. § 556 ................................................................................................................ 4, 15

5 U.S.C. § 557 .................................................................................................................... 20

5 U.S.C. § 703 ................................................................................................................. 6, 33

5 U.S.C. § 704 .............................................................................................................. 5, 11, 33

5 U.S.C. § 706 .......................................................................................................... 5, 6, 9, 22

16 U.S.C. § 1531 .................................................................................................................. 3

*16 U.S.C. § 1536 .......................................................... 2, 3, 4, 5, 7, 9, 11, 14, 15, 16, 17, 19, 21,
    22, 23, 24, 25, 26, 27, 28, 29, 30, 32, 36

28 U.S.C. § 2112 ............................................................................................................ 9, 22

28 U.S.C. § 2401................................................................................................. 36

Act to Amend the ESA,
    Pub. L. No. 95-632, § 5(i)(1), 92 Stat. 3751 (Nov. 10, 1978)........................................... 27

## Regulations

50 C.F.R. § 402 ..................................................................................................... 3

50 C.F.R. § 451 ............................................................................................... 18, 19

*50 C.F.R. § 452 ....................................................................................... 16, 18, 19, 21

50 C.F.R. § 453 ............................................................................................... 19, 21

## Other Authorities

18 Fed. Prac. & Proc. Juris. § 4404 (3d ed.)................................................................. 37

91 Fed. Reg. 16966 (Apr. 3, 2026) ............................................................................. 8

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ..... 29

*Decision*, MERRIAM-WEBSTER DICTIONARY (last visited June 16, 2026).................................... 26

The Federalist No. 72 (A. Hamilton) ......................................................................... 29

S. Rep. No. 97-418 (1982)....................................................................................... 20

**INTRODUCTION**

The Gulf of America (also known as the Gulf of Mexico) is home to some of the world's most imperiled species. Five of the world's seven sea turtle species reside there; all are listed as endangered or threatened under the Endangered Species Act. So are many other Gulf inhabitants: the Florida manatee is listed as threatened, and the sperm whale, Gulf sturgeon, Black-capped Petrel, and whooping crane are all listed as endangered. The Rice's whale, of which fewer than 100 individuals remain, lives exclusively in Gulf waters along the continental shelf break. Having lost over one-fifth of its population to the 2010 Deepwater Horizon oil spill, the Rice's whale now stands on the brink—the death of a single breeding female could drive the species into extinction.

Yet, on March 31, 2026, the Endangered Species Committee (the Committee) granted a blanket exemption (the Exemption) from the Endangered Species Act (ESA) for "all oil and gas exploration, development, and production activities associated with the Bureau of Ocean Energy Management's (BOEM) and the Bureau of Safety and Environmental Enforcement's (BSEE) Outer Continental Shelf Oil and Gas Program." Am. Compl. Ex. B (Committee Order), at 1, ECF No. 22-2.

Certainly, Congress bestowed the Committee with the power to grant exemptions in rare circumstances. But given the import of the Committee's power—the ability to extinguish an entire species—Congress also installed guardrails in the ESA, ensuring that the Committee's consideration of exemption applications is careful and deliberate. Heedless of these procedural and substantive ESA requirements, on March 31, the Committee plowed through those guardrails, delivering a foreboding exemption in just 17 minutes. Its only justification for doing so was a never-before-invoked, one-sentence provision stating that the Committee "shall grant an

1

exemption for any agency action if the Secretary of [War] finds that such exemption is necessary for reasons of national security." 16 U.S.C. § 1536(j).

Secretary of War Pete Hegseth found that such an exemption was necessary. Specifically, Secretary Hegseth determined that ESA-based litigation against oil and gas activities in the Gulf threatened national security. Am. Compl. Ex. E (Secretary Hegseth Letter), at 1. To circumvent that litigation, eliminate the need for statutory compliance, and dodge the burdens of judicial scrutiny, Secretary Hegseth requested that the Committee grant the exemption.

In swiftly acceding, the Committee set a sinister precedent. Its Exemption was the third ever granted and the first in over thirty years. No prior exemption has matched this one's breadth, sidestepped the ESA's mandatory process of applications and hearings, or invoked a putative national security justification. Before this Exemption, it would have been inconceivable for the Committee to take such unprecedented and sweeping action for the express purpose of preemptively evading accountability and judicial review for oil-and-gas-related ESA violations. The Exemption was also, under any plausible statutory interpretation, illegal.

The Committee insisted that it granted the Secretary of War's request pursuant to section 7(h) of the ESA, rendering the Exemption reviewable "exclusively in the U.S. Courts of Appeals for the Fifth or Eleventh Circuits[]" under section 7(n). Committee Order at 3. But the Exemption's connection to section 7(h) was in name only. The Committee ignored nearly every procedural and substantive requirement described therein. It now seeks to dismiss NRDC's case before this Court and forcibly impose its own venue preference by misreading the very statutory text it disregarded in delivering the Exemption. In doing so, Defendants invite the Court to endorse their novel interpretation of section 7 and how this Exemption fits into its scheme before reaching the merits of the case. The Court should reject Defendants' efforts to frontload the

2

merits on a Rule 12(b)(1) motion and require Defendants to defend their acrobatic statutory interpretation on summary judgment.

**BACKGROUND**

I.      **Legal Background**

A.      **The Endangered Species Act**

Congress enacted the ESA because human activities had caused many species to go extinct, while other species "have been so depleted in numbers that they are in danger of or threatened with extinction." 16 U.S.C. § 1531(a)(2). Section 7 of the ESA therefore generally prohibits federal agencies from authorizing, funding, or carrying out any action "likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." *Id.* § 1536(a)(2). Section 7 establishes a consultation process with the U.S. Fish and Wildlife Service (FWS) and/or the National Marine Fisheries Service (NMFS) (collectively, the Services) to ensure agency actions avoid jeopardizing endangered or threatened species or adversely affecting their habitat. Where a proposed action is likely to adversely affect listed species or their habitat, triggering formal consultation, the relevant Service prepares a biological opinion (BiOp) to determine, *inter alia*, whether the action is likely to jeopardize the continued existence of a listed species or destroy or adversely modify critical habitat. 16 U.S.C. §§ 1536(b)(3)(A)-(B); 50 C.F.R. § 402.14(h)(iv). Where the Service finds that the proposed action violates section 7(a)—that is, is likely to jeopardize a listed species or adversely affect its habitat—it must "suggest those reasonable and prudent alternatives which [it] believes would not violate subsection (a)(2) and can be taken by the Federal agency or applicant in implementing the agency action." 16 U.S.C. § 1536(b)(3)(A).

3

Congress also recognized that there may be rare cases where no reasonable and prudent alternatives are available. In 1978, Congress amended the ESA to authorize a committee of government officials—the Endangered Species Committee—to issue an exemption from the substantive requirements of section 7(a)(2) following a series of adjudicatory hearings bound by rigorous procedural rules. *See id.* §§ 1536(e), (g)-(p).

The Committee can exercise its exemption authority only after an agency, state, or permit or license applicant applies for an exemption within 90 days following completion of consultation in which the Service determines "that the agency action would violate [section 7(a)(2)]." *Id.* § 1536(g)(1)-(2)(A). The Secretary must then promptly notify the Governors of any affected states, publish the application in the Federal Register, and determine whether the application meets certain threshold requirements, including that the federal agency and the exemption applicant have made a "good faith" and "reasonable and responsible effort to develop and fairly consider modifications or reasonable and prudent alternatives to the proposed agency action which would not violate [section 7(a)(2)]." *Id.* § 1536(g)(3). Should the Secretary determine that these preliminary criteria are met, he "shall, in consultation with the Members of the Committee, hold a hearing on the application for exemption in accordance with" the adjudicatory provisions of the Administrative Procedure Act (APA): 5 U.S.C. §§ 554-556. 16 U.S.C. § 1536(g)(4). The Secretary must then submit to the Committee a report discussing the factors relevant to the Committee's consideration, including the availability of reasonable and prudent alternatives and reasonable mitigation measures. *Id.* § 1536(g)(5).

Only after receiving this report is the Committee authorized to hold a "formal adjudicatory hearing" and decide whether to grant the application. *Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1541 (9th Cir. 1993); 16 U.S.C. § 1536(h)(1). In

4

order to grant an exemption, the Committee must, "by a vote of not less than five of its members voting in person," determine on the record that:

> (i) there are no reasonable and prudent alternatives to the agency action; (ii) the benefits of such an action clearly outweigh the benefits of alternative courses of action consistent with conserving the species or its critical habitat, and such an action is in the public interest; (iii) the action is of regional or national significance; and (iv) neither the Federal agency concerned nor the exemption applicant made any irreversible or irretrievable commitment of resources prohibited by subsection (d).

16 U.S.C. § 1536(h)(1)(A). The Committee must also "establish[] such reasonable mitigation and enhancement measures … as are necessary and appropriate to minimize the adverse effects of the agency action upon the endangered species, threatened species, or critical habitat concerned. *Id.* § 1536(h)(1)(B). Section 7(n) of the ESA provides that the Committee's adjudication of an application for an exemption is judicially reviewable in the United States Courts of Appeals. *Id.* § 1536(n).

Relevant to this case, section 7(j) of the ESA provides that "[n]otwithstanding any other provision of this chapter, the Committee shall grant an exemption for any agency action if the Secretary of [War] finds that such exemption is necessary for reasons of national security." *Id.* § 1536(j).

## B.    The Administrative Procedure Act

The APA confers a right of judicial review on any person who is adversely affected by agency action, 5 U.S.C. § 702, and "provides a right to judicial review of all 'final agency action for which there is no other adequate remedy in court,'" *Bennett v. Spear*, 520 U.S. 154, 175 (1997) (quoting 5 U.S.C. § 704). Under the APA, a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A reviewing court

5

shall also "hold unlawful and set aside" any agency action promulgated "without observance of procedure required by law." *Id*. § 706(2)(D). APA claims can be brought "in a court specified by statute or, in the absence or inadequacy thereof, . . . in a court of competent jurisdiction." *Id*. § 703.

## II.    Factual Background

As illustrated by the 2010 Deepwater Horizon oil spill, the federal oil and gas program in the Gulf poses numerous threats to marine and coastal wildlife, including many species listed as endangered or threatened under the ESA. Am. Compl. ¶¶ 59-63. These threats exist at every stage of the oil and gas production process. *Id.* ¶ 60. Seismic airgun surveys to locate oil and gas deposits produce damaging and disruptive levels of noise; wells, pipelines, and other structures destroy seafloor habitats; transportation vessels strike animals; oil spills pollute massive swaths of the ocean surface; and gas leaks (or flares) exacerbate coastal air pollution. *Id*.

In light of these grave threats, and pursuant to their obligations under section 7 of the ESA, BOEM and BSEE (collectively, the Bureaus) sought programmatic consultation with the Services for the offshore and onshore environmental effects of the offshore oil and gas program. *See id.* ¶¶ 67-70. Notably, neither Service found that the analyzed programmatic oil and gas activities on the Outer Continental Shelf would violate section 7(a)(2) of the ESA. In a BiOp issued in 2018 and reaffirmed in 2025, FWS found that the proposed oil and gas leasing activity was not likely to jeopardize or adversely modify any species or critical habitat listed under the ESA. *See id.* ¶¶ 67-68. And in its 2025 BiOp, NMFS found that the programmatically analyzed activity was likely to jeopardize the continued existence of the critically endangered Rice's whale but suggested a reasonable and prudent alternative that would eliminate this jeopardy. *See id.* ¶¶ 69-71.

Both the FWS and NMFS BiOps were challenged in federal district court. Environmental groups, including Plaintiff Natural Resources Defense Council (NRDC), challenged the 2025 NMFS BiOp in U.S. District Court for the District of Maryland. *Id.* ¶ 73. The State of Louisiana, Chevron U.S.A. Inc., and the American Petroleum Institute (API) (intervenor in this case) also challenged the same BiOp in the U.S. District Court for the District of Louisiana, *id.* ¶ 74, and the Center for Biological Diversity (CBD) challenged the FWS BiOps in this Court, Am. Compl., *Ctr. for Biological Diversity v. Burgum*, 1:24-cv-990-DLF (Aug. 4, 2025), ECF No. 36.[1]

Unsurprisingly, since neither Service found a section 7(a)(2) violation in their BiOps on federally authorized oil and gas activity in the Gulf, there was no application for an exemption from section 7(a)(2) within 90 days of completion of either the NMFS or FWS consultations. Am. Compl. ¶ 116; 16 U.S.C. § 1536(g)(2)(A). Nevertheless, on March 31, 2026, Defendants purportedly convened as the Endangered Species Committee for a public meeting. Committee Chairman and Secretary of the Interior Doug Burgum opened the meeting by inviting Secretary Hegseth to share the national security finding distributed beforehand to the Committee members. Am. Compl. ¶ 120. Secretary Hegseth opined that, as a matter of "urgent national security," a steady, affordable supply of domestic energy is required but is "under threat" by "ongoing Endangered Species Act litigation" that "threaten[s] to halt oil and gas activity in the Gulf of America." *Id.* ¶ 121 (citing Ex. G (Meeting Transcript) at 4:16-17, 19-21). Secretary Hegseth

---

[1] Defendants in these cases moved to dismiss *Sierra Club* and *Center for Biological Diversity* as moot in light of the exemption. *Ctr. for Biological Diversity*, 1:24-cv-990-DLF (Apr. 23, 2026), ECF No. 48-1; *Sierra Club*, 8:25-cv-1627 (Apr. 23, 2026), ECF No. 99. By contrast, Federal Defendants moved unopposed for a Rule 60(b) relief from judgment in *State of Louisiana*. 2:25-cv-691 (Apr. 27, 2026), ECF No. 63. Federal Defendants' motions have been granted in *State of Louisiana*, 2:25-cv-691 (Apr. 29, 2026), ECF No. 64, and *Sierra Club*, 8:25-cv-1627 (June 24, 2026), ECF No. 112; but remain pending in *Center for Biological Diversity* as of the date of this filing.

proclaimed that "we cannot allow our own rules to weaken our standing and strengthen those who wish to harm us." *Id.* (citing 7:4-6).

Based only on Secretary Hegseth's findings, the Committee voted to grant a sweeping exemption from the ESA's interagency consultation requirements for federally authorized oil and gas activity in the Gulf of America. 91 Fed. Reg. 16966, 16966-67 (Apr. 3, 2026). In the Exemption's text, the Committee stated, without support, that it was excused from following section 7(h)'s procedural consultation and substantive "jeopardy" and "adverse modification" mandates, as well as sections 7(g) and 7(h)'s other procedural requirements, due to the Secretary of War's national security findings under section 7(j). *Id.* Similarly, the Committee asserted that when faced with the Secretary of War's national security determination, the predicate "application and other related requirements do not apply" and the Exemption "need not specify any" of section 7(h)(1)(B)'s "mitigation and enhancement measures." *Id.*

Despite these repeated invocations of section 7(j) to skirt section 7(g) and 7(h)'s directives, the Committee claimed in a conclusory fashion that its Exemption was still "made under" section 7(h), so section 7(n)'s jurisdictional provision should channel review to the "circuit wherein the agency action concerned will be, or is being, carried out"—which, according to the Committee, was the Fifth or Eleventh Circuit Courts of Appeals. *Id.* at 16967.

### III.    Procedural Background

On April 1, 2026, NRDC filed a complaint in this Court challenging the Committee's Exemption under the Administrative Procedure Act (APA). Complaint, ECF No. 1. There are two other related cases challenging the Exemption pending before this Court. *See Ctr. For Biological Diversity v. Burgum*, No. 1:26-cv-940 (D.D.C. filed Mar. 18, 2026); *Healthy Gulf v. Burgum*, 1:26-cv-1118 (D.D.C. filed Apr. 2, 2026).

On April 3, 2026, NRDC filed a protective Petition for Review in the D.C. Circuit. *NRDC v. Burgum*, No. 26-1079 (D.C. Cir. filed Apr. 3, 2026) (No. 2167070). The Petition explicitly specified that NRDC "believes that judicial review of Respondents' action is proper, *not* in the courts of appeals pursuant to 16 U.S.C. § 1536(n), but rather in the district court pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 704, 706." *Id*. at 2. Other groups also filed Petitions for Review. *See Am. Energy Ass'n (AEA) v. Burgum*, No. 26-60240 (5th Cir. filed Apr. 13, 2026); *W&T Offshore, Inc. v. Burgum*, No. 26-11211 (11th Cir. filed Apr. 13, 2026); *Defs. of Wildlife v. Burgum*, No. 26-1085 (D.C. Cir. filed Apr. 14, 2026); *Nat'l Wildlife Fed'n v. Burgum*, No. 26-1088 (D.C. Cir. filed Apr. 15, 2026).

Once Defendants notified the Judicial Panel on Multidistrict Litigation (JPML) of the D.C. Circuit and Fifth Circuit petitions, the JPML consolidated the petitions and randomly selected the Fifth Circuit as the venue for their review under 28 U.S.C. § 2112(a). Consolidation Order, *NRDC v. Burgum*, No. 26-1079 (Apr. 20, 2026), ECF No. 3. NRDC and other petitioners moved for reconsideration of the Consolidation Order, prompting the JPML to stay its Consolidation Order. *In Re: Endangered Species Comm.*, MCP No. 202 (JPML Apr. 23, 2026). On May 6, NRDC and other petitioners moved for an abeyance of the Fifth Circuit proceedings pending the JPML's resolution of their motion, *AEA*, No. 26-60240*,* ECF No. 32-1, but on May 18, immediately after Defendants filed their opposition, a single-judge panel of the Fifth Circuit denied that motion, Order, *AEA*, No. 26-60240, ECF No. 56-2. On June 5, 2026, the JPML denied the motions for reconsideration. Order Denying Motions for Reconsideration of Consolidation Order, *In Re: Endangered Species Comm.*, MCP No. 202 (June 5, 2026), ECF No. 31.

Because merits briefing in the Fifth Circuit was scheduled to commence on July 15, 2026, NRDC filed a motion in the Fifth Circuit requesting a stay of merits briefing in its own case pending resolution of the jurisdictional issue Defendants raise here in their motion to dismiss. NRDC Motion, *AEA*, No. 26-60240 (June 16, 2026), ECF No. 68. Alternatively, if denied its request for a temporary stay, NRDC requested dismissal without prejudice, to prevent "duplicative briefing," particularly where NRDC had protectively filed its Petition. *Id*. at 2. On June 29, 2026, the Fifth Circuit summarily denied both requests. Order, *AEA*, No. 26-60240, ECF No. 88-2. Consequently, on June 30, 2026, NRDC filed an unopposed motion for voluntary dismissal, *AEA*, No. 26-60240, ECF No. 91, which the court granted that same day.

## STANDARD OF REVIEW

To defeat a Rule 12(b)(1) motion to dismiss, a plaintiff must only "state a plausible claim" for relief. *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2017). On a Rule 12(b)(6) motion to dismiss, "the complaint is construed liberally in the plaintiff[']s[] favor, and [the Court] grant[s] plaintiff[] the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994); *see also Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) ("To survive a motion to dismiss, a complaint must have "facial plausibility," meaning it must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

## ARGUMENT

The Court should deny Defendants' motion to dismiss for lack of jurisdiction. First, Defendants' characterization of the Exemption and inventive theories of statutory interpretation are merits arguments improperly raised at this juncture. NRDC's entitlement for relief under the

10

APA based on Defendants' novel statutory interpretation is not a jurisdictional question that is properly subject to a Rule 12(b)(1) motion. Second, Defendants are incorrect that section 7(n) requires NRDC to challenge this Exemption exclusively in a Court of Appeals. Defendants' Exemption exceeded the bounds of section 7's statutory authority, and Defendants' interpretation of section 7(n) is an implausible attempt to shoehorn the Exemption into an inapplicable judicial review framework. APA review is therefore proper because there is no other adequate remedy in court.

## I. Defendants cannot challenge NRDC's statutory cause of action on a motion to dismiss for lack of jurisdiction

Defendants do not challenge this Court's Article III jurisdiction over NRDC's pleadings. Nor could they; through its members, NRDC has alleged a judicially redressable injury traceable to the Exemption's devastating effects on Gulf wildlife. Am. Compl. ¶¶ 12-16.

Instead, Defendants argue that challenges to ESA exemptions are generally subject to ESA section 7(n), which provides direct judicial review of exemptions *issued under section 7(h)* in the federal Courts of Appeals. This channeling provision departs from the default rule that final agency actions under section 7 are reviewable in district courts. Central to Defendants' motion to dismiss is the parties' dispute over whether Defendants granted the Exemption under section 7(h) or section 7(j). NRDC pleads that Defendants "acted under ESA section 7(j)" and that their action was not a "decision of the Endangered Species Committee under []section [7](h)," Am. Compl. ¶ 8 (quoting 16 U.S.C. § 1536(n)), while Defendants argue that the Exemption was granted under section 7(h), Defs.' Mot. 13, ECF No. 28-1. Thus, Defendants' motion raises the question of whether review is proper under the general review provisions of the APA, *see* 5 U.S.C. §§ 704, 706, without citing any authority for their proposition that the Court should resolve this dispute on a motion to dismiss for lack of jurisdiction.

Defendants conflate whether NRDC has pleaded a statutory cause of relief for judicial review in this court under the APA with whether it has alleged sufficient facts to establish Article III jurisdiction. Defs.' Mot. 9-10. But the Supreme Court and the D.C. Circuit instruct that the question of whether a plaintiff has a cause of action under the APA is "an issue that requires [courts] to determine, using traditional tools of statutory interpretation whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). And unlike questions of Article III standing, "[this] is a merits issue, not a jurisdictional one." *Citizens for Const. Integrity v. Census Bureau*, 115 F.4th 618, 627 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2818 (2025) (quoting *CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 33 F.4th 584, 586 (D.C. Cir. 2022)). Because Defendants' arguments go to merits issues, the motion for lack of jurisdiction should be denied.[2]

But even if NRDC's entitlement to relief under the APA raised a jurisdictional question, it would be so closely interwoven with the merits that this Court should defer its judgment on the former until it considers the latter. Whether the Exemption fits within section 7(h)'s statutory grant of authority and whether the Committee correctly invoked that statutory authority are core disputed questions in this case. *See* Am. Compl. ¶ 8. The D.C. Circuit has held that "though the trial court may rule on disputed jurisdictional facts at any time, if they are inextricably intertwined with the merits of the case it should usually defer its jurisdictional decision until the merits are heard." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 198 (D.C. Cir. 1992). And in

---

[2] Nor do Defendants have any Rule 12(b)(6) motion to fall back on. Defendants cite Rule 12(b)(6) only once in their brief in support of their claim-splitting argument. Defs.' Mot. 22-23. Given the motion's reliance on Rule 12(b)(1), there is no reason for the Court to rescue it via conversion to a Rule 12(b)(6) motion. *See Lemus ex rel O.C.L. v. D.C. Int'l Charter Sch.*, No. 20-cv-3839 (RCL), 2022 WL 407151, at *10, n.5 (D.D.C. Feb. 10, 2022) (declining to treat a jurisdictional motion to dismiss as a Rule 12(b)(6) motion).

cases "where the question of jurisdiction is dependent on decision of the merits," the Supreme Court has held that "the District Court has jurisdiction to determine its jurisdiction by proceeding to a decision on the merits." *Land v. Dollar*, 330 U.S. 731, 735, 739 (1947); *see also Am. Oversight v. U.S. Dep't of Veterans Affs.*, 498 F. Supp. 3d 145, 153 (D.D.C. 2020) (recognizing that "where jurisdictional defenses and the merits of a dispute overlap, the jurisdictional defense is not used—in the absence of special considerations—to short-circuit the factual development and adjudicative process to which a plaintiff is generally entitled").

Defendants' motion thus inverts the burden of proof and asks this Court to assume the validity of their merits positions. But Defendants bear the burden of proving the three premises they expect the Court to just accept: that the Committee correctly characterized its Exemption as one issued under section 7(h), that section 7(j) exemptions necessarily result in section 7(h) determinations, and that section 7(n) judicial review applies to section 7(j) determinations. Meanwhile, at this juncture, NRDC need only demonstrate that its claim for relief under the APA in district court is plausible. *Humane Soc'y of the U.S.*, 797 F.3d at 10; *Hettinga*, 677 F.3d at 476.

To meet their burden, Defendants must pass through the eye of a needle. They must prove they can issue an exemption "under section 7(h)" to trigger section 7(n)'s venue provision, without actually following any of section 7(h)'s statutory requirements. Whether they can successfully thread that needle animates merits questions on the nature of the challenged exemption and the soundness of Defendants' statutory interpretation. *See Lexmark Int'l,* 572 U.S. at 127; *Citizens for Const. Integrity*, 115 F.4th at 627; *CSL Plasma Inc.*, 33 F.4th at 586. Should the Court reach these questions here, it will find Defendants' interpretation faulty, as discussed below. But such questions are best considered on summary judgment and in light of the administrative record. *Zemeka v. Holder*, 963 F. Supp. 2d 22, 26 (D.D.C. 2013).

**II.    No plausible reading of the ESA supports direct review of the Exemption in the Courts of Appeals**

The ESA's plain text defeats Defendants' theory that jurisdiction over NRDC's challenge to the Exemption properly lies in the Courts of Appeals. Defendants are owed no deference for their interpretation of the ESA, and the Court should choose the "best meaning" of the statute by "deploying its full interpretive toolkit." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 408-09 (2024). Here, there is no plausible interpretation of the statutory scheme that gives each provision its requisite meaning and allows the Court to view the Exemption as having been issued under section 7(h). Section 7(n)'s review-channeling provision therefore does not apply, and this Court is the proper venue for NRDC's APA claims.

**A.    This Court has jurisdiction because the Exemption exceeded the Committee's statutory authority**

It is black-letter law that an agency "'literally has no power to act' . . . unless and until Congress authorizes it to do so by statute." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 301 (2022) (citing *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). Absent such statutory authorization, "an agency's action is plainly contrary to law and cannot stand." *Hikvision USA, Inc. v. FCC*, 97 F.4th 938, 944 (D.C. Cir. 2024).

Here, the ESA authorizes the Committee to grant exemptions under extremely limited circumstances. The Committee's core statutory purpose is to "review any application submitted to it pursuant to [section 7] and determine . . . whether or not to grant an exemption." 16 U.S.C. § 1536(e)(2). Thus, the Committee can only grant exemptions in response to applications from "[a] federal agency, the Governor of the State in which in agency action will occur, if any, or a permit or license applicant." *Id.* § 1536(g)(1). And those applications may only be made when the relevant Secretary determines both that the proposed agency action will jeopardize a listed

14

species or adversely modify its critical habitat *and* there are no reasonable and prudent alternatives to mitigate that harm—in other words, that there is an irreconcilable conflict between the proposed action and ESA protections. *Id.* § 1536(b)(3)(A), (g)(1). Later subsections describe the specific forms by which applications must be submitted and the specific procedures by which the Committee must consider the applications. *Id.* § 1536(g)-(h). Importantly, while the ESA consistently refers to exemption applications throughout the text of section 7, it *never* contemplates an exemption being granted without the predicate application.

Congress also limited exemptions by imposing specific procedures the Committee must follow. Upon receiving an application, the relevant Secretary must promptly notify the Governors of any affected states, publish the application in the Federal Register, and determine whether the application meets certain threshold requirements, including that the federal agency and the exemption applicant have made a "good faith" and "reasonable and responsible effort to develop and fairly consider modifications or reasonable and prudent alternatives to the proposed agency action which would not violate [section 7(a)(2)]." *Id*. §§ 1536(g)(2)(B)-(3). Should the Secretary determine that these preliminary criteria are met, he "shall, in consultation with the Members of the Committee, hold a hearing on the application for exemption in accordance with" the adjudicatory provisions of the APA (5 U.S.C. §§ 554-556). *See* 16 U.S.C. § 1536(g)(4). The Secretary must then submit to the Committee a report discussing the factors relevant to the Committee's consideration, including the availability of reasonable and prudent alternatives and reasonable mitigation measures. *Id.* § 1536(g)(5).

Furthermore, the Committee may only grant exemptions based on its reasoned determination of discrete, enumerated statutory factors. Specifically, the Committee may only grant an exemption if, "by a vote of not less than five of its members voting in person," it

15

determines on the record in a formal adjudicatory hearing, 50 C.F.R. § 452.05, that: there "are no reasonable and prudent alternatives" to the proposed action; the proposed action is of "regional or national significance" and "in the public interest;" the associated benefits "clearly outweigh" the benefits of any alternatives; and the agency or applicant has made no prohibited "irreversible or irretrievable commitment of resources." 16 U.S.C. § 1536(h)(1)(A). It must also "establish[] such reasonable mitigation and enhancement measures . . . as are necessary and appropriate to minimize the adverse effects of the agency action upon the endangered species, threatened species, or critical habitat concerned." *Id.* § 1536(h)(1)(B).

Here, the Exemption was wholly divorced from the guardrails Congress installed within section 7. To begin, no one applied for the Exemption. *See id.* § 1536(e)(2), (g)(1). Rather, it was initiated by Secretary Hegseth's unprompted determination that environmental litigation so threatened national security that the entire Gulf leasing program should be exempted from the ESA. *See* Am. Compl. ¶¶ 114-17. And neither FWS nor NMFS ever found that there was an irreconcilable conflict between the ESA and the oil and gas activities proposed in the BiOp—in fact, the BiOp itself recommended a reasonable and prudent alternative which "would allow the action to proceed in compliance with section 7(a)(2)." BiOp at 574; *see also* Am. Compl. ¶ 70.

Nor did the relevant Secretary comply with the basic procedures for an exemption. He did not notify the Governors of affected states and request that they appoint individuals to the Committee, nor did he publish notice of receipt of an application in the Federal Register. *See* 16 U.S.C. § 1536(g)(2)(B). He did not determine that the federal agency concerned and exemption applicant carried out their section 7(a) consultation requirements, conducted biological assessments, or refrained from making irreversible or irretrievable commitments of resources. *See id.* § 1536(g)(3). And he did not hold a Committee hearing on the exemption application, nor

16

did he submit a report to the Committee discussing reasonable and prudent alternatives, mitigation and enhancement measures, or other required considerations. *See id.* § 1536(g)(4)-(5).

Without that report or hearing, the Committee could not (and did not) determine on the record the findings it must make under section 7(h)(A). *See id.* § 1536(h)(1)(A). Nor did it establish any mitigation or enhancement measures to "minimize the adverse effects of the agency action upon the endangered species, threatened species, or critical habitat concerned." *Id.* § 1536(h)(1)(B). Instead, the Committee took the unsupported position that it need not abide by that statutory requirement because the application and "exemption applicant" contemplated by the statutory structure "are not present in this situation," Committee Order at 2.

In summary: the Committee granted an unprecedentedly broad exemption, purportedly under the ESA, while ignoring nearly every one of the ESA's procedural and substantive requirements for granting an exemption.

Subsection (j) does not contort the Committee's illegal Exemption to fit within the ESA's bounds. That subsection provides that "[n]otwithstanding any other provision of [the] chapter, the Committee shall grant an exemption for any agency action if the Secretary of [War] finds that such exemption is necessary for reasons of national security." 16 U.S.C. § 1536(j). Defendants' theory takes a single word—"notwithstanding"—not only to make an end-run around the entirety of section 7's procedural and substantive requirements, but also to empower the Secretary of War to dictate sweeping ESA exemptions without any predicate application. Such a theory is unprecedented in the nearly fifty years of the Committee's existence. Defendants thus ask the Court to bless a new, long-dormant Secretarial power—one that single-handedly undermines "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). In doing so, the Court would

17

make precisely the paradigmatic "discover[y] in a long-extant statute [of] an unheralded power" that the Supreme Court has warned against. *W. Virginia v. EPA*, 597 U.S. 697, 724 (2022); *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014).

Instead, the "notwithstanding" clause has a more modest function than Defendants would prefer. Section 7(j) requires no more than what it says in its plain text: the Committee must grant an exemption, as understood in the context of section 7 of the ESA, when the Secretary of War finds it necessary for national security reasons. Any such exemption must be initiated by and ruled on via specific processes of application, information-gathering, and reasoned determination, none of which are incompatible with or excused by a directed outcome based on the Secretary of War's finding. "[A] statute's meaning does not always turn solely on the broadest imaginable 'definitions of its component words.'" *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018) (citing *Yates v. United States*, 574 U.S. 528, 537 (2025)). And it is well-settled that a "notwithstanding" clause "applies only when some other provision . . . conflicts with the scope" of the relevant section. *Greenbaum v. Islamic Republic of Iran*, 67 F.4th 428, 433 (D.C. Cir. 2023) (cleaned up). There is no conflict here between section 7(j) and the many other guardrails in the ESA exemption process.

This Exemption's illegality is underscored by the Committee's regulations, which do not contemplate exemptions without an application and pre-Committee determinations by the relevant Secretary. *See* 50 C.F.R. §§ 451-452. And while the regulations incorporate section 7(j)—stating that "[i]f the Secretary of [War] finds in writing that an exemption for the agency action is necessary for reasons of national security, the Committee shall grant the exemption notwithstanding any other provision in this part," *id.* § 453.03(d)—that provision is embedded within Part 453, which "prescribes the procedures to be used by the Endangered Species

18

Committee *when examining applications for exemption*," *id.* § 453.01 (emphasis added). Thus, even under the Committee's own interpretation of its statutory authority, a national security determination cannot bypass the requirements for an application, a pre-Committee examination and report by the relevant Secretary, and pre-decision hearings by "the Secretary, in consultation with the members of the Committee." *See id.* §§ 451, 452.03-05.[3]

Congress did not authorize the Committee to grant an application-less exemption, unprompted by any tension between the ESA and a proposed agency action, and which circumvented nearly every procedural and substantive requirement for the statutory exemption process. This Exemption was thus beyond the bounds of the Committee's statutory authority under subsection (h): it bears no resemblance to an exemption granted under subsection (h), and cannot plausibly be considered a decision "under subsection (h)" that would require Court of Appeals review under 16 U.S.C. § 1536(n).

## B.    The Committee's disregard for subsections (g) and (h) highlights the impropriety of original appellate review

The Committee's failure to follow the statute's prescribed adjudicatory procedures provides an additional basis for district court jurisdiction. The APA "divides agency action into two broad categories, rulemaking and adjudication." *ITServe All., Inc. v. U.S. Dep't of Homeland Sec.*, 71 F.4th 1028, 1034 (D.C. Cir. 2023). Sections 7(g) and (h) of the ESA give the Committee an adjudicatory role: the Committee must consider specific exemption applications for distinct actions, hold fact-finding hearings, and undergo deliberations. 16 U.S.C. § 1536(g), (h), (n). Statutes often empower such bodies to adjudicate administrative actions and enforce statutory

---

[3] Invoking national security does not excuse an exemption from those procedures. Both the statute and implementing regulations contemplate that federal agencies (for instance, the Department of War) can apply for exemptions. *See* 16 U.S.C. § 1536(g)(1); 50 C.F.R. § 451.02(c).

rights. *See Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 450-54 (1977) (explaining it is well-settled that Congress may "entrust enforcement of statutory rights to an administrative process or specialized court of equity" (quoting *Curtis v. Leother*, 415 U.S. 189, 195 (1974))).

Although agency adjudications are often reviewed by circuit courts in the first instance, because a properly performed agency adjudication "effectively fills in for the district court" by executing adjudicatory and fact-finding responsibilities in the first instance, the dearth of factfinding, record-making, or other adjudicatory procedure supporting this Exemption leaves a Court of Appeals without a record to review. *See Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023); *see also Bombardier, Inc. v. U.S. Dep't of Lab.*, 145 F. Supp. 3d 21, 34 (D.D.C. 2015) (these schemes have "a familiar structure: agency action, then review before an administrative law judge, then review by a higher agency board or commission, then finally judicial review"). By way of contrast, in the only instance of judicial review under subsection (n), the Ninth Circuit emphasized that "'the Endangered Species Committee is designed to function as an *administrative court of last resort*,'" *Portland Audubon Soc'y*, 984 F.2d at 1541 (emphasis added by Ninth Circuit) (quoting S. Rep. No. 97-418, at 17 (1982)), with its decision "based, in part, upon a 'formal adjudicatory hearing.'" *Id.* (quoting S. Rep. No. 97-418, at 16-18). Indeed, the Ninth Circuit concluded that a section 7(h) hearing is the formal adjudication "on the record," subject to the requirements of 5 U.S.C. § 557. *Id.*

When Congress elevates an administrative body into a judicial role, it requires that the administrative body perform its assigned judicial functions. *Id.* at 1540 ("Certain administrative decisions closely resemble judicial determinations and, in the interests of fairness, require similar procedural protections."). As the D.C. Circuit has explained:

20

> The judicial character of … statutory hearings is emphasized, and perhaps demanded, by statutory provisions for a 'review' of the agency action in a court.[] A 'review' is not usually a trial de novo; the common understanding is that the reviewing tribunal will inspect the step-by-step functioning and determinations of the agency. Of necessity, in such case a record of the agency hearing is required.

*Jordan v. Am. Eagle Fire Ins. Co.*, 169 F.2d 281, 286 (D.C. Cir. 1948). But where the administrative body acting in place of a trial court neglects to hold hearings, establish a record for a reviewing court, and otherwise fulfill its fact-finding duties, it frustrates the statutory scheme. *Cf. NRDC v. U.S. Nuclear Regul. Comm'n*, 606 F.2d 1261, 1265 (D.C. Cir. 1979) ("As long as we have an administrative record on which to base our review, as we do here, there is no need for evidentiary hearings in the district court."). Indeed, when considering a similar scheme where the sole method of review from a state administrative commission was by petition to the state's supreme court, Justice Cardozo asked a question this Court should now consider: "how [is] it possible for the appellate court to review the law and the facts and intelligently decide that the findings of the Commission were supported by the evidence when the evidence that it approved [is] unknown and unknowable?" *Ohio Bell Tel. Co. v. Pub. Utilities Comm'n of Ohio*, 301 U.S. 292, 303 (1937).

Here, the Committee's invocation of subsection (j) has made comprehensive appellate review in the first instance impossible. Although subsections (g) and (h) require the Committee and the relevant Secretary to develop a record based on written applications and reports, fact-finding hearings, and the documented weighing of mandatory factors to inform a final determination, the Committee here did none of those things. 16 U.S.C. § 1536(g)-(h). By granting its Exemption pursuant to section 7(j), without conducting the fact-finding required by section 7(h) or otherwise developing the record envisioned by implementing regulations, *see* 50 C.F.R. pts. 452-53, the Committee did not perform any quasi-judicial role. An appellate court

21

could therefore not meaningfully "review the law and the facts and intelligently decide that [its] findings . . . were supported by the evidence." *Ohio Bell Tel. Co.*, 301 U.S. at 303; *see also City of Rochester v. Bond*, 603 F.2d 927, 932 (D.C. Cir. 1979) (considering whether the record is "adequate for review in the court of appeals, a circumstance we have frequently held to be a principal indicium of 'orders' reviewable within the meaning of direct review statutes").

The Committee's scant record for review in the Fifth Circuit case reinforces the dissonance between the section 7(n) judicial review process and the instant section 7(j) national security determination. Ordinarily, for a section 7(h) proceeding, the record for review will at least consist of the application for an exemption; the record of the adjudicatory hearing on the application for an exemption held before the relevant Secretary under section 7(g)(4), 16 U.S.C. § 1536(g)(4); the report of that Secretary, *id*. § 1536(g)(5); and the record of the hearing before the Committee, *id*. § 1536(h)(1)(A). These compiled documents will then be available to a Court of Appeals reviewing the "record in the proceeding, as provided in [28 U.S.C. § 2112]." 16 U.S.C. § 1536(n). But here, due to the Committee's exclusive reliance on Secretary Hegseth's national security determination, there is no record of any application, Secretarial adjudicatory hearing, Secretarial report, or Committee hearing weighing the mandatory statutory factors, leaving a Court of Appeals with sparse factual material on which to base a decision. Given that NRDC challenges Secretary Hegseth's national security finding, the reviewing court will need the "whole record" for judicial review under 5 U.S.C. § 706, including materials directly or indirectly considered by Secretary Hegseth. *See WildEarth Guardians v. Salazar*, 670 F. Supp. 2d 1, 4 (D.D.C. 2009). The Committee's "record in the proceeding" under section 7(n) will not suffice. *See* 16 U.S.C. § 1536; 28 U.S.C. § 2112(b).

Because the Committee did not undertake an adjudication, the Courts of Appeals do not have jurisdiction over this case under section 7(n), and jurisdiction is proper in this Court. *See* 16 U.S.C. § 1536(n). Congress authorized the Courts of Appeals to judicially review the Committee's decision when the Committee acts as a trial court. *See Portland Audubon Soc'y*, 984 F.2d at 1540-41. Judicial review by a Court of Appeals, where the Committee performed no adjudication, would undermine the statute's design. Thus, the question of whether the factual record supports Secretary Hegseth's national security finding is better answered by this Court, where jurisdiction is presumptively vested in APA cases. *See Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1287 (D.C. Cir. 2007); *see also Sierra Club v. Thomas*, 828 F.2d 783, 791 (D.C. Cir. 1987) *partly abrogated by statute as recognized by Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 553 n.6 (D.C. Cir. 2015) ("District courts are better suited to making factual determinations than are courts of appeals[.]").

C.     **Even if section 7(j) authorized the Exemption, the Committee improperly invoked section 7(h)**

Even assuming that Defendants permissibly applied section 7(j) to skirt the ESA's requirements, this Exemption still could not be considered a decision "under subsection (h)" for purposes of section 7(n)'s review-channeling provision. Rather than offering a well-reasoned explanation for how subsection (j) fits within the broader exemption framework of section 7, Defendants fall back on a deceptively simple syllogism—because subsection (h) is the only mechanism for the Committee to grant an exemption, the Court should treat any exemption as an exemption under subsection (h). *See* Defs.' Mot. 13. But there is a glaring flaw with Defendants' argument. Under section 7, a proposed agency action can be decided through *multiple* pathways, and only *one* available pathway—through subsection (h)—proceeds to direct review in the Courts of Appeal. Defendants have not demonstrated that exemptions granted pursuant to the

23

Secretary of War's direction under subsection (j) necessarily travel the subsection (h) route. And regardless of whether a 7(j) exemption *can* travel the 7(h) route, this Exemption certainly did not.

> **i.** **Only exemptions under subsection (h) are subject to direct review in the Courts of Appeal**

While the exemption process necessarily culminates in either the grant or denial of an exemption, contrary to Defendant's assertions, *see* Defs.' Mot. 10, the statute creates different paths to reach those endpoints. First, the relevant Secretary may deny an exemption application under section 7(g)(3)(B) for failure to meet threshold requirements. 16 U.S.C. § 1536(g)(3)(B). That denial, which occurs before the relevant Secretary develops his report and submits the application to the Committee, constitutes final agency action, but is not a grant of an exemption under section 7(h). *Id*. Thus, it is not subject to any unique venue provisions and is reviewable in the district court as a final agency action under the APA. *See id.* Second, an application may be terminated by the Secretary of State's certification that the proposed agency action would violate international treaty obligations. *Id*. § 1536(i). Though subsection (i) does not specify standards for judicial review, the Secretary of State's certification is likewise presumably reviewable in federal district court. *See Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 624 (D.C. Cir. 2020) (noting "strong presumption in favor of judicial review").

Should an exemption's consideration survive these initial steps, it may reach its endpoint—a denial or grant of an exemption—by way of subsections (h), (p), or (j). The first path, subsection (h), contemplates an adjudicatory process—that is, a rigorous application, record-building, and determination process—that avails itself of the Committee's specialized knowledge and abilities. *See* 16 U.S.C. § 1536(g)-(h). Meanwhile, subsection (p) contemplates the President, in lieu of the Committee, making the determinations under subsections (g) and (h)

24

that are binding on the Committee and thus effectively directing its decision-making during national emergencies. *Id*. § 1536(p). Based on this structure, an exemption issued under subsection (p) may still travel the (h) route but reach a Presidentially-directed outcome. Finally, subsection (j) creates an additional path wholly independent of subsection (h) which unfolds when the Secretary of War finds that an exemption is necessary for reasons of national security, requiring the Committee to grant an exemption. *Id*. § 1536(j).

But by its own terms, section 7(n) only provides original appellate review for a specific category of exemptions: those which traveled the section 7(h) path to a final determination. *Id*. § 1536(n). "This conclusion follows directly from the application of a well-established canon of statutory interpretation: '*expressio unius est exclusio alterius*'—in plain English, 'expressing one item of [an] associated group or series excludes another left unmentioned.'" *Esteras v. United States*, 606 U.S. 185, 195 (2025) (quoting *Chevron v. Echazabal*, 536 U.S. 73, 80 (2002)).

This is not a case where Congress prescribed a judicial review procedure "solely by reference to the subject matter of the Commission action and not by reference to the procedural particulars of the Commission action." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 739 (1985). Rather, subsection (n) explicitly references subsection (h), the Committee's decision under this subsection, and the "record in the proceeding." 16 U.S.C. § 1536(n). Had Congress intended for subsection (n) to broadly apply to all final grants or denials by the Committee, as Defendants posit, it would have used broader language. It did not.

Instead, section 7(n) contemplates a "decision of the Endangered Species Committee under subsection (h)," *id.* § 1536(n), and section 7(h) sets forth the processes and substantive requirements for the Committee's "final determination whether or not to grant an exemption," *id.* § 1536(h). The terms "decision" and "determination" entail conclusions reached based on

25

processes of consideration and reasoning. *See Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 136 (1951) ("An appropriate governmental 'determination' must be the result of a process of reasoning . . . . This is inherent in the meaning of 'determination.'"); *Decision*, MERRIAM-WEBSTER DICTIONARY, Merriam-webster.com/dictionary/decision (last visited June 16, 2026) (defining "decision" as "a determination arrived at after consideration" or "a judicial determination made after consideration of the facts or law of a case"). It follows that the Committee's "decision" or "determination" under section 7(h) must be based on the decision-making process prescribed by section 7(h)(1)(A), including considering whether there are "reasonable and prudent alternatives," whether "the benefits of such action clearly outweigh the benefits of alternative courses of action," and whether "the action is of regional or national significance." *See* 16 U.S.C. § 1536(h)(1)(A).

In contrast, section 7(j) ignores section 7(h)'s mandatory considerations and removes the Committee's discretion, requiring the Committee to "grant" certain exemptions absent any independent reasoning. *Id.* § 1536(j). Indeed, some of the Defendants expressly stated that "under statute[,] the Committee has no discretion" to oppose Secretary Hegseth's requested exemption. *See, e.g.*, Am. Compl. Ex. G (Transcript) at 9:9-10 (Administrator Lee Zeldin). That directed outcome is independent of section 7(h)'s determination process: the Committee could, for instance, find on the record that there *are* "reasonable and prudent alternatives to the agency action" or that the benefits of the action do *not* "clearly outweigh the benefits of alternative courses of action consistent with conserving the species or its critical habitat," *see id.* § 1536(h)(1)(A), and *still* be forced to grant the exemption based on the Secretary of War's 7(j) directive. This possibility highlights that a 7(j) exemption grant does not proceed under the

26

Committee's 7(h) reasoning and could not constitute a "decision" or "determination" of the Committee under that subsection.

      ii.      **Defendants have not demonstrated that exemptions granted pursuant to the Secretary of War's direction under subsection (j) necessarily travel the subsection (h) route**

As detailed *supra*, a holistic review of section 7 reflects Congress' vision of different types of exemptions under that section—that is, exemptions under sections 7(h), 7(j), and 7(p). In enacting the exemption procedures of section 7, Congress clearly specified where it referred only to exemptions issued under 7(h). For example, it set minimal parameters for exemptions under section 7(h): the exemption is permanent unless the Committee takes action to limit its scope, *id*. § 1536(h)(2), and the interagency consultation requirements and limitations on take are not required when an exemption is issued under section 7(h). *Id*. § 1536(a)(2), (o)(1). Indeed, it makes sense for Congress to give maximal effect to an exemption under subsection (h), because at the time the exemption process was included in section 7 of the ESA, Congress was encouraging the Committee constituted under the Carter Administration to fully exempt the Grayrocks and Tellico Dam projects from the ESA. *See* An Act to Amend the ESA, Pub. L. No. 95-632, § 5(i)(1), 92 Stat. 3751, 3761 (Nov. 10, 1978). Further, it makes sense that Congress did not set a floor on the effect of a subsection (j) national security exemption, because such exemptions might extend only so far as is "necessary for reasons of national security." 16 U.S.C. § 1536(j). For instance, a Secretary of War could find that a project must move forward despite destroying a species' critical habitat, but a full exemption for every species that might be affected is not necessary. By contrast, once the Committee reaches an exemption under subsection (h), subsections (a)(2) and (o)(1) are no longer applicable, *id*. §§ 1536(a)(2), (o)(1), and any limiting principles on the exemption must be put in place by the Committee, *id*. § 1536(h)(1)(B).

27

Subsection (p) shows that Congress knew how to build a path to an exemption grant that invokes subsection (h) decision-making—a path Congress declined to carve out for subsection (j). Subsection (p) states that, under certain conditions and for certain projects, "the President is authorized to make the determinations required by subsections (g) and (h)" and that "[n]otwithstanding any other provision of this section, the Committee shall accept the determinations of the President under this subsection." 16 U.S.C. § 1536(p). Thus, under subsection (p), the Committee may still decide to grant or deny the exemption, albeit based on the President's section 7(g) and (h) determinations.

By contrast, once the Secretary of War properly invokes subsection (j), the Committee cannot make the ultimate decision to grant or deny the exemption. Because subsection (j) does not preserve this decision-making role for the Committee, it is not incorporated into either the subsection (h) process or the subsection (n) appellate review scheme.  Congress could have used language similar to subsection (p) when crafting subsection (j) but elected against it, underscoring that 7(j) grants are detached from 7(h) decision-making and therefore do not automatically fall under 7(n)'s review-channeling provision. *See City of Chicago v. Env't Def. Fund*, 511 U.S. 328, 338 (1994) ("It is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." (cleaned up)).

Interpreting the two provisions identically as they relate to subsection (h) would "run counter to the 'basic interpretive canon[ ]' that 'a statute should be construed so that effect is given to all its provisions.'" *Am. Petroleum Inst. v. SEC*, 714 F.3d 1329, 1333-34 (D.C. Cir. 2013) (quoting *Corley v. United States,* 556 U.S. 303, 314 (2009)). Moreover, such an interpretation would give the Secretary of War greater authority than the President, despite the

28

President's greater power than those "'assistants or deputies' who 'derive their offices from his appointment' and remain 'subject to his superintendence.'" *Trump v. Slaughter*, 609 U.S. ---, 2026 WL 1855612, at *2 (U.S. June 29, 2026) (quoting The Federalist No. 72, p. 436 (A. Hamilton)).

Defendants' argument that the Exemption can only be reviewed as if issued under subsection (h) creates further interpretive problems. Defendants note that section 7 is replete with provisions that apply only to exemptions issued under subsection (h). *See* Defs.' Mot. 13 (citing 16 U.S.C. §§ 1536(a)(2), (e)(2), (h)(1), (*l*), (m), (o)(1)). But there is no canon of statutory interpretation to support Defendants' theory that when Congress referred to exemptions under subsection (h), it meant all exemptions, and vice versa. Had Congress intended subsection (n) to apply to all exemptions, it would have said so. Instead, it mandated direct judicial review in the Court of Appeals only for exemptions issued under subsection (h). In assuming that an exemption can only be issued under subsection (h), Defendants would treat all these specific references to exemptions "pursuant to subsection h" as surplusage. *See* 16 U.S.C. §§ 1536(a)(2), (e)(2), (*l*), (m), (n), (o)(1), (p). But courts presume that Congress did not "'include words that have no effect,' and so . . . generally 'avoid a reading that renders some words altogether redundant.'" *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1068 (D.C. Cir. 2018) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176-77 (2012)); *see also Fischer v. United States*, 603 U.S. 480, 498 (2024) (rejecting an interpretation that "renders an unnerving amount of statutory text mere surplusage").

The canon against surplusage is particularly strong here, where Congress *did* enact certain provisions that apply to exemptions generally, not just those issued under subsection (h). *See, e.g.,* 16 U.S.C. § 1536(e)(3)(G), (i), (j), (k). As the Supreme Court has explained, "[w]here

Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (quotation omitted).

### iii.    This Exemption was not issued under subsection (h)

Whether or not a section 7(j) exemption *can* go through section 7(h) and thus be subject to direct review in the Courts of Appeals, it is incontrovertible that *this* Exemption did not. Indeed, Defendants made only a cursory attempt to cast this Exemption as one under subsection (h). Defendants then asserted that subsection (h)'s "standards for the Committee to apply"—and Section 7 more broadly—are irrelevant "when the Secretary of War finds that an exemption is necessary for reasons of national security." Committee Order at 2.

Not only did Defendants ignore all of subsection (h)'s procedural and substantive requirements, *see supra* Part II(A), but they also evaded subsections that, like subsection (n), pertain exclusively to exemptions issued under (h). For example, subsection (*l*)(1) provides that "[i]f the Committee determines under subsection (h) that an exemption should be granted with respect to any agency action, the Committee shall issue an order granting the exemption and specifying the mitigation and enhancement measures established pursuant to subsection (h) which shall be carried out and paid for by the exemptions applicant in implementing the agency action." 16 U.S.C. § 1536(*l*)(1). But here, the Committee concluded in the Exemption's text that it "need not specify" any of the mitigation and enhancement measures that subsection (h)(1)(B) and (*l*)(1) require "because the application and other related requirements do not apply" due to the Secretary of War's 7(j) directive. Committee Order at 2.

Despite eschewing any obligations under subsection (h) and its related subsections, the Committee nonetheless cherry-picks the venue provisions of subsection (n) as the *one aspect* of

7(h) applicable to this Exemption. But the Committee cannot have its cake and eat it too. By explicitly circumventing every one of the ESA's requirements for decisions made under subsection (h), the Committee relinquished any right to demand review under subsection (n).

### iv. The Committee cannot evade district court jurisdiction by labeling its Exemption a "section 7(h)" exemption

At the Rule 12(b) stage, it suffices for NRDC to plausibly allege that Defendants improperly labelled their action as an exemption under section 7(h). *Humane Soc'y of the U.S.*, 797 F.3d at 8; *Hettinga*, 677 F.3d at 476. Apart from the Committee's conclusory assertions that its order was "pursuant" to section 7(h), *e.g.* Committee Order at 2, the Exemption bears no discernible connection to section 7(h) whatsoever. Defendants cannot avail themselves of the review-channeling provision tailored exclusively to 7(h) purely through their own say-so. *See Sea-Land Serv., Inc. v. Fed. Mar. Comm'n*, 402 F.2d 631, 634 (D.C. Cir. 1968) (an agency's "label is not conclusive, and what is decisive is the substance of what it has done"); *see also Azar v. Allina Health Servs.*, 587 U.S. 566, 575 (2019) ("[C]ourts have long looked to the *contents* of the agency's action, not the agency's self-serving *label*, when deciding whether statutory notice-and-comment demands apply."); *Murphy Expl. & Prod. Co. v. U.S. Dep't of the Interior*, 252 F.3d 473, 479 (D.C. Cir. 2001), *modified on denial of petition for reh'g*, 270 F.3d 957 (D.C. Cir. 2001) ("It goes without saying that the jurisdiction of the federal courts is outside agencies' expertise.").

Rather than accept Defendants' characterization of the Exemption, the Court should "make an independent assessment" of the nature and substance of the Exemption in determining whether it was actually issued under section 7(h). *See EPA v. Calumet Shreveport Ref., L.L.C.*, 605 U.S. 627, 638 (2025) (holding that for purposes of determining which court should hear a case, "the [statute's] framing of the relevant 'action' [is] controlling, regardless of how [the

31

agency] chooses to package its decision in the Federal Register"). To do so, the Court "should parse the reasoning offered by [the agency] in taking an action to decide which determinations primarily drove the action[]"—which, as detailed *supra*, constitutes a merits issue. *Id.* at 646; *accord Oklahoma v. EPA*, 605 U.S. 609, 623 (2025).

### D.    NRDC's claims are properly before this Court

#### i.    Because NRDC's claims fall outside of the scope of section 7(n), they are properly brought under the APA

Without subsection (n)'s review-channeling provision, NRDC's claims are properly considered by this Court, in accordance with the default rule for review of agency action. That default rule provides "that persons seeking review of agency action go first to district court rather than to a court of appeals," as "district courts have general federal question jurisdiction under 28 U.S.C. § 1331." *Pub. Citizen, Inc.*, 489 F.3d at 1287. "Initial review of agency decisions occurs at the appellate level only when a direct-review statute specifically gives the court of appeals subject-matter jurisdiction to directly review agency action," *id.* (cleaned up), and "[a]n appellate court's jurisdiction under a direct review statute is strictly limited to the agency action(s) included therein," *NetCoalition v. S.E.C.*, 715 F.3d 342, 348 (D.C. Cir. 2013).

Here, original appellate jurisdiction is strictly limited to review of Committee decisions made under subsection (h). 16 U.S.C. § 1536(n). Because the Committee's Exemption bore no connection to subsection (h) and, if properly granted, was done so pursuant to subsection (j), only the district courts have original jurisdiction to review it. *See Am. Petroleum Inst.*, 714 F.3d at 1333 (dismissing petition for review in Court of Appeals where the challenged rule was only tangentially related to those rules for which review was available in the Courts of Appeals). Section 7(n) no more "cuts off original jurisdiction in other courts" for claims arising under section 7(j) than it would for claims arising under sections (a)(2) or (g)(3). *Telecomms. Rsch. &*

32

*Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984) (holding that an exclusive review provision applies to challenges to the delay of actions that once final would be reviewable exclusively in the Courts of Appeal). After all, a "special statutory review scheme" provides the "exclusive means of obtaining judicial review" only in "those cases to which it applies." *Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 498 (D.C. Cir. 2018) (quotation omitted); *see also* 5 U.S.C. § 703.

Defendants' argument that subsection (n)'s "more specific" provision precludes general APA remedies in this case is wrong, Defs.' Mot. 18-20; subsection (n) does not apply to NRDC's claims, *see supra* Part II, so it does not "preclude review," Defs.' Mot. 19. And because the ESA does not include a more specific statute providing an adequate remedy for NRDC's claims, the APA provides the vehicle for review. *See* 5 U.S.C. § 704; *see also Am. Petroleum Inst.*, 714 F.3d at 1332-33. The Supreme Court reached this same conclusion in finding it "not [] maintainable" to contend that "the causes of action against the Secretary set forth in the ESA's citizen suit provision are exclusive, supplanting those provided by the APA." *Bennett v. Spear*, 520 U.S. 154, 175 (1997). Where the ESA citizen-suit provision neither "expressly preclude[d] review under the APA, nor" did the "statutory scheme suggest[] a purpose to do so," APA challenges to the Secretary's failure to comply with section 7 remained available to the plaintiff. *Id*. So too here. NRDC's APA challenge to this Exemption is proper because section 7(n) neither applies to this Exemption nor expressly precludes the claims NRDC brings.

To the extent Defendants nevertheless argue that section 7(n) precludes APA remedies even for causes of action that cannot be brought under section 7(n), Defs.' Mot. 18-20, Defendants cannot overcome "the strong presumption that Congress intends judicial review of administrative action," *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986). Nor can they advance "'clear and convincing evidence that Congress intended to restrict judicial

33

review of the matter at issue."[4] *Loyola Univ. Med. Ctr. v. Becerra*, 728 F. Supp. 3d 128, 138 (D.D.C. 2024) (quoting *Knapp Med. Ctr. v. Burwell*, 192 F. Supp. 3d 129, 133-34 (D.D.C. 2016)); *see also Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015); *Bowen*, 476 U.S. at 670. Indeed, the cases Defendants cite on the importance of statutes of limitations all concern plaintiffs who did not timely file to avail themselves of judicial review pursuant to a different statutory provision. *Hinck v. United States*, 550 U.S. 501, 508 (2007); *EC Term of Years Tr. v. United States*, 550 U.S. 429, 432 (2007); *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 122 (2005); *Eagle-Picher Indus., Inc. v. EPA*, 759 F.2d 905, 911-12 (D.C. Cir. 1985). The only case Defendants cite involving a statute foreclosing judicial review altogether is *Block v. Community. Nutrition Institute*, 467 U.S. 340 (1984), which presents a unique set of facts inapplicable here. *Block* involved a comprehensive administrative review scheme focused on dairy handlers and producers to ensure their participation in the development of market orders; the statute, however, omitted any provision allowing dairy consumers to participate in any proceeding, so they could not seek judicial review under that statute. *Id.* at 346-47. This exceptional case only proves the rule, because very few statutes, and certainly not the ESA, so clearly reveal Congress' intention to close the door on all judicial review.

### ii.    Defendant's policy arguments cannot rewrite the statute

Defendants' arguments that Congress must have intended to route all exemptions through section 7(h) are unpersuasive. Indeed, these arguments bear an uncanny resemblance to the

---

[4] Defendants may argue on summary judgment that Secretary Hegseth's national security determination is not reviewable in any court. But having failed to make this argument in its opening brief on this motion, it may not do so in its reply brief. *United States v. Apodaca*, 251 F. Supp. 3d 1, 5 (D.D.C. 2017); *see also McBride v. Merrell Dow & Pharm., Inc.*, 800 F.2d 1208, 1211 (D.C. Cir. 1986) ("Considering an argument advanced for the first time in a reply brief . . . is not only unfair to [a non-movant], but also entails the risk of an improvident or ill-advised opinion on the legal issues tendered." (citations omitted)).

arguments rejected by the Supreme Court in *National Association of Manufacturers v. Department of Defense*, 583 U.S. 109, 114, 117-19 (2018). There, too, the federal respondents advanced a capacious reading of the exclusive appellate review provisions of an environmental statute. *Id.* at 123-29. To excuse the surplusage and inconsistencies created by its statutory interpretation, federal respondents resorted to the same "extratextual considerations" that Defendants advance here. *See id.* at 129. They argued that routing the challenged rule through the district courts would create a "bifurcated judicial-review scheme," *id.*, whereas "immediate court-of-appeals review facilitates quick and orderly resolution of disputes" and "promotes . . . national uniformity," *id.* at 130 (cleaned up). The Court rejected all of these "policy arguments" and held that federal respondents' reliance on *Florida Power & Light Co. v. Lorion* was misplaced because the challenged action was not among those for which Congress provided judicial review in the Courts of Appeals. *Id*. at 131-32 (citing *Fla. Power & Light,* 470 U.S. 729, 745 (1985)). Because the challenged action was a "final agency action for which there is no other adequate remedy in a court," review was available in district court under the APA. *Nat'l Ass'n of Mfrs*, 583 U.S. at 118-19.

So too here. Contrary to Defendants' assertions, this is not an instance of "a claim challenging procedural or intermediate actions that will culminate in a final agency action reviewable only in the courts of appeals." Defs.' Mot. 16. The final agency action at issue is either a subsection (j) exemption grant divorced from subsection (h), or an exemption wholly beyond the Committee's statutory authority to grant, both of which are properly reviewed at the district court level. To the extent NRDC's arguments about the lack of an application and arbitrariness of the Secretary of War's national security determination are "challenges to

35

procedural and intermediate agency action," they did not "culminate in a final agency action reviewable only in the courts of appeals." *Id*. at 15-16.

Because original jurisdiction for this action is proper at the district court level, the risk of the "duplicative and potentially conflicting review" that concurrent jurisdiction would create is not present here. *Id.* at 16. Nor does section 7(n)'s use of a short statute of limitations prove any Congressional intent for an expansive reading. In *National Manufacturers Association*, the Supreme Court rejected this same argument, acknowledging that "routing . . . challenges directly to the courts of appeals may improve judicial efficiency," but efficiency was not Congress' only goal, as demonstrated by its decision to not adopt direct appellate review for all national Clean Water Act actions as it did for the Clean Air Act. 583 U.S. at 130. If anything, section 7(n)'s statute of limitations supports the key distinctions between subsection (h) decision making and subsection (j) directives. Congress's imposition of a 90-day window to challenge subsection (h) determinations more closely resembles the 30-day window to appeal a district court decision than the APA's six-year window. *Compare* 16 U.S.C. § 1536(n), *with* 28 U.S.C. § 2401(a), *and* Fed. R. App. P. 4. By imposing that time limit, Congress recognized that decisions informed by subsection (h) processes—and only those decisions—should be treated like trial court determinations. Indeed, petitioners for review of a Committee decision under section 7(h) could very likely be applicants or intervenors. *See, e.g., Portland Audubon Soc'y*, 984 F.2d at 1537 n.4. As demonstrated by the cases Defendants cite, an abbreviated statute of limitations makes sense in cases, unlike this one, where the plaintiffs participated in the administrative action culminating in the final decision, or were directly subject to that action. *Hinck*, 550 U.S. at 508; *EC Term of Years Tr.*, 550 U.S. at 432; *City of Rancho Palos Verdes*, 544 U.S. at 122; *Eagle-Picher Indus.*, 759 F.2d at 911.

Defendants may believe that Congress should have written the subsection (n) judicial review provision to encompass all exemptions issued under the statute. But such policy preferences are no basis for the Court to rewrite the statute. *See Am. Petroleum Inst.*, 714 F.3d at 1336; *see also Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 223-24 (2012) (rejecting theory that Congress meant to expand Quiet Title Act provision to encompass a plaintiff's claims, and holding that since those claims fell outside of the scope of the claims specified by the relevant provision, the case "falls within the APA's general waiver of sovereign immunity").

### iii.    Defendants' claim-splitting argument fails

Contrary to Defendants' argument, NRDC's run-of-the-mill protective petition was not an impermissible "parallel action" justifying dismissal of NRDC's district court complaint. *See* Defs.' Mot. 21. And now that NRDC has dismissed that Petition, Defendant's claim-splitting argument is moot.

Generally, a court's decision to "dismiss an action that presents the same claim … as another pending action" is a matter of "discretion," 18 Fed. Prac. & Proc. Juris. § 4404 (3d ed.); *Elgin v. Dep't of Treasury*, 567 U.S. 1, 14 (2012), and is based on principles of case management or "as an outturn of finality and fairness," *Steele v. United States*, 144 F.4th 316, 325 (D.C. Cir. 2025). But here, NRDC never sought to litigate the exemption in two courts. Filing a protective petition for review in the Court of Appeals in case a district court lawsuit is dismissed on jurisdictional grounds—what NRDC has done—is a well-established practice before this District Court. *Nat'l Ass'n of Mfrs.*, 583 U.S. at 119; *e.g. Am. Soybean Ass'n v. Regan*, 77 F.4th 873, 874-75 (D.C. Cir. 2023) (petitioners challenged EPA orders regulating pesticides in this Court and filed protective petitions in the D.C. Circuit, which agreed that this Court had proper jurisdiction); *Sierra Club v. Jackson*, 813 F. Supp. 2d 149, 154 n.2 (D.D.C. 2011) (Sierra Club

37

filed protective petition in D.C. Circuit, which was held in abeyance while this Court resolved the jurisdictional question).

More importantly, dismissal on claim-splitting grounds would also be unfair and improper. *See Steele*, 144 F.4th at 328. NRDC never sought two bites at the apple. NRDC only filed a protective petition because Defendants opined in the Exemption's text that review was proper "exclusively in the U.S. Courts of Appeals." 91 Fed. Reg. at 16967. NRDC explained in its petition that it disagreed and believed that review is proper only in this Court pursuant to the APA. NRDC Pet. for Review at 2-3, *NRDC v. Burgum*, No. 26-1079 (D.C. Cir. Apr. 3, 2026) (No. 2167070). Defendants themselves admit that "[a] protective petition may preserve a party's position while the proper forum is resolved." Defs.' Mot. 25. And yet here, to no avail, NRDC repeatedly requested that the Fifth Circuit stay proceedings to allow jurisdictional determinations to proceed in other venues including this one, and has consistently asserted that jurisdiction is only proper in this Court, *see* NRDC Mot. to Stay or Dismiss at 4, 9, *AEA* (No. 2660340) (June 16, 2026), ECF No. 68. NRDC diligently endeavored to prevent the simultaneous litigation of which Defendants now complain, over Defendants' repeated objections in the Fifth Circuit. Ultimately, NRDC had no choice but to dismiss its protective petition or proceed on the merits of a petition over which the Court of Appeals lacked jurisdiction, and it chose the former. Blocking NRDC from redress in this Court merely because it sought to preserve its claims in the court in which Defendants believed that jurisdiction was proper would be harshly inequitable, ensuring NRDC gets no bite at the apple at all.

Finally, since NRDC has dismissed its Petition for Review in the Fifth Circuit, Defendants' claim-splitting argument is moot. "This Circuit has traditionally applied a 'first-in-time' rule for instances of claim-splitting: The court where a suit is first commenced is allowed

to proceed to its decision first." *Baxter v. Islamic Republic of Iran*, No. 1:11-CV-2133-RCL, 2025 WL 689217, at \*14 (D.D.C. Mar. 4, 2025) (citing *Wash. Metro Area Transit Auth. v. Ragonese*, 617 F.2d 828, 830 (D.C. Cir. 1980)). Here, NRDC filed its Complaint with this District Court before it filed, and ultimately dismissed, its protective petition. *See* Compl., ECF No. 1 (D.D.C. Apr. 1, 2026); NRDC Pet. for Review, No. 26-1079 (D.C. Cir. Apr. 3, 2026) (No. 2167070). Even if the doctrine against claim-splitting applied at the time Defendants filed their motion, NRDC's dismissal of its Petition for Review extinguishes any possible claim-splitting concerns and allows the first-in-time case to proceed alone, as per this Circuit's rule.

## CONCLUSION

The lynchpin of Defendants' motion to dismiss is that, based on section 7(n), jurisdiction is only proper in the Court of Appeals. Defendants' jurisdictional argument is wrong, and without it, Defendants offer no reason this case cannot proceed before this Court. Because NRDC has stated a plausible claim for relief, the Court should deny Defendants' motion to dismiss.

Pursuant to Local Civil Rule 7(f), NRDC respectfully requests the Court hold oral argument on Defendants' Motion.

Dated: July 14, 2026                                    Respectfully submitted,

                                                                    /s/ Sitara Witanachchi
                                                                    Sitara Witanachchi (D.C. Bar No. 1023007)
                                                                    Jared Solomon (D.C. Bar No. 90033165)
                                                                    Erik Van de Stouwe (New York Bar No. 5692512) *admitted pro hac vice*
                                                                    Natural Resources Defense Council, Inc.
                                                                    1152 15th St. NW, Suite 300
                                                                    Washington, D.C. 20005
                                                                    switanachchi@nrdc.org
                                                                    jsolomon@nrdc.org
                                                                    evandestouwe@nrdc.org
                                                                    Tel: (202) 289-6868

*Attorneys for Plaintiff Natural Resources Defense Council, Inc.*

40