**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., | : | |
| Plaintiff, | : | Civil Action No.: 26-1116 (RC) |
| v. | : | Re Document Nos.: 28, 37 |
| DOUG BURGUM, Secretary of the Interior, *et al.*, | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

### GRANTING FEDERAL DEFENDANTS' MOTION TO DISMISS

### I. INTRODUCTION

This case concerns an obscure, and scarcely convened, government committee colloquially named the "God Squad" because of its unique authority to grant exemptions from the Endangered Species Act ("ESA"), potentially leading to the extinction of entire species. In 1973, Congress passed the ESA to prevent species from going extinct. Five years later, Congress amended that legislation, concluding that some extreme cases might require exemptions from the ESA's requirements. So it established the Endangered Species Committee (the "Committee"), which it authorized to grant exemptions to certain ESA requirements. *See* 16 U.S.C. § 1536(e). Particularly relevant to this case, Congress mandated that the Committee must grant an exemption if the Secretary of Defense found it "necessary for reasons of national security." *Id.* § 1536(j).[1]

[1] Last year, the President authorized the Secretary of Defense to use a secondary title of Secretary of War. *See* Restoring the United States Department of War, Exec. Order No. 14,347, § 2(a), 90 Fed. Reg. 43,893, 43,893 (Sep. 5, 2025) ("The Secretary of Defense is authorized the

In the almost half century between the Committee's inception and the events underlying this case, the Committee had granted only two exemptions. And the Secretary of Defense had *never* found that national security made an exemption necessary.

In early 2026, that changed. Secretary of Defense Pete Hegseth found that national security required an exemption for certain oil and gas activities in the Gulf of Mexico, also referred to as the Gulf of America. Although no agency or private entity involved in those activities had applied for an exemption, the Committee quickly convened and granted one anyway.

In response, Plaintiff National Resources Defense Council, Inc. ("NRDC") sued to stop the exemption. NRDC argues that the Committee's decision violated the very statute that created it because, among other things, the Committee cannot issue an exemption without a valid application. Moreover, NRDC warns of dire consequences from the exemption. According to NRDC, oil and gas activity in the Gulf has already threatened the extinction of many species, including Rice's whale—currently one of the most endangered species of whale in the world and one native only to the Gulf.

Recognizing that the Committee's decisions implicate grave issues like these—weighing the existential risk to species against important national interests—Congress implemented robust guardrails for the Committee's decisions and created a path to challenge those decisions in federal court. But not in this Court. Congress directed all challenges to the Committee's exemption decisions to the federal courts of appeals. *See* 16 U.S.C. § 1536(n). If NRDC wishes

---

use of this additional secondary title—the Secretary of War . . . ."). Some of the documents in this case use that title, but the Court uses Secretary of Defense in this opinion for clarity because it is the title Congress used in the relevant statute.

to pursue its challenge to the Committee's exemption decision, it must start there. The Court therefore grants Federal Defendants'[2] motion to dismiss for lack of jurisdiction.[3]

## II. BACKGROUND

The Court draws the following factual background from NRDC's allegations in the Amended Complaint, ECF No. 22. The Court assumes the truth of these allegations for purposes of this motion, as it must. *See Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 619 (D.C. Cir. 2023).

### A. Statutory Framework

Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). It declared a policy that "all Federal departments and agencies shall seek to conserve endangered species and threatened species." *Id.* § 1531(c)(1).

To effectuate these goals, Congress required that federal agencies "consult[ ]" with the the Secretary of the Interior or the Secretary of Commerce to ensure "that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species." *Id.* § 1536(a)(2); *see also id.* § 1532(15) (defining the term "Secretary"). The act also made it "unlawful" to harm endangered species.

---

[2] The Court uses "Federal Defendants" to refer collectively to Defendants Secretary of the Interior Doug (Douglas) Burgum, Secretary of Agriculture Brooke Rollins, Acting Secretary of the Army Adam R. Telle (substituted for former Secretary of the Army Daniel P. Driscoll), Chair of the Council of Economic Advisors Stephen Miran (substituted for Acting Chair of the Council of Economic Advisers Pierre Yared), Administrator of the Environmental Protection Agency Lee M. Zeldin, Administrator of the National Oceanic and Atmospheric Administration Neil Jacobs, and Secretary of Defense Pete Hegseth, all acting in their official capacities.

[3] Intervenor Defendant American Petroleum Institute joined Defendants' motion to dismiss. *See* Notice Joinder Defs.' Mot. Dismiss, ECF No. 34.

*Id.* § 1538(a) (declaring it "unlawful" to "take" listed endangered species of fish, wildlife, or plants); *see id.* § 1532(19) (defining the term "take" to include harm).

Five years after Congress enacted the ESA, the Supreme Court wielded the statute to "halt[ ] work on a dam that had cost $100 million (in 1978 dollars) to save 'a relatively small number of three-inch fish among all the countless millions of species extant.'" *Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 596 (D.C. Cir. 2023) (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 172 (1978)). That decision prompted multiple amendments to the ESA, one of which is relevant here. *See id.*

As part of its amendments to the ESA, Congress created a Committee empowered to grant exemptions to certain of the ESA's requirements. *See* 16 U.S.C. § 1536(e). Because the ability to grant an exemption to the ESA's safeguards for endangered species allowed the Committee to effectively consign those species to extinction, the Committee is "known popularly as 'The God Squad.'" *Portland Audubon Soc. v. Endangered Species Comm.*, 984 F.2d 1534, 1536 (9th Cir. 1993). The Committee is comprised of five permanent members, all heads of government agencies, and two rotating members appointed by the President based on the particular action in question. 16 U.S.C. § 1536(e)(3). Congress made the Committee responsible for "review[ing] any application submitted to it . . . and determin[ing] . . . whether or not to grant an exemption from the requirements of subsection (a)(2)," *id.* § 1536(e)(2)—meaning exempting the action from the ESA's requirement that agencies ensure their actions are "not likely to jeopardize the continued existence of any endangered species," *id.* § 1536(a)(2). The exemption would also free anyone working on the projects from liability for harming endangered species if the harm came from activity "necessary to carry out" the exempted project. *Id.* § 1536(o)(1).

Because exemptions provide such sweeping relief from the ESA's requirements, Congress created a rigorous process for applicants before the Committee may grant an exemption. The process begins, at least generally, with the ordinary consultation with the Secretary of the Interior or of Commerce to determine whether the project is likely to jeopardize the continued existence of an endangered species in the first place. *See id.* § 1536(g)(1). If it is, project participants may apply "for an exemption." *Id.* They must submit the application in writing "not later than 90 days after the completion of the consultation process." *Id.* § 1536(g)(2)(A). The Secretary then determines whether the applicant has met certain threshold requirements—completing the consultation process in good faith, conducting a biological assessment, and "refrain[ing] from making any irreversible or irretrievable commitment[s] of resources" to the project. *Id.* § 1536(g)(3)(A). If the applicant fails any of these requirements, then the Secretary may unilaterally "deny the application," and the applicant may seek judicial review of that denial. *Id.* § 1536(g)(3)(B).

If the applicant passes these threshold requirements, however, they move on to the Committee. *See id.* § 1536(g)(4). The Secretary, "in consultation with the Members of the Committee," must "hold a hearing on the application" and "prepare [a] report" for the Committee. *Id.* The Committee then "shall make a final determination whether or not to grant an exemption." *Id.* § 1536(h)(1). It may grant the exemption if it determines, based on the evidence, that (1) "there are no reasonable and prudent alternatives to the agency action"; (2) "the benefits of such action clearly outweigh the benefits of alternative courses of action" and the "action is in the public interest"'; (3) "the action is of regional or national significance"; and (4) "neither the Federal agency concerned nor the exemption applicant made any irreversible or irretrievable commitment of resources." *Id.* § 1536(h)(1)(A). The Committee must also

establish "reasonable mitigation and enhancement measures . . . as are necessary and appropriate to minimize the adverse effects of the agency action upon the endangered species." *Id.* § 1536(h)(1)(B). The Committee's "meetings and records . . . shall be open to the public." *Id.* § 1536(e)(5)(D).

Although the Committee is the only entity authorized to grant an exemption, Congress constrained the Committee's authority to grant or deny exemptions in specific circumstances implicating disasters or foreign affairs. If the Secretary of State "certifies" that granting an exemption would result in a "violation of an international treaty obligation or other international obligation," the Committee "shall be prohibited from considering" the application. *Id.* § 1536(i). Or, if the President declares "a major disaster area . . . , the President is authorized to make the determinations required by subsections (g) and (h)" for projects in those areas and "the Committee shall accept th[ose] determinations" "[n]otwithstanding any other provision." *Id.* § 1536(p). Finally, and most relevant to this case, "[n]otwithstanding any other provision of this chapter, the Committee *shall grant* an exemption for any agency action if the Secretary of Defense finds that such exemption is necessary for reasons of national security." *Id.* § 1536(j) (emphasis added).

To enforce the exemption process's various requirements, Congress expressly created a path to judicial review of Committee decisions. "*Any person* . . . may obtain judicial review, under [the Administrative Procedure Act ("APA")], of *any decision* of the Endangered Species Committee under subsection (h) . . . ." *Id.* § 1536(n) (emphases added). But Congress directed that plaintiffs must bring those challenges "in the United States Court of Appeals." *Id.*

### B. Factual Background

The exemption at issue in this case concerns oil and gas activity in the Gulf of Mexico. *See* Am. Compl. ¶¶ 1–2. NRDC alleges that the Gulf is "among the most productive and biodiverse ecosystems in the United States, providing a home to thousands of species." *Id.* ¶ 2. It "is the exclusive home of the critically endangered Rice's whale, of which fewer than 100 individuals remain on Earth." *Id.* ¶ 54. According to NRDC, "the loss of even a single breeding female could drive the species into extinction." *Id.*

Oil and gas activities in the Gulf threaten the continued survival of Gulf species like the Rice's whale. In 2025, a government report from the National Marine Fisheries Service concluded that "a federal oil and gas program in the Gulf [was] 'likely to jeopardize the continued existence of the Rice's whale.'" *Id.* ¶ 69 (internal quotation omitted). The report proposed alternatives that would allow the program to proceed without risking extinction of the Rice's whale. *See id.* ¶ 70. Unsatisfied with the report, and similar reports by other agencies, both environmental and industry groups sued over the manner and scope of oil and gas activities in the Gulf. *See id.* ¶¶ 73–74.

This ESA litigation prompted Secretary of Defense Pete Hegseth to send a letter in March 2026 to the Committee asserting that the litigation was "threaten[ing] to halt oil and gas production in the Gulf." *Id.*, Ex. E at 1, ECF No. 22-5. He declared that this, in turn, "threaten[ed] national security by preventing the agencies that regulate oil and gas activities from realizing the Gulf's full developmental potential." *Id.* He therefore "found it necessary for reasons of national security to exempt Gulf oil and gas activities from the ESA's requirements" and "request[ed] that the Endangered Species Committee . . . grant an exemption for" the oil and gas activities in the Gulf. *Id.*

Secretary Hegseth's letter included an attached memorandum with national security findings. *See id.* at 4. The memorandum explained that "[t]he United States relies on domestic oil production to support military operations and readiness" and that disrupting the supply would "benefit our adversaries and hurt our allies" by allowing "countries like Russia and Iran [to] generate more revenue from their own oil exports," thereby "blunt[ing] U.S. sanctions efforts and bolster[ing] these countries' economies and geopolitical standing." *Id.* at 5.

Three days after Secretary Hegseth sent his letter, the Committee gave notice that it would convene a meeting at the end of the month to address the request. Am. Compl. ¶ 115. Although the relevant agencies engaged in the consultation required by 16 U.S.C. § 1536(a)(2), NRDC alleges that no designated agency concluded that both the "proposed agency action would likely 'jeopardize' the continued existence of listed species or critical habitat[s], *and* that no 'reasonable and prudent alternatives' to the proposed action exist to avoid jeopardy." *Id.* ¶ 116. NRDC also alleges that the Committee never "receive[d] an 'application' for an exemption." *Id.* Because there was no application, the relevant secretary did not make any initial determination about the threshold requirements for an application under 16 U.S.C. § 1536(g)(2), nor did the secretary submit a report to the Committee under 16 U.S.C. § 1536(g)(5). *Id.* ¶ 117.

Before the Committee convened to discuss the exemption, NRDC sent Secretary of the Interior Douglas Burgum two letters explaining why, in NRDC's view, the Committee could not convene, much less grant the requested exemption. *See id.* ¶¶ 118–19. Apparently unpersuaded by NRDC's analysis, six members of the Committee convened alongside Secretary Hegseth and unanimously voted in favor of granting the requested exemption. *Id.* ¶¶ 120, 124. Multiple Committee members explained that, in their view, Secretary Hegseth's national-security finding precluded them from making any other decision, although they clarified that they agreed with his

finding in any event. *See id.* ¶ 122. No one mentioned a report or the considerations enumerated in Section 1536(h)(1). *See id.* ¶ 123.

In its order, the Committee "grant[ed] an exemption for Gulf of America Oil and Gas Activities," which referred to "all oil and gas exploration, development, and production activities associated with" various federal programs in the Gulf. Endangered Species Committee Decision and Order, 91 Fed. Reg. 16,966, 16,966–67 (Apr. 3, 2026); *see also* Am. Compl. ¶ 134. Although the Committee granted the exemption, it insisted that the activities must still adhere to the "avoidance or minimization measures described" in prior federal reports, which were aimed at mitigating harm to endangered species. 91 Fed. Reg. at 16,967.

The Committee explained that it granted the exemption "pursuant to subsection (h)" and thus "the federal agencies implementing" the programs would not be "required to comply with the section 7(a)(2) procedural consultation and substantive 'jeopardy' and 'adverse modification mandates.'" *Id.* at 16,966. Nor would "any action that would ordinarily be considered a take . . . be prohibited under the Endangered Species Act," a reference to subsection (o)(2). *Id.* The Committee expressly "recognize[d] that the Endangered Species Act sets out a process for the Committee to consider for an exemption and standards for the Committee to apply when considering an application." *Id.* (citing 16 U.S.C. § 1536(g), (h)(1)). But the Committee concluded "that these other provisions of Section 7, including the application requirements and standards, do not apply when the Secretary of War finds that an exemption is necessary for reasons of national security." *Id.* The Committee then explained that any person seeking judicial review could do so "exclusively in the U.S. Courts of Appeals for the Fifth or Eleventh Circuits." *Id.* at 16,967.

After granting the exemption, the Committee published four documents relating to its decision. *See* Am. Compl. ¶¶ 126–30. These are the only documents the Committee made public. *Id.* ¶ 131. NRDC alleges that the Committee never undertook an analysis under the National Environmental Policy Act ("NEPA") and did not prepare an environmental impact statement for the exemption. *See id.* ¶¶ 132–33.

**C. Procedural Posture**

The Committee's exemption decision generated much litigation. Even before the Committee made its final decision, one environmental group sued in this Court seeking a temporary restraining order enjoining the Committee from even holding its meeting. *See* Pl.'s Mot. TRO, *Ctr. for Biological Diversity v. Burgum*, No. 26-cv-940, ECF No. 9 (D.D.C. Mar. 19, 2026). This Court denied that motion. *See* Order Denying Pl.'s Mot. TRO, *Ctr. for Biological Diversity v. Burgum*, No. 26-cv-940, ECF No. 17 (D.D.C. Mar. 27, 2026). The plaintiff then amended its complaint and raised similar claims to those that NRDC brings here; and other environmental groups brought yet another case before this Court covering similar ground, bringing the total to three cases (including the present action). *See* Am. Compl., *Ctr. for Biological Diversity v. Burgum*, No. 26-cv-940, ECF No. 18 (D.D.C. Mar. 31, 2026); Am. Compl., *Healthy Gulf v. Burgum*, No. 26-cv-1118, ECF No. 19 (D.D.C. May 26, 2026).

Beyond proceedings in this Court, there are also parallel proceedings in the courts of appeals. The Judicial Panel on Multidistrict Litigation consolidated those petitions into a single proceeding. *See* Consolidation Order, *Am. Energy v. Burgum*, No. 26-60240, ECF No. 9 (5th Cir. Apr. 21, 2026). That consolidation included, on the one hand, petitions by industry groups seeking to expand the exemption by attacking the mitigation requirements that the Committee implemented when it granted the exemption and, on the other, a protective petition filed by

NRDC in the D.C. Circuit seeking to undo the exemption altogether. *See id.* at 2. NRDC ultimately dismissed its petition voluntarily. *See* Clerk Order, *Am. Energy v. Burgum*, 26-60240, ECF No. 92 (5th Cir. June 30, 2026).

In this case, NRDC, an environmental group with a mission "to safeguard the earth," sued the Federal Defendants in district court to challenge the Secretary of Defense's national-security finding and the Committee's exemption decision. *See id.* ¶¶ 1, 12. The Federal Defendants, in response, move to dismiss all of NRDC's claims under Fed. R. Civ. P. 12(b)(1), arguing that NRDC needed to raise them in the appropriate courts of appeals, not here. *See* Defs.' Mem. P. & A. Supp. Mot. Dismiss ("Defs.' Mot.") at 1, ECF No. 28-1.[4]

## III. LEGAL STANDARD

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(1), the plaintiff "must state a plausible claim" that this Court has jurisdiction over the case. *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2017). While determining whether the plaintiff's claim is plausible, the Court must "accept[ ] the allegations of the complaint as true." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015). But the Court need "not assume the truth of legal conclusions." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). The Court may therefore resolve contested issues of statutory interpretation without deference to either side. *See Kōloa Rum Co. v. Noem*, 822 F. Supp. 3d 8, 34 (D.D.C. 2026).

[4] After ordinary briefing completed, NRDC sought "leave to file a brief surreply addressing Defendants' claim preclusion argument." Pl.'s Mot. Leave File Surreply Opp'n Defs.' Mot. Dismiss at 1, ECF No. 37. Because the Court does not reach the claim-preclusion argument, the surreply is unnecessary, and the Court denies NRDC's motion. *See UnitedHealthcare Ins. v. Azar*, 316 F. Supp. 3d 339, 349 (D.D.C. 2018).

## IV. ANALYSIS

The jurisdictional dispute in this case centers on whether the Committee granted the exemption under subsection (h) or subsection (j). If the Committee acted under subsection (h), then NRDC must challenge that decision in the courts of appeals. *See* 16 U.S.C. § 1536(n). Otherwise, review might lie in this Court.

### A.

Before even reaching that threshold issue, however, NRDC attempts to forestall the Court's jurisdictional determination by arguing that even this preliminary question is premature. *See* Pl. NRDC's Mem. P. & A. Opp'n Defs.' Mot. Dismiss ("Pl.'s Opp'n") at 11–13, ECF No. 32. It argues that (1) the determination is not truly jurisdictional and (2) even if the determination were jurisdictional, it is too intertwined with the merits for resolution now. *See id.* The Court disagrees.

First, the issue of whether the Committee acted under subsection (h) or not bears jurisdictional weight. Congress placed challenges to decisions made under subsection (h) within a special statutory review scheme. Under that scheme, rather than allowing plaintiffs to proceed in district court first, Congress provided that a plaintiff "may obtain judicial review . . . of any decision of the Endangered Species Committee under subsection (h) in [a specified] United States Court of Appeals." 16 U.S.C. § 1536(n). Although Congress wrote only that plaintiffs "*may* obtain judicial review" in the courts of appeals, courts have long interpreted such provisions to mean that a plaintiff may bring their challenges in the court of appeals *and not elsewhere*. *See Wagner v. Fed. Election Comm'n*, 717 F.3d 1007, 1012–13 & n.5 (D.C. Cir. 2013) (per curiam) (holding that a similarly worded provision conferred exclusive jurisdiction on the *en banc* court and therefore ousted other tribunals of jurisdiction) (collecting cases).

NRDC counters that this statutory review scheme addresses only whether it pleaded a valid cause of action than whether this Court maintains jurisdiction over the case, Pl.'s Opp'n at 12, but the Supreme Court has held otherwise. When Congress creates "[a] special statutory review scheme" like this one by "specifying a different method to resolve [certain] claims about agency action," such as providing review directly in the courts of appeals, it "implicitly" "preclude[s] district courts from exercising jurisdiction over [those] challenges." *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 185 (2023). In other words, these schemes implicitly "oust[ ] district courts of jurisdiction." *Id.* at 186. Because Congress divested this Court of jurisdiction through its special statutory review scheme, rather than merely cutting off a cause of action, the determination of whether that statutory review scheme covers NRDC's claims here implicates the Court's jurisdiction.[5]

Second, the Court cannot defer deciding the jurisdictional question. NRDC claims that the Court should not determine its jurisdiction on a motion to dismiss because the jurisdictional question is "so closely interwoven with the merits." Pl.'s Opp'n at 12. But that practice of deferring a jurisdictional decision applies only when the court would be required to "rule on disputed jurisdictional *facts*." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 198 (D.C. Cir. 1992) (emphasis added). In this decision, the Court does not rule on any disputed facts. Rather, it assumes the truth of NRDC's alleged facts. For example, the Court takes as true NRDC's allegations that the Committee did not receive a valid application for an exemption, that the Secretary of the Interior "did not make the initial determinations as to whether the agencies

[5] NRDC makes much of the fact that the Federal Defendants do not dispute NRDC's standing. *See* Pl.'s Opp'n at 11. But standing is not the only jurisdictional constraint on federal courts. Congress may also divest federal courts of jurisdiction. *See Hain Celestial Grp., Inc. v. Palmquist*, 607 U.S. 421, 424 (2026) ("Federal courts are courts of limited jurisdiction and generally can resolve only the cases that Congress grants them power to hear.").

carried out their consultation responsibilities" or issue an initial report, and that the Committee did not consider alternatives. Am. Compl. ¶¶ 116–17, 123.

The only aspect of NRDC's claim that the Court analyzes at this stage is NRDC's legal conclusion that the Committee's decision was not made under subsection (h). Courts need not accept "legal conclusions" on a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). And NRDC's claim about the statutory authority undergirding the Committee's decision is a legal conclusion because, as the analysis below demonstrates, it turns entirely on statutory interpretation, which the Court may resolve on a motion to dismiss. *See Kōloa Rum Co. v. Noem*, 822 F. Supp. 3d 8, 34 (D.D.C. 2026) (resolving a dispute at the motion-to-dismiss stage because it "turn[ed] on the interpretation of a century-old statute").

**B.**

Having concluded that it may (indeed, must) do so, the Court now addresses the jurisdictional issue: whether the Committee granted the exemption under subsection (h), in which case only the courts of appeals may review the Committee's decision, and this Court lacks jurisdiction over NRDC's claims. *See* 16 U.S.C. § 1536(n). The parties agree that the *reason* the Committee granted the exemption is because the Secretary of Defense found that an exemption was "necessary for reasons of national security," and, when that happens, subsection (j) requires the Committee to grant the exemption. 16 U.S.C. § 1536(j). In other words, the rule of decision (that the exemption must be granted) came from subsection (j).

But the parties dispute under which authority the Committee granted the exemption. The Federal Defendants argue that the Committee's only authority to grant an exemption comes from subsection (h), so when the Committee grants an exemption it necessarily does so under subsection (h) or not at all. *See* Defs.' Mot. at 13 ("The only exemption in Section 7 is the

exemption in Section 7(h).”). NRDC, however, contends that Congress created multiple paths for the Committee to grant an exemption, including both subsections (h) and (j). *See* Pl.’s Opp’n at 25. In NRDC’s telling, because the Committee relied on subsection (j) and did not follow any of the procedures required under subsection (h), it cannot have made its decision under subsection (h), and this Court therefore has jurisdiction. *See id.* at 19.

**1.**

The Court concludes that the Federal Defendants have the better argument. Although subsection (j) provides the rule of decision for the Committee in cases involving a national-security determination by the Secretary of Defense, subsection (h) is the only legal authority under which the Committee actually grants exemptions. NRDC must therefore challenge the Committee’s decision in the courts of appeals.

To understand which authority the Committee used to grant the exemption, look first to the portion of the statute where Congress created the Committee and established its authority to grant exemptions. Subsection (e) “establishe[s] a committee to be known as the Endangered Species Committee.” 16 U.S.C. § 1536(e)(1). In the next paragraph, the statute describes the Committee’s central task. “The Committee shall review any application submitted to it pursuant to this section and determine . . . whether or not to grant an exemption from the requirements of subsection (a)(2)”—meaning the requirements to avoid harming endangered or threatened species. *Id.* § 1536(a)(2), (e)(2). When founding the Committee, Congress did not empower it to grant any other types of exemptions. The Committee can only grant exemptions to “the requirements of subsection (a)(2).” *Id.* § 1536(e)(2). So when subsection (j) contemplates the Committee “grant[ing] an exemption for an agency action” but does not specify what kind of

exemption, *id.* § 1536(j), it naturally speaks of an exemption to the requirements of subsection (a)(2).

That raises the question of how the Committee grants an exemption to subsection (a)(2). It does so exclusively through subsection (h). The same provision that establishes the Committee's authority to grant exemptions in the first place insists that the Committee may grant the exemptions only "in accordance with subsection (h)." *Id.* § 1536(e)(2). And subsection (a)(2) reiterates the point. Its requirements apply "unless [the] agency has been granted an exemption for [its] action by the Committee pursuant to subsection (h)." *Id.* § 1536(a)(2). Both the provision establishing the Committee's power to grant exemptions and the provision covering the requirement being exempted refer expressly, and exclusively, to subsection (h).

These repeated references to subsection (h) should be unsurprising because subsection (h), helpfully titled "Grant of exemption," sets forth the only procedures for granting an exemption in all of Section 1536. It establishes a timeline ("within 30 days of receiving the report of the Secretary"), a voting scheme ("a vote of not less than five of its members voting in person"), and other procedures. *Id.* By contrast, subsection (j) says nothing about the process for granting an exemption. *See id.* § 1536(j). The absence of any details in subsection (j) makes sense if Congress assumed that exemptions implicating subsection (j) would still proceed through subsection (h), which already had a built-in process for exemptions. But it would raise a host of unanswered questions if, as NRDC posits, Congress intended to establish a parallel exemption process through subsection (j) divorced from subsection (h)'s procedures. *See* Pl.'s Opp'n at 25 (arguing that "subsection (j) creates an additional path wholly independent of subsection (h)").

Thus, all roads lead to subsection (h). The only exemptions the Committee can grant are exemptions from the requirements of paragraph (a)(2), and it may only grant those exemptions "in accordance with subsection (h)." *Id.* § 1536(e)(2). Subsection (h), in turn, contains the only process that the statute establishes for granting exemptions. So when the Committee grants an exemption, it necessarily does so under subsection (h).

Two nearby provisions confirm this interpretation. First, even where Congress has lowered the procedural requirements for exemptions, such as in cases of emergency, it still routes those exemptions through subsection (h). Under subsection (p), Congress allows the President to quickly grant exemptions in areas afflicted by a "major disaster" in "an emergency situation which does not allow the ordinary procedures of this section to be followed." 16 U.S.C. § 1536(p). But in doing so, Congress specified that the President was "authorized to make the determinations required by subsections (g) and (h)." *Id.* That language makes sense only if Congress assumed that it would otherwise be necessary for the Committee to make those determinations, meaning it assumed the exemption would otherwise run through subsection (h). And as the Federal Defendants point out, Congress made this assumption even though, much like subsection (j), Congress instructed that "[n]otwithstanding any other provision in this section, the Committee shall accept the determinations of the President." *Id.*; *see* Fed. Def.'s Reply Supp. Mot. Dismiss at 9, ECF No. 35. In Congress's eyes, the Committee's limited substantive role did not change whether the exemption ultimately traveled through subsection (h).

NRDC draws the opposite conclusion from subsection (p). It argues that because subsection (p) explicitly provides that the President must make the necessary determinations under subsection (h), while subsection (j) never mentions subsection (h), the Court should infer from subsection (j)'s silence that it does not run through subsection (h). *See* Pl.'s Opp'n at 28.

That argument might work if subsection (p) expressly stated that it was "subject to subsection (h)" or must be "in accordance with subsection (h)." But it does not. It merely specifies *who* must make the determinations required by subsection (h), a clarification that is only necessary because Congress assumed, without needing to say so, that subsection (h) applied in the first place and therefore the default would have been for the Committee to make those determinations. *See* 16 U.S.C. § 1536(p). In contrast, that clarifying language is unnecessary in subsection (j) because, to the extent any such determinations are necessary, they are still made by the Committee, as is the default.

The second neighboring provision confirming that all Committee exemption decisions run through subsection (h) is subsection (o). In that provision, Congress tied vital protections for exempted activities to subsection (h) and only subsection (h). It provides that "any activity which is necessary to carry out" "any agency action for which an exemption is granted . . . shall not be considered to be a taking of any endangered species or threatened species." *Id.* § 1536(o)(1). In simpler terms, it protects anyone acting under a valid exemption from liability for harming endangered species, among other things. *See id.*; *see, e.g.*, *id.* § 1538(a)(1)(B)–(C) (two provisions protected against by subsection (o) which make it unlawful to "take" certain endangered and threatened species). But subsection (o) protects only "exemption[s] granted under subsection (h)." *Id.* § 1536(o)(1). So if, as NRDC would have it, an exemption granted because of national-security concerns were not an exemption granted under subsection (h), anyone working on a project would still risk liability for harming endangered species *even though they were covered by the exemption*. That would seem to defeat the point of subsection (j), which Congress drafted to allow projects of great national-security importance to proceed notwithstanding their effect on endangered species.

NRDC attempts to reconcile this provision with its interpretation by arguing that it "makes sense" that subsection (o)(1) would not apply to exemptions granted under subsection (j) because the Secretary of Defense "could find that . . . a full exemption for every species that might be affected is not necessary." Pl.'s Opp'n at 27. Nothing in subsection (h) prevents the Secretary of Defense, or perhaps the Committee, from appropriately limiting the scope of the exemption so that it does not cover every species if doing so is not necessary. They could simply craft the exemption in a way that specifies what counts as an "activity which is necessary to carry out" the exempted action. 16 U.S.C. § 1536(o)(1). But unless the "exemption is granted under subsection (h)," the exemption covers *no* takings of *any* endangered species because the only authority for insulating participants from such liability comes from subsection (o)(1), which applies only to exemptions granted under subsection (h). *Id.*

**2.**

Despite this statutory scheme, NRDC raises three counterarguments for why this Court may review the Committee's decision. The Court addresses each in turn.

*First*, NRDC argues that Congress's statutory scheme does not channel all exemption decisions through subsection (h) but rather empowers the Committee to grant exemptions under subsections (h), (j), or (p). *See* Pl.'s Opp'n at 24–25. The Court has already addressed this interpretation, but NRDC's subsection (j) argument merits further discussion. By its terms, subsection (j) restricts the Committee's authority, forcing the Committee to grant exemptions it might otherwise deny. *See* 16 U.S.C. § 1536(j) (providing that "the Committee shall grant [the] exemption"). NRDC, however, interprets this provision to expand the Committee's power, vesting the Committee with newfound authority to grant exemptions outside the carefully limited authority that Congress granted it in the subsection creating the Committee. *See id.* § 1536(e)(2)

(authorizing the Committee to decide "whether or not to grant an exemption" but only "in accordance with subsection (h)"). Because Congress never mentioned this purported power anywhere in the subsection creating the Committee, or anywhere else in Section 1536, the Court concludes that reading subsection (j) as an implicit grant of a new power to the Committee stretches the text beyond its plain meaning.

In support of its argument that not all exemption decisions fall under subsection (h), NRDC also points to exemption decisions that do not involve the Committee, which NRDC argues are reviewable in district court. *See* Pl.'s Opp'n at 24. For example, the Secretaries of the Interior or Commerce may unilaterally deny an application if it does not meet the threshold criteria for an exemption application. 16 U.S.C. § 1536(g)(3)(B). Similarly, if the Secretary of State "certifies" that the granting of an exemption would result in the "violation of an international treaty obligation or other international obligation of the United States," then "the Committee shall be prohibited from considering [the] exemption" application. *Id.* § 1536(i). NRDC posits that district courts may review these decisions. *See* Pl.'s Opp'n at 24.

Even assuming these decisions may be reviewed in district court, whether a district court can review exemption denials not made by the Committee reveals nothing about which court must review exemption decisions made by the Committee. Congress gave only the Committee the power to *grant* exemptions, decisions which are made under subsection (h), and Congress provided for direct review in the courts of appeals of "any decision of the Endangered Species Committee under subsection (h)." 16 U.S.C. § 1536(n). Because NRDC challenges the Committee's decision to grant an exemption, the Court need not decide who may review

exemption-related decisions made by others. After all, even subsection (j) states that "*the Committee* shall grant [the] exemption." *Id.* § 1536(j) (emphasis added).[6]

*Second*, NRDC contends that the Court must construe the Committee as having somehow granted the exemption under subsection (j) because no one had applied for an exemption and subsection (h) presupposes the existence of an exemption application. *See* Pl.'s Opp'n at 16. As NRDC sees it, the Committee did not comply with any of subsection (h)'s procedural requirements, or many of the statute's other procedural requirements for that matter, and

[6] NRDC also argues that the rule against surplusage counsels in favor of interpreting Section 1536 to create multiple paths to exemptions. *See* Pl.'s Opp'n at 29. Some provisions, like subsections (a)(2), (e)(2), (n), and (o)(1), expressly reference exemptions granted "pursuant to subsection (h)" or use similar phrasing, while others, like subsections (e)(3)(6), (i), (j), and (j), simply discuss exemptions with no mention of subsection (h). NRDC points out that, if all exemptions are exemptions under subsection (h), then Congress could have gotten away without ever specifying that the exemptions fell under subsection (h) in any of these provisions because it would be implied. *See id.*

It is a fair point, but, as surplusage arguments go, it is a fairly weak point. The Supreme Court has described the rule against surplusage as a "preference," which "is not absolute." *Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004) (declining to follow the rule against surplusage). The cannon is most persuasive where one "interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) (declining, as well, to follow the rule against surplusage); *see Yates v. United States*, 574 U.S. 528, 562 (2015) (Kagan, J., dissenting) (arguing against applying the rule against surplusage despite "significant overlap" because the statutory provisions still had some independent meaning); *see also Czajka v. Holt Graphic Arts, Inc.*, 310 A.3d 1051, 1068–69 (D.C. 2024) (en banc) (Shanker, J., dissenting) (discussing "two distinct iterations of the rule against surplusage" and explaining that it carries less force when it merely makes a few words in a provision redundant). Here, however, interpreting subsection (h) to cover all exemption decisions does not render any subsection meaningless, or even less effectual. It just means Congress could perhaps have saved a word or two. Congress may have been perfectly willing to spill that extra ink "to remove any doubt." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226 (2008) (rejecting rule against surplusage). Therefore, the Court concludes that the preference for avoiding surplusage does not overcome all the other textual clues indicating that all exemptions run through subsection (h).

therefore acted "beyond the bounds of [its] statutory authority under subsection (h)." *Id.* at 16, 19; *see also id.* at 30.[7]

That argument flips the analysis on its head. How the Committee acted in this case does not change Congress's statutory scheme. Congress created only one type of exemption, and it funneled challenges to those exemptions to the courts of appeals. If, as NRDC argues, the Committee failed to follow the procedures of subsection (h), then an appellate court may vacate the Committee's decision. But Congress has divested district courts, like this Court, of jurisdiction to overturn the Committee's exemption decisions. *See* 16 U.S.C. § 1536(n). This Court therefore takes no position on whether the Committee *complied* with subsection (h) or any other procedural requirements or how the notwithstanding clause in subsection (j) might modify the applicable requirements. Those questions await the courts of appeals.

The Supreme Court drove this point home last term. In *Mullin v. Doe*, 609 U.S. 324 (2026), the Supreme Court considered a provision that barred "'judicial review of any determination . . . with respect to . . . the termination' of a [Temporary Protected Status ("TPS")] designation." *Id.* at 328 (ellipses in original) (quoting 8 U.S.C. § 1254a(b)(5)(A)). The Secretary of Homeland Security's authority to review TPS designations, however, came with a precondition. She could review the TPS designations only after "consult[ing] with appropriate agencies of the Government." 8 U.S.C. § 1254a(b)(3)(A); *see Mullin*, 609 U.S. at 332. In

[7] It is not entirely clear that the Committee avoided all of subsection (h)'s requirements. For example, the Committee left in place mitigation measures approved by other agencies. *See* 91 Fed. Reg. at 16,967. That may have been an effort to comply with 16 U.S.C. § 1536(h)(1)'s requirement to "establish[ ] such mitigation and enhancement measures . . . as are necessary and appropriate." The mitigation measures were apparently onerous enough to have prompted industry groups to sue over them. *See* Pet.'s Br., *Am. Energy v. Burgum*, No. 26-60240, ECF No. 94 (5th Cir. July 15, 2026). But the Court need not decide to what extent the Committee complied with subsection (h) for this case.

attempting to evade the judicial-review bar, the plaintiffs argued, among other things, that "the Secretary had not properly consulted other Government agencies," thereby failing a prerequisite to the judicial-review bar. *Mullin*, 609 U.S. at 338. The Supreme Court rejected that argument, holding that this type of claim, which it classified as raising "alleged procedural errors," still fell within the judicial-review bar. *Id.* at 340–42.

Thus, to the extent NRDC argues that the jurisdictional provision here cannot apply because the Committee flunked a prerequisite to its authority to grant a subsection (h) exemption—such as the existence of a valid application—their argument runs straight into *Mullin*. As in *Mullin*, the jurisdictional provision here embraces "all those steps [that] were part of the process that led to [the] final decision" to grant the exemption. *Id.* at 339. It covers not just the Committee's final determination but "*any* decision . . . under subsection (h)." 16 U.S.C. § 1536(n) (emphasis added).[8]

[8] While *Mullin* involved a provision that denied judicial review entirely, this case involves a provision that merely channels review to a different Article III court. This case therefore does not require the Court to decide whether, if subsection (n) stripped judicial review entirely, the "strong presumption in favor of judicial review of administrative action" would demand a more searching inquiry. *Salinas v. U.S. R.R. Ret. Bd.*, 592 U.S. 188, 197 (2021) (quoting *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015)); *see also Mullin*, 609 U.S. at 362–63 (Kagan, J., dissenting) (lamenting that the majority's decision "ignore[s]" this presumption and "makes *everything* in the statute precatory, including procedural requisites whose enforcement would seem to fall smack in the middle of the judicial wheelhouse"); *cf. COMSAT Corp. v. Fed. Commc'n Comm'n*, 144 F.3d 223, 224–25 (D.C. Cir. 1997).

Relatedly, if Congress had established multiple ways for the Committee to grant exemptions based on the procedures the Committee followed, and those different types of exemptions were reviewable in different courts, then the procedures utilized might be relevant to determining where jurisdiction lay. *See, e.g.*, *Am. Soybean Ass'n v. Regan*, 77 F.4th 873, 877 (D.C. Cir. 2023) (holding that direct-review provision did not apply where the statute conditioned direct review by the courts of appeals on a public hearing and the agency's notice did not meet "an essential precondition to" a public hearing). Here, however, the Court has concluded that Congress created only one path for the Committee to grant an exemption, so the procedures the Committee actually followed do not determine which procedures apply and thus where review lies.

Finally, and in a similar vein, NRDC urges the Court to ignore Congress's jurisdictional command because, by circumventing the statute's procedural requirements, the Committee failed to develop any factual record, making "comprehensive appellate review in the first instance impossible." Pl.'s Opp'n at 21. But nothing in the text of Congress's review scheme hinges on the record the Committee created. *See* 16 U.S.C. § 1536(n). And if an appellate court concludes that it needs a more robust record to review the Committee's decision, it may remand the decision for the Committee to conduct further proceedings. *See, e.g.*, *Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1536–37 (9th Cir. 1993) (holding that the Endangered Species Committee failed to provide the full record and "remand[ing] the matter to the Committee for an evidentiary hearing"); *see also, e.g.*, *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 416 (D.C. Cir. 2011) ("Where we cannot evaluate the challenged agency action on the basis of the record before us, the proper course is to remand to the agency for additional investigation or explanation." (cleaned up)).

## V. CONCLUSION

The Court therefore concludes that the Committee made its decision under subsection (h), and NRDC can only challenge a decision made under subsection (h) in the courts of appeals. Accordingly, the Court lacks jurisdiction over NRDC's claims and grants the Federal Defendants' motion to dismiss in its entirety.[9] An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

---

[9] Although NRDC raises two additional claims as well—a challenge to the Secretary of Defense's national-security determination relating to the exemption (Count I) and a NEPA claim (Count III), *see* Am. Compl. ¶¶ 140–43, 147–52—the Federal Defendants move to dismiss both of those counts too, and NRDC makes no effort to separately defend or differentiate them from its challenge to the Committee's exemption decision. Indeed, NRDC never mentions "NEPA" in the analysis section of its brief. The Court therefore deems NRDC to have conceded that the Court lacks jurisdiction over these claims to the extent it lacks jurisdiction over claims

Dated: November 16, 2026

RUDOLPH CONTRERAS
United States District Judge

---

challenging the Committee's decision. *See Bancoult v. McNamara*, 227 F. Supp. 2d 144 (D.D.C. 2002) ("[I]f the opposing party files a responsive memorandum, but fails to address certain arguments made by the moving party, the court may treat those arguments as conceded, even when the result is dismissal of the entire case."); *Bronner ex rel. Am. Stud. Ass'n v. Duggan*, 962 F.3d 596,611 (D.C. Cir. 2020) ("Arguments in favor of subject matter jurisdiction can be waived by inattention or deliberate choice." (cleaned up)).